IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

ELIZABETH GOODWIN, etc.,    )
                            )
            Plaintiff,      )
                            )
      v.                    )    Case No. 1:15-CV-0027
                            )    Judge Donald C. Nugent
CITY OF CLEVELAND, et al.,  )
                            )
            Defendants.     )

- - -

THE DEPOSITION OF OFFICER ANTONIO MUNIZ

FRIDAY, FEBRUARY 26, 2016

- - -

The deposition of OFFICER ANTONIO MUNIZ, a
witness, called for examination by the Plaintiff, under
the Federal Rules of Civil Procedure, taken before me,
Kristine M. Esber, a Notary Public in and for the State
of Ohio, pursuant to notice, at Cleveland City Hall,
Department of Law, 601 Lakeside Avenue, Cleveland,
Ohio, commencing at 9:00 a.m., the day and date above
set forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK, SUITE 440
1360 WEST NINTH STREET
CLEVELAND, OH  44113
(216) 621-2550
FAX (216) 621-3377
1-888-595-1970

Page 2

1    APPEARANCES:

2    On behalf of the Plaintiff:

3        ALPHONSE A. GERHARDSTEIN, ESQ.
         Gerhardstein & Branch Co., LPA
4        432 Walnut Street, Suite 400
         Cincinnati, Ohio 45202
5        (513) 621-9100

6        DAVID B. MALIK, ESQ.
         The Law Office of David B. Malik
7        8437 Mayfield Road, Suite 101
         Chesterland, Ohio  44026
8        (440) 729-8260

9

10   On behalf of the Defendant City of Cleveland:

11       SUSAN BUNGARD, ESQ.
         Assistant Law Director
12       Department of Law
         601 Lakeside Avenue, Room 106
13       Cleveland, Ohio  44114
         (216) 664-2310
14

15   On behalf of the Defendants Scott Aldridge and Bryan
     Myers:
16

17       JOHN P. BACEVICE, JR., ESQ.
         Assistant Law Director
18       Department of Law
         601 Lakeside Avenue, Room 106
19       Cleveland, Ohio  44114
         (216) 664-2807
20

21                      -  -  -

22

23

24

25

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

1                              INDEX

2                                              PAGES

3    CROSS-EXAMINATION BY

4         MR. GERHARDSTEIN                        4

5

6                           - - -

7

8    PLAINTIFF'S EXHIBITS MARKED

9         6                                      48

10

11                          - - -

12

13   OBJECTIONS BY

14        MR. BACEVICE        5, 17(2), 18(2), 19(2), 20(4),
                              21(2), 22(3), 23(2), 25, 26,
15                            29(3), 30(2), 32(2), 42, 53(3),
                              54, 64, 65(3), 66, 67(2)
16

17        MS. BUNGARD         17, 45, 67

18

19                          - - -

20

21

22

23

24

25

1              OFFICER ANTONIO MUNIZ

2    a witness, called for examination by the Plaintiff,

3    under the Rules, having been first duly sworn, as

4    hereinafter certified, deposed and said as follows:

5              CROSS-EXAMINATION

6    BY MR. GERHARDSTEIN:

7    Q.     Good morning.

8    **A.     Good morning.**

9    Q.     We met out by the reception area.  My name is Al

10   Gerhardstein.  We're here for a deposition on the

11   Tanesha Anderson case.

12        State your name, please.

13   **A.     Antonio Muniz.**

14   Q.     Have you ever been deposed before?

15   **A.     No.**

16   Q.     Okay.  So I assume your lawyer has told you that

17   I'll ask questions.  You're under oath, but if you

18   don't understand the question, just ask me to clarify.

19   If you need a break, that's fine.

20        You are not a defendant.  You're simply a

21   witness in the case.  And if you need any clarification

22   on anything we're doing, just speak up.  Okay?

23   **A.     (Indicating).**

24   Q.     Okay.  You have to say yes or no, --

25   **A.     Yes, yes.**

1  Q.      -- because she's writing everything down.   All

2  right?

3  **A.      Okay.   Sure.**

4  Q.      All right.   Where do you work?

5  **A.      City of Cleveland.**

6  Q.      And what's your job?

7  **A.      Police officer.**

8  Q.      Your date of higher was May 4th of '09?

9  **A.      Yes.**

10  Q.      What's the highest level of education you have?

11  **A.      GED.   High school.**

12  Q.      Have you ever been disciplined as a Cleveland

13  Police Officer?

14          MR. BACEVICE:                    Object.

15  **A.      No.**

16  Q.      Have you applied for any promotions?

17  **A.      Nope.**

18  Q.      What's your current assignment?

19  **A.      Patrolman, Third District.**

20  Q.      Prior to you taking the job here in '09, just

21  briefly describe the other jobs you've had.

22  **A.      I was a bus driver for RTA.**

23  Q.      Anything else?

24  **A.      I also did some work for the Plain Dealer.**

25  Q.      What kind of work?

1    A.       Delivering the mail at night -- not mail, but

2    newspapers.

3    Q.       Anything else?

4    A.       I've had various jobs.

5    Q.       Those are the main ones?

6    A.       Yeah.

7    Q.       Okay.  So this was your first law enforcement

8    job?

9    A.       No.  I was a correction officer years ago, for a

10   short stint.

11   Q.       Where?

12   A.       North Royalton, City of North Royalton.

13   Q.       How long did you do that?

14   A.       I don't recall.

15   Q.       I mean more than a year?

16   A.       I don't -- it's been awhile.

17   Q.       When you hired on here what kind of training did

18   you get?

19   A.       I was at the academy for six months.

20   Q.       Is the academy in Cleveland run by the City of

21   Cleveland?

22   A.       Yes.

23   Q.       And at the time did you use the OPOTA

24   curriculum, the Ohio Peace Officer --

25   A.       Yes.  That's what they were -- yes.

Page 7

1    Q.      Was there any curriculum written just by the

2    City of Cleveland, or was it all OPOTA?

3    **A.      I don't recall.**

4    Q.      Since you went for those six months to the

5    academy, describe the kind of training you've gotten

6    since then.

7    **A.      Wow.  Off the top of my head, I can't recall**

8    **anything.**

9    Q.      All right.  So every year do you requalify on

10   your firearm?

11   **A.      Oh, absolutely.**

12   Q.      Every year do you requalify on your taser?

13   **A.      Yeah.  It's part of the training.  It's**

14   **in-service.**

15   Q.      Okay.  And that's annual?

16   **A.      Yes.**

17   Q.      And when you requalify on the taser do you shoot

18   a taser again?

19   **A.      Yeah, we go to OCS.**

20   Q.      And when you requalify on the firearm and on the

21   taser do you do any simulation, or is it just shooting

22   for accuracy?

23          Do you know what I mean by that?

24   **A.      No.**

25   Q.      Are you testing your judgment on shoot, don't

1  shoot, or are you just testing for accuracy on hitting

2  the target?

3  **A.      Well, it's two different days.**

4  Q.      Okay.

5  **A.      That's, you know, you're at the range.  It's**

6  **completely separate from when you're shooting your**

7  **taser.**

8  Q.      All right.  So when you're at the range what are

9  you doing, just shooting at targets?

10  **A.      You're qualifying.**

11  Q.      Okay.  And does that include judgement about

12  when to shoot, or is that just accuracy?

13  **A.      Yeah.  You're shooting, yeah, you know, for**

14  **accuracy.**

15  Q.      All right.  And is there any simulation where

16  you are put in a situation where you have to decide

17  whether to pull the trigger?

18  **A.      Not that I can recall.  No.**

19  Q.      And then with respect to the taser, is that for

20  accuracy, shooting the cartridge so that the prongs hit

21  where you want them to go?

22  **A.      We shoot at a dummy.**

23  Q.      Okay.  And is that a situation where you're

24  asked to make a judgment about whether to pull the

25  trigger or not, or is it just for accuracy?

1    A.        We're shooting -- we're shooting the dummy.

2    Q.        Yeah.  Is that for accuracy?

3    A.        For accuracy?

4    Q.        Yeah.  Is that what you're doing?

5    A.        Well, you know, you're aiming at it.

6    Q.        Okay.  In addition to those two

7    requalifications, since 2009 have you had any other

8    annual in-service training?

9    A.        In-service?  In-service is just once --

10   Q.        Okay.

11   A.        Once a year.

12   Q.        All right.  And those are the two things you do?

13   A.        When we go to in-service, you know, there's --

14   there's whatever the course is of that year, you know.

15   So it just varies.

16   Q.        Is there a written record of the in-service

17   you've received?

18   A.        I'm sure there is.

19   Q.        Have you ever looked at it?

20   A.        Have I looked at it?

21   Q.        Yeah.  Have you ever looked at your record of

22   training?

23   A.        I don't recall if I did or not.

24   Q.        Have you, in those years during your

25   in-services, received any specific training about use

1    of force?

2    **A.      Yes.**

3    Q.      Okay.  Can you describe what you've received?

4    **A.      Like what?  I mean explain.**

5    Q.      Well, describe the type of training you've had.

6    Is it a guy standing in front of a classroom just

7    talking at you, or is there something --

8    **A.      Yeah, there's an instructor.  Yes, there is an**

9    **instructor.**

10   Q.      And do you engage in any simulation at all or

11   role playing?

12   **A.      Like fighting you mean?**

13   Q.      Yeah.

14   **A.      No.**

15   Q.      Okay.  And have you ever seen a PHATS machine?

16   **A.      A what?**

17   Q.      Like one of those giant videos where you are

18   given an opportunity to make a decision as to whether

19   to use force or not, have you ever gone through

20   something like that?

21   **A.      At the range we've done that.**

22   Q.      Okay.  How often have you done that?

23   **A.      I don't recall.**

24   Q.      More than once?

25   **A.      I believe so.**

1  Q.      And have you used that in connection with

2  decisions about using your firearm?

3  A.      **Yes, my firearm.**

4  Q.      Have you received any training with respect to

5  dealing with the mentally ill?

6  A.      **In the academy.**

7  Q.      Okay.  And that was 2009?

8  A.      **Yes.**

9  Q.      And have you received any since then?

10  A.      **Not that I can recall.**

11  Q.      Have you ever been through the crisis

12  intervention training?

13  A.      **No.  The training, no.**

14  Q.      Have you received any training with respect to

15  the use of restraints?  Cuffing?

16  A.      **Explain -- cuffing?  Yes.**

17  Q.      And how often have you gotten training about

18  that?

19  A.      **I remember the academy.**

20  Q.      Okay.

21  A.      **I can't recall any other time.**

22  Q.      Have you received training about first aid?

23  A.      **Yes.**

24  Q.      Where?

25  A.      **EMS building on Lakeside.**

1  Q.      When?

2  **A.      I don't recall, but I believe it was last year**

3  **or this year.  I'm not sure.  But I can't recall.**

4  Q.      Prior to that had you received any first aid

5  training?

6  **A.      In the academy.**

7  Q.      Did you volunteer for the training you got last

8  year on first aid, or were you assigned to do that?

9  **A.      I can't recall.  I think we were assigned, but I**

10  **can't recall.**

11  Q.      And briefly describe what that first aid

12  training consisted of.

13  **A.      CPR.  There was putting blood clot out on a**

14  **wound, on a gunshot wound.  There was other stuff they**

15  **talked about.**

16  Q.      Would you say that there have been many changes

17  in your job between the time you got hired and the

18  present?

19  **A.      Like what?  What do you mean?**

20  Q.      Just the way you do things, or has it stayed

21  pretty much the same?

22  **A.      I'm sure, you know, things changed.  I'm sure of**

23  **it.**

24  Q.      Anything significant come to mind?

25  **A.      No.**

1  Q.      Okay.  Do you train people?

2  **A.      Do I?**

3  Q.      Yeah.

4  **A.      Like what?**

5  Q.      Well, any kind of training.  Do you take people

6  and teach them how to be a police officer?

7  **A.      I have.**

8  Q.      Tell me about that.

9  **A.      Like what; what do you want?**

10  Q.      I want to know how you got involved in that and

11  what you've done.

12  **A.      If I'm assigned to it.  I've been assigned to**

13  **it.**

14  Q.      So what courses have you taught?

15  **A.      Like what do you mean, what have I taught?**

16  Q.      What subject matter?

17  **A.      You gotta go a little deeper.  What do you mean,**

18  **like what?**

19  Q.      Have you taught at the academy or at an

20  in-service, or --

21  **A.      No, no, no, no.**

22  Q.      -- were you a field training officer?

23  **A.      Field training, yes.**

24  Q.      Okay.  So you've been a field training officer?

25  **A.      I've been assigned to be a field training**

1  **officer.**

2  Q.      Okay.   Do you know Officer Aldridge?

3  **A.      I do know him.**

4  Q.      Do you know if he has been a field training

5  officer?

6  **A.      I do not know.**

7  Q.      Were you serving as a field training officer on

8  November 12th, 2014 for your partner McGrath?

9  **A.      McGrath, yes.**

10  Q.      How many people have you served as field

11  training officer for?

12  **A.      I don't know.**

13  Q.      I mean, more than five?

14  **A.      I don't know, because like I said, it's assigned**

15  **to me.**

16  Q.      Are you serving as a field training officer

17  right now?

18  **A.      No.**

19  Q.      When you serve as a field training officer, do

20  you have to keep paperwork on the person you're

21  training, like fill out evaluations?

22  **A.      There is paperwork.**

23  Q.      And is that on paper or is that electronic?

24  **A.      It's on paper.**

25  Q.      What do you do with it?

1   **A.**      **What do you mean what do I do with it?**

2   Q.      What do you do with that paper after you fill it

3   out?

4   **A.**      **It's filled out and it's kept by the rookie.**

5   **See, now there's a new training program now.**

6   Q.      Okay.

7   **A.**      **On FTO.  And like I said, I don't know anything**

8   **about it because I'm not a field training officer.**

9   Q.      So that's changed recently?

10  **A.**      **I don't know how long it's been, but it's**

11  **changed.**

12  Q.      It's changed since November of 2014?

13  **A.**      **I believe so.**

14  Q.      Would you say that you encounter members of the

15  public as a police officer who are mentally ill on a

16  fairly frequent basis?

17  **A.**      **Yes.**

18  Q.      Do you think you see, in terms of your regular

19  work as a patrol officer, a mentally ill citizen and

20  you encounter them every day?

21  **A.**      **Every day?  I'm not sure about every day.**

22  Q.      But certainly several times a week?

23  **A.**      **Probably, yeah.**

24  Q.      Okay.  So as you sit here today in your uniform

25  ready to go out to work again, you know that over the

1   next few days you'll probably encounter another

2   mentally ill person, right?

3   **A.       Probably.**

4   Q.      And many of the people who are having a mental

5   health problem that you encounter as a Cleveland Police

6   Officer haven't committed any crimes, right?

7   **A.       Sure.**

8   Q.      Because sometimes they're just confused or

9   delusional and need to get some medical help, right?

10  **A.       Probably, yes.**

11  Q.      I mean, you've run into people like that, right?

12  **A.       I mean, we run into, you know, everyone, you**

13  **know, just not, you know, mental people.**

14  Q.      Right.

15  **A.       And, you know, we can't -- I don't know if**

16  **you're mental.   I don't know that, you know.**

17  Q.      Pardon?

18  **A.       We don't know that when we get to a -- you know,**

19  **when we meet someone on the street, we don't know that.**

20  Q.      Right.   But if a family calls you and says that

21  they're having trouble with somebody and they want help

22  getting treatment for that person, you know, at least

23  based on that much information you'll know that the

24  person you're going to be involved with is not a

25  criminal, right?

1          MS. BACEVICE:                    Objection.

2  BY MR. GERHARDSTEIN:

3  Q.      It's just a sick person, right?

4          MR. BACEVICE:                    Objection.

5          MS. BUNGARD:                     Objection,

6          yeah.

7               You can answer.

8  **A.      Go again.   I'm sorry.**

9          MR. GERHARDSTEIN:               You can

10         read it back.

11         THE NOTARY:                     Question:

12         "But if a family calls you and says that

13         they're having trouble with somebody and

14         they want help getting treatment for that

15         person, you know, at least based on that

16         much information you'll know that the

17         person you're going to be involved with is

18         not a criminal, right?

19             Mr. Bacevice, objection."

20                                          Question:

21         "It's just a sick person, right?

22             Mr. Bacevice, objection."

23  **A.      Yeah.   That's how it comes over radio.**

24  Q.      Okay.  So in that type of situation how do you

25  deal with people like that?

1          MR. BACEVICE:              Objection.

2     BY MR. GERHARDSTEIN:

3     Q.     Mentally ill people who need help.

4          MR. BACEVICE:              Objection.

5     Q.     You can answer.

6     A.     You deal with them nice and calm, you know.  You

7     have to, you know, be, you know, at the same level with

8     them, you know.  Keep everything nice and calm.

9     Q.     Why?

10    A.     Because you don't know what state they're in,

11    you know.  You know, you don't know if they're on their

12    meds or not.

13    Q.     Okay.  And what's your goal when you deal with

14    people like that?

15    A.     To figure out what's going on, make sure that

16    they're safe, they're not harming themselves, making

17    sure that, you know, if they do need medical attention,

18    make sure we give it to them, call EMS.

19    Q.     And if they need mental health attention what do

20    you do?

21    A.     If they do?

22    Q.     Yeah.

23    A.     If we believe that if they're -- if they're a

24    harm to themselves?

25    Q.     Yeah.

1  **A.      Or a harm to others.  If they're not on their**

2  **medication and if they're delusional, you know, we**

3  **speak to them and take them to the hospital.**

4  Q.      Can you take them to any hospital, or where do

5  you take them?

6  **A.      We could.  I mean, it's -- usually EMS will --**

7  **you know, EMS will arrive on scene, and wherever EMS**

8  **wants to take them.**

9  Q.      So even if they are a possible harm to

10  themselves or others and you just want to get them to a

11  psych evaluation, an assessment, you would call EMS?

12          MR. BACEVICE:                    Objection.

13  BY MR. GERHARDSTEIN:

14  Q.      Or do you just take them right to the hospital

15  yourself?

16  **A.      Every situation is different.  Every situation**

17  **is different.**

18  Q.      So what kind of situations would you call EMS?

19          MR. BACEVICE:                    Objection.

20  **A.      I guess if they're feeling -- like I said, it**

21  **all depends.  It really does, you know.  Obviously if**

22  **they're bleeding, you know, you could see signs of**

23  **they've harmed themselves.**

24  Q.      Okay.  So one situation you'd call EMS is if you

25  see evidence of an injury?

1   **A.      Yes.**

2   Q.      If you don't see any evidence of an injury, but

3   you certainly from what they're saying and how they're

4   acting think they need a psych evaluation, would you

5   call EMS?

6           MR. BACEVICE:                          Objection.

7   **A.      I can call EMS.**

8   Q.      And do you?

9   **A.      I have.**

10          MR. BACEVICE:                          Objection.

11  BY MR. GERHARDSTEIN:

12  Q.      So when do you just take them to the hospital

13  yourself and when do you call EMS?

14          MR. BACEVICE:                          Objection.

15  **A.      Like I said, it varies, you know.  Every**

16  **situation is different.**

17  Q.      Yeah, I appreciate that.  I'm just trying to get

18  an understanding of in these different situations when

19  do you call EMS to help you out and when do you handle

20  it yourself.  What are some of the scenarios that you'd

21  handle yourself versus calling EMS?

22          MR. BACEVICE:                          Objection.

23          MS. BUNGARD:                           If you

24          can, answer.

25  Q.      Well, base it on your experience.  I mean you've

1   done this for years.

2   **A.      I mean like I said before, it all varies.**

3   Q.      Right.

4   **A.      You know, it does.  It varies.**

5   Q.      Well, I understand that.  But within those

6   varied situations tell me about the ones you called EMS

7   versus the ones you've handled alone.

8               MR. BACEVICE:                    Objection.

9   **A.      What do you mean alone; by myself?**

10  Q.      Yeah.  Like --

11  **A.      Or with a partner?**

12  Q.      Do you ever take a citizen who is in need of a

13  psych evaluation to the hospital yourself without

14  calling EMS?

15  **A.      With my partner I have.**

16  Q.      Okay.  So describe a situation like that where

17  you didn't call EMS for help, you and your partner just

18  took the person yourselves.

19              MR. BACEVICE:                    Objection.

20  **A.      Well, like I said, there's no signs of injury on**

21  **them.**

22  Q.      Okay.

23  **A.      You know, we've taken them to the hospital.**

24  Q.      And if you firmly believe that the person needed

25  a psych evaluation and they were resistant to your

1  taking them to the hospital, what do you do --

2             MR. BACEVICE:                    Objection.

3  BY MR. GERHARDSTEIN:

4  Q.      -- in that situation?

5  **A.      Like I said, that's when, you know, you talk to**

6  **them.**

7  Q.      Okay.

8  **A.      Let them understand what's going on.  You want**

9  **to speak to them.**

10  Q.      And if they're so delusional that they aren't

11  tuned in and talking isn't working, but you feel they

12  need to be evaluated, what do you do; do you use force?

13             MR. BACEVICE:                    Objection.

14  **A.      What do you mean you use force?**

15  Q.      Do you ever use force to get the person to the

16  psych evaluation?

17             MR. BACEVICE:                    Objection.

18  **A.      Do we use force for that?**

19  Q.      Yeah.

20  **A.      I have -- like you mean me, myself?**

21  Q.      Yeah.

22  **A.      Not that I could recall.**

23  Q.      So in all your encounters with people in need of

24  psych evaluations you've been able to use your verbal

25  skills; is that right?

Page 23

1          MR. BACEVICE:                    Objection.

2    **A.       That I can recall.**

3    Q.     In those situations if you had a resistant

4    citizen, somebody who didn't really want to get their

5    psyche evaluated, are you authorized to use force to

6    get them to the hospital?

7               MR. BACEVICE:                 Objection.

8               MR. GERHARDSTEIN:             You can

9               have a standing objection on this line of

10              questioning.

11              MR. BACEVICE:                 That's

12              fine.

13   **A.       Go again.  I'm sorry.**

14   Q.     In that situation where you know based on your

15   experience that a citizen really does need a psych

16   evaluation, you think they're a harm to themselves or

17   others, but they're resistant and the talking isn't

18   working, are you authorized to use force to get them to

19   the hospital?

20   **A.       We use reasonable.**

21   Q.     Okay.  What would be --

22   **A.       The least.**

23   Q.     -- your options?

24   **A.       Like what do you mean the options?**

25   Q.     Yeah.  What kind of options would you have

1    within that world of reasonable force?

2    **A.       That could vary, you know.   That could vary.**

3    Q.       Can you put them in cuffs?

4    **A.       Yes.**

5    Q.       Are there written policies that guide you in the

6    Cleveland Police Department about handling mentally ill

7    subjects?

8    **A.       Is there a policy?**

9    Q.       Yeah.

10   **A.       The GPO?**

11   Q.       Yeah.

12   **A.       Yeah, there is.**

13   Q.       Are there any specific reports you have to fill

14   out when you have escorted a mentally ill person to the

15   hospital for an evaluation?

16   **A.       It's called a crisis intervention report.**

17   Q.       And do you fill those out?

18   **A.       Yes, if they're taken to the hospital.**

19   Q.       What do you do with them when you fill them out?

20   **A.       What do you mean, what do I do with them?**

21   Q.       You just keep it; do you turn it into somebody?

22   **A.       No.   You know, every report gets turned in at**

23   **the end of the night.**

24   Q.       To your supervisor?

25   **A.       Yes.**

1   Q.      What's that, your sergeant or --

2   **A.      My sergeant, whoever is in charge that night.**

3   Q.      If you're working with somebody that you're

4   trying to get to the hospital for a psych evaluation

5   and you determine that some modest amount of force is

6   needed, even after you've used some force would you try

7   to re-establish cooperation by using your verbal

8   skills?

9               MR. BACEVICE:                    Objection.

10  **A.      Like I said, you always got to communicate with**

11  **the mentally ill.  You have to.**

12  Q.      So even after you've used force, you would try

13  to re-establish cooperation by using your calming

14  voice, your verbal skills?

15  **A.      Oh, absolutely.**

16  Q.      Have you ever had any instruction yourself on

17  the dangers of restraining anybody in a prone position?

18  **A.      What do you mean?  I don't understand.**

19  Q.      Face down, putting them in cuffs and having them

20  be face down on the ground.

21  **A.      Explain yourself again.  You're kind of losing**

22  **me there.**

23  Q.      Have you ever had any instruction about

24  handcuffing someone behind his back while he's face

25  down on the ground?

Page 26

1   **A.      Off the top of my head I can't recall.**

2   Q.      Okay.  And when you have been a field training

3   officer have you, with your trainees, taken people into

4   custody?

5   **A.      Yes.**

6   Q.      And when you've been a field training officer

7   have you, with your trainees, handcuffed people who

8   were prone on the ground?

9   **A.      They were prone on the ground?**

10  Q.      Yeah.

11  **A.      Not that I can recall.**

12  Q.      When you have been a field training officer have

13  you given any instruction to your trainees about any

14  dangers that may exist with respect to handcuffing

15  people that are prone on the ground?

16  **A.      I can't recall if I have or not.**

17  Q.      Have you ever heard of positional asphyxiation?

18          MR. BACEVICE:                    Objection.

19  **A.      I'm not sure if I have.  Explain it.**

20  Q.      Can you tell me what it is?

21  **A.      I'm asking you, a different wording?**

22  Q.      Have you ever heard of people having breathing

23  trouble as a result of being restrained in a way that

24  causes their breathing to be obstructed?

25  **A.      I've heard of it.**

1    Q.    Okay.  And what, if anything, have you learned

2    to avoid that type of problem in people you restrain?

3    **A.    I don't know.  I can't recall.  I --**

4    Q.    Have you received any instruction with respect

5    to any dangers posed or possibly experienced by obese

6    people when you restrain them when they're face down on

7    the ground and you're cuffing them behind their back?

8    **A.    Not that I can recall.**

9    Q.    Do you have any guidance for the people you

10   train as to how long it is safe to have that detainee

11   cuffed behind his or her back and prone on the ground;

12   how long it's okay to have them prone on the ground

13   while they're cuffed behind the back?

14   **A.    I don't recall ever -- I don't recall --**

15   Q.    Okay.

16   **A.    -- anything.**

17   Q.    So you don't give your trainees any specific

18   instruction about that; is that correct?

19   **A.    About cuffing?**

20   Q.    About cuffing people who are prone on the ground

21   and leaving them in that position.

22   **A.    No, not that I can recall.  No.**

23   Q.    All right.  Do you have any certifications for

24   your first aid, like a CPR certification or anything

25   like that?

1   **A.      Yes, we did receive that.**

2   Q.      And did you have that in November of 2014?

3   **A.      We got training in the academy.**

4   Q.      And that included CPR training?

5   **A.      Yes.**

6   Q.      And when you get CPR training do you also learn

7   how to take vitals, like how to check respiration and

8   pulse and stuff like that?

9   **A.      I can't recall off the top of my head.**

10  Q.      Do you know how to monitor a person's vitals?

11  **A.      What do you mean?**

12  Q.      Do you know how to check and see if a person in

13  your custody is experiencing any heart problems or

14  breathing problems?

15  **A.      Heart problems, I -- you know, how would I --**

16  **you know, I can't see through someone's --**

17  Q.      Right.  Do you know how to take a person's

18  pulse?

19  **A.      A pulse?**

20  Q.      Yeah.

21  **A.      I can't recall if -- I can't recall if they**

22  **taught us that or what.**

23  Q.      If you wanted to know if a person was in any

24  kind of distress, given your level of medical

25  knowledge, would you just call EMS and have them check

1    them?

2             MR. BACEVICE:                    Objection.

3    **A.      I'd always call EMS if, you know -- first thing.**

4    **It's always the, you know, making sure that the person**

5    **you're dealing with is fine, you know, that they're**

6    **healthy.**

7    Q.      Back in November of 2014 was there any protocol

8    for when an officer should call EMS following the use

9    of force on a citizen?

10   **A.      Obviously, like I said, again, if that person**

11   **needs medical attention you would call EMS for whatever**

12   **reason.**

13   Q.      Okay.  But let's say that a person is simply

14   still on the ground after you've cuffed them; is that a

15   reason to call EMS?

16   **A.      I mean, you got to give more than that.  I**

17   **mean --**

18             MR. BACEVICE:                    Objection.

19   BY MR. GERHARDSTEIN:

20   Q.      Well, you don't know how to take a person's

21   pulse, right?

22             So you don't know, you know, whether that person

23   is having any heart problems.  Is that the type of

24   situation that you'd call EMS or you wouldn't call EMS?

25             MR. BACEVICE:                    Objection.

1  **A.    Like I said before, you call EMS, you know, when**
2  **you believe that person needs medical attention.**
3  Q.    And how do you make that decision believing that
4  a person needs medical attention; what do you use to
5  make that decision?
6  **A.    The way they're -- you know, the way they**
7  **respond to you.  Are they responding to you at all.**
8  **Are they talking to you.**
9  Q.    Okay.  So if they aren't talking to you and
10  they're on the ground, that would be a reason to call
11  EMS --
12            MR. BACEVICE:              Objection.
13  BY MR. GERHARDSTEIN:
14  Q.    -- if they're like nonresponsive; is that fair?
15  **A.    You know, like I said, you need to -- you're**
16  **always talking to this person.  You're always, you know**
17  **-- you always got to be at their level.  Always**
18  **talking, always talking.**
19  Q.    If you thought a person was simply upset, crying
20  and hysterical, would that be a reason to call EMS?
21            MR. BACEVICE:              Objection.
22  **A.    Well, like I said, again, you're talking to**
23  **them.**
24  Q.    Yeah.
25  **A.    You got to get a feel -- you know, you got to**

1    talk to them, ask them what's going on.  You know,

2    you're always talking.  You need to always talk.  You

3    got to -- always communicating.  You have to.

4    Q.      Well, but my point is through that communication

5    how do you exercise your discretion; how do you know

6    when you call EMS and when you don't?

7    A.      Well, like I said, you need to know if they want

8    to harm themselves.  You got to ask them these

9    questions.  Do you feel like harming others.  Do you

10   feel suicidal.  Are you on your medication.  Those are

11   the kind of questions you need to ask them.

12   Q.      So those kind of questions would help you decide

13   whether you're going to get them evaluated at the

14   hospital, right?

15   A.      That's one, yes.

16   Q.      And some of those people you've testified you

17   would take alone with your partner to the hospital,

18   right?

19   A.      (Indicating).

20   Q.      And my question is more how do you know when to

21   engage EMS in your work with that citizen?

22   A.      Like I said, it's again, communication, and if

23   you see that they need medical attention, you call EMS.

24   Q.      And you've used this term medical attention.

25   What kind of people need medical attention?

Page 62

1   Q.      Okay.   And I think you've already testified that

2   you never went through the crisis intervention

3   training; is that correct?

4   **A.       I have not.**

5   Q.      Okay.   So you were not, as of November 12th,

6   2014, any designated crisis intervention officer,

7   right?

8   **A.       What I received from the academy.**

9   Q.      Right.   But you weren't labeled as a crisis

10  intervention officer?

11  **A.       No.**

12  Q.      Were you aware of any special deployment of

13  people that had gotten crisis intervention training so

14  that they would be available to those of you in the

15  field in November of 2014?

16  **A.       What do you mean?   I don't understand.**

17  Q.      Like were you aware of who had crisis

18  intervention training that you could call on for help?

19  **A.       That day, I don't recall.**

20  Q.      Generally would you be aware of who had that

21  kind of training?

22  **A.       We could advise radio, and radio would let us**

23  **know who's trained.**

24  Q.      Did you ever ask for that in any of your other

25  runs?

Page 63

1    **A.        Have I?**

2    Q.        Yeah.

3    **A.        Like I said, that day I was FTOing --**

4    Q.        Right.

5    **A.        -- my partner that I'm -- my regular partner**

6    **that I work with every day, he's CIT certified.**

7    Q.        Okay.

8    **A.        So when we do get a call, he's certified.**

9    Q.        All right.  So do I understand that you wouldn't

10   have had a need to call for help from other CIT

11   officers because you worked with one; is that what

12   you're saying?

13   **A.        Yeah.  My partner is.  Yes.**

14   Q.        All right.  Now, when you were working -- how

15   long had you worked with that partner?

16   **A.        With my partner?**

17   Q.        Yeah.

18   **A.        I've been with him for, I don't know, a couple**

19   **of years.**

20   Q.        And what was his name?

21   **A.        My partner?**

22   Q.        Yes.

23   **A.        Do I have to answer that?**

24   **I don't want to -- my --**

25            MR. BACEVICE:                    You should

1       answer.

2       MS. BUNGARD:                    Yeah.  Go

3       ahead.

4   A.      Yeah.  My regular partner is Officer Day.

5   Q.      Officer Day?

6   A.      Yeah.

7   Q.      What's his first name?

8   A.      Daniel.

9   Q.      And when you worked with Officer Daniel Day did

10  you ever observe him get called to respond because of

11  his CIT training?

12  A.      Yes.

13  Q.      And then you would go with him if that happened?

14  A.      Yes.  He's my partner, yes.

15  Q.      And in those instances would the request come

16  from dispatch?

17  A.      It can.

18  Q.      So was dispatch somehow aware that he was CIT

19  trained; do you know?

20  A.      I don't know.

21  Q.      In those instances where Mr. Day had to go to

22  assist in a situation because of his CIT expertise, did

23  you ever observe him use force on the citizen who was

24  having the mental health problem?

25      MR. BACEVICE:                  Objection.

Page 65

1    **A.      Not that I could recall.**

2    Q.     And did any of those encounters with those

3    citizens in need of mental health intervention result

4    in you and Mr. Day or Officer Day taking those citizens

5    to the hospital?

6              MR. BACEVICE:                    Objection.

7    **A.      We've taken them to the hospital.   Yes.**

8    Q.     In those instances where Officer Day was called

9    on because of his CIT expertise, was EMS also called to

10   these encounters with the mentally ill person?

11             MR. BACEVICE:                    Objection.

12   **A.      They have been.**

13   Q.     And in any of those situations was EMS called,

14   even though the citizen didn't have an obvious physical

15   injury?

16             MR. BACEVICE:                    Objection.

17   **A.      I don't recall.**

18   Q.     In your experience when EMS is working with you

19   with a mentally ill person, did it appear that the EMS

20   people had any special training?

21   **A.      I don't know what their training is.**

22   Q.     Did you find them to use the same kind of

23   tactics you were trying to use, to talk and reason and

24   stay calm, that kind of stuff?

25   **A.      I can't recall.**