IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

ELIZABETH GOODWIN,           )
            Plaintiff,       )
                             )
      v.                     )  Case No.  1:15-CV-0027
                             )  Judge Donald C. Nugent
CITY OF CLEVELAND, et al.,   )
            Defendants.      )

- - -

THE DEPOSITION OF SERGEANT ROCHELLE BOTTONE
MONDAY, JUNE 27, 2016

- - -

        The deposition of SERGEANT ROCHELLE BOTTONE, a
witness, taken as if upon cross-examination by the
Plaintiff, under the Federal Rules of Civil Procedure,
taken before me, Janet M. Hoffmaster, Registered
Professional Reporter and Notary Public in and for the
State of Ohio, pursuant to Notice, at Burke Lakefront
Airport, 1501 North Marginal Road, Cleveland, Ohio,
commencing at 2:00 p.m., the day and date above set
forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK
1360 WEST 9TH STREET, SUITE 440
CLEVELAND, OHIO  44113
(216) 621-2550
FAX: (216) 621-3377
1-888-595-1970

Page 2

1    APPEARANCES:

2    On behalf of the Plaintiffs:

3        ALPHONSE A. GERHARDSTEIN, ESQ.
         Gerhardstein & Branch
4        441 Vine Street, Suite 3400
         Cincinnati, OH  45202
5        (513) 621-9100 Ext. 17

6        DAVID B. MALIK, ESQ.
         Law Office of David B. Malik & Associates
7        Chester Professional Building
         8437 Mayfield Road, Suite 101
8        Chesterland, OH  44026
         (440) 729-8260

9

10   On behalf of the Defendant City of Cleveland:

11       SHAWN M. MALLAMAD, ESQ.
         Assistant Director of Law
12       Department of Law
         601 Lakeside Avenue, Room 106
13       Cleveland, OH  44114
         (216) 664-3774

14

15   On behalf of the Defendants Scott Aldridge and Bryan
     Myers:

16

17       JILLIAN L. DINEHART, ESQ.
         Assistant Director of Law
         Department of Law
18       601 Lakeside Avenue, Room 106
         Cleveland, OH  44114
19       (216) 664-3559

20                          - - -

21

22

23

24

25

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 3

1                          INDEX

2                                          PAGES

3   CROSS-EXAMINATION BY

4        MR. GERHARDSTEIN                    4

5

6                         - - -

7

8

9   PLAINTIFF'S EXHIBITS MARKED

        48 (remarked as 49)                22
10      49                                 64
        50                                 64
11      51                                 64

12                        - - -

13

14  OBJECTIONS BY

15      MR. MALLAMAD        5(2), 16, 28, 51(2), 52, 60,
                            75(3), 77, 78, 85, 86, 87, 89,
16                          90

17      MS. DINEHART        60, 75(2), 77, 78, 86, 87(2),
                            89, 90
18

19                        - - -

20

21

22

23

24

25

1                    SERGEANT ROCHELLE BOTTONE

2    a witness, called for examination by the Plaintiff,

3    under the Rules, having been first duly sworn, as

4    hereinafter certified, was deposed and said as follows:

5                        CROSS-EXAMINATION

6    BY MR. GERHARDSTEIN:

7    Q.      Good afternoon.

8    **A.      Good afternoon.**

9    Q.      State your full name, please.

10   **A.      Rochelle Battone.**

11   Q.      And what's your rank?

12   **A.      Sergeant.**

13   Q.      When were you appointed sergeant?

14   **A.      That was May of 2008.**

15   Q.      And just briefly trace your history with the

16   Cleveland Police Department.

17   **A.      I began my career in the Second District on**

18   **basic patrol.  I worked a year in the Third District**

19   **Vice Unit.  I worked three years in our Sex Crimes and**

20   **Child Abuse Unit.  I was our Grand Jury liaison with**

21   **the Cuyahoga County Prosecutor's Office.**

22   **         And I supervised the Crime Analysis Unit out of**

23   **our fusion center for a year, but I spent the majority**

24   **of my career as a sergeant as a patrol supervisor in**

25   **the Third District and now the First.**

Page 5

1  Q.      When did you join the department?

2  **A.      March of 1997 is my date of appointment.**

3  Q.      Have you ever been disciplined?

4          MR. MALLAMAD:                    Objection.

5                  You can answer.

6  **A.      Only a written reinstruction.**

7  Q.      What was that about?

8          MR. MALLAMAD:                    Same

9          objection.

10                 Go ahead.

11 **A.      It was an investigation that was perceived late**

12 **to the chief's office.**

13 Q.      What was the topic of the investigation?

14 **A.      It was a motor vehicle accident involving a**

15 **police officer.**

16 Q.      So was the issue whether you gave any favoritism

17 to the police officer?

18 **A.      No.  There was really no issue, they just have a**

19 **certain time frame that they like to have them received**

20 **by and there were some complications with receiving**

21 **information and it -- I requested extensions, but I**

22 **believe things fell through the cracks and I was**

23 **reinstructed.**

24 Q.      What are your duties as a sergeant in patrol?

25 **A.      My duties involve supervising the officers on my**

Page 6

1  shift to ensure that they're handling radio

2  assignments.  I mainly ensure that our resources are

3  being used efficiently.

4        We're short manpower, so that leaves me, usually

5  dispatchers are coming to me to decide what cars are

6  going to go where and what they're going to handle

7  first.

8        And then anything involving use of force or any

9  usually felonies that are violent felonies, anything

10  involving a crime scene, I would go to secure that

11  crime scene.  I would handle any use of force

12  investigations.

13        Basically I'm just there to also be a mentor to

14  the officers.  We have a lot of newer officers.

15  Q.    How many sergeants in like a district?

16        This happened on third shift in 2014, how many

17  sergeants did you share that shift with?

18  A.    Just one patrol sergeant and there's also one

19  that works the desk.

20  Q.    One in addition to you?

21  A.    Yeah, one that works inside and then one in

22  addition to me on the road.

23  Q.    And how many officers were you supervising in

24  the district?

25        That was for the whole district?

1  **A.      For the whole district, yes.**

2  Q.      So how many officers would be deployed out?

3  **A.      I could not tell you the exact number --**

4  Q.      Roughly.

5  **A.      -- but usually on average there are usually**

6  **about 15 officers and then two sergeants.**

7  Q.      And how many cars?

8  **A.      And that's usually six two-man cars, and then**

9  **two one-man cars, and then usually an officer that**

10  **works the office.**

11  Q.      How many zones within District 3 or the Third

12  District?

13  **A.      There are seven, I believe.**

14  Q.      What importance do the zones have in terms of

15  deploying your officers?

16  **A.      We usually split the zones up into -- well, I**

17  **should say there's two sectors in the district, and**

18  **each sector has three to four zones.**

19  **        So my sector that evening entailed Zone 5, 6,**

20  **and 7, and then half of 4.  So it's usually -- my**

21  **sector, we usually split it in half.  It's like East**

22  **55th and east of East 55th.**

23  Q.      And as you dialogued with dispatch when you were

24  in District 3, would you feel comfortable having any

25  officer respond to any location in that sector, or did

Page 8

1   you really try to have officers respond within their

2   zones?

3   A.      We really did try to keep them in their zones,

4   just because it made more sense.  They tried to stay

5   within their zone as they were patrolling, so in order

6   to have better response times we would try and keep the

7   assignments that came over in, say, Zone 5, we would

8   try and give that to Car 5.

9           It didn't always happen that way.  I mean, quite

10  often it didn't.  In fact.  I don't even -- I don't

11  even know that Officer Aldridge and Myers were assigned

12  to Zone 5 that night.

13  Q.      Was the Ansel address in Zone 5?

14  A.      I believe it was.

15  Q.      And if you wanted to know what zone they were

16  assigned to, what document would tell you that?

17  A.      That would have been their duty report.

18  Q.      The individual officer duty report?

19  A.      M-hm.

20  Q.      Is there a schedule that supervisors make up

21  that assign --

22  A.      Yes.

23  Q.      -- everybody to zones?

24  A.      There's also our daily duty assignment and that

25  has the schedule of all the cars for that evening.

Page 9

```
 1    Q.      And both of those documents would indicate

 2    whether Aldridge and Myers were assigned to Zone 5?

 3    A.      Correct.

 4    Q.      Did you know Scott Aldridge?

 5    A.      Professionally, yes.

 6    Q.      Did you ever socialize with him?

 7    A.      No.

 8    Q.      Were you ever involved in any discipline of him?

 9    A.      No.

10    Q.      What about Myers?

11    A.      No.  He was brand new.

12    Q.      So November 12th, 2014, when did you first get

13    any indication about the Tanisha Anderson incident?

14    A.      I received a broadcast assignment from dispatch

15    to respond to that address because the car that was

16    there was asking -- requesting for a supervisor.

17    Q.      So on a regular shift would you be monitoring

18    all the radio traffic?

19    A.      M-hm, yes, I would.

20    Q.      So were you aware that they had already gone to

21    the Ansel address?

22    A.      I was aware that they were on assignment.  I did

23    not -- I did not realize what they were there for.  I

24    had just started my shift, and -- and if I could add, I

25    believe if they were to have been assigned from a
```

Page 10

1  different zone, it might have been because Zone 5

2  doesn't start until ten o'clock.  So sometimes they do

3  have to call other cars to handle those zones because

4  they're not on the air yet.

5  Q.    So their third shift ran 10:00 to 6:00?

6  A.    They're 10-hour shifts, so the earlier cars

7  start at 9:00, and then the later cars start at 10:00,

8  so it's 10:00 to 8:00.

9  Q.    And you worked third shift, and what's that mean

10  for you?  What were your hours?

11  A.    I'm 10:00 p.m. to 8:00 a.m.

12        Although not to add confusion, but at that time

13  our start time was a half hour earlier, theirs was.

14  So it might have been 9:30.  I can't remember when they

15  changed it.  I apologize.

16  Q.    All the patrol officers in the Third District

17  started at 9:30, or did it vary by zone?

18  A.    It varied.  It varied.  And I can't recall, I

19  believe it was 8:30 and 9:30, if I'm not mistaken, but

20  I could be wrong, because they changed it, like I said.

21  Q.    Well, it makes sense.  I mean, you would not

22  want a complete turnover at exactly the same time.

23  A.    Right.

24  Q.    So I assume that's still how it works?

25  A.    Yeah, there's still that hour.

1   Q.    What about you and the other sergeant?  Did you

2   start at different times?

3   **A.    No, I always started at 10:00.  My time stayed**

4   **the same.**

5   Q.    Okay.  So you were aware that they had been

6   deployed to the Ansel address and you aren't sure that

7   you knew what the deal was because it hadn't risen to

8   that, probably, to that high of a level of importance.

9   **A.    I really had no idea.**

10  Q.    Okay.  And then you got word that you might be

11  needed, and what did you learn about that?

12  **A.    Well, I was actually stopped on my way out the**

13  **door in the parking lot by one of the second shift**

14  **officers that had responded to that same address**

15  **earlier in the evening.  And he wanted to explain to me**

16  **what had happened when they responded.**

17  Q.    What did he say, and who was it?

18  **A.    It was Officer Muniz, and he said that the**

19  **family had called and they were just having a hard time**

20  **dealing with their daughter that was mentally disabled.**

21  **        They really didn't know what her issue was, you**

22  **know.  They knew that she might have had some psych**

23  **issues, and they were told that she had just recently**

24  **got out of inpatient treatment, I think at Laurelwood,**

25  **and they weren't sure what she was there for.**

1    But as far as they knew, what the family told

2  them, is that she was on her meds, she was not off of

3  her meds, but she wasn't acting right and they were

4  trying to get her to calm down.

5    She kept leaving the house.  She was very like

6  anxious and would leave the house and come back, she'd

7  disappear, they'd have to go looking for her, is what

8  my understanding was.  And they just wanted us to take

9  her to the hospital just because they couldn't control

10  her.

11    And what the officer told me was that they felt

12  like they didn't have a reason to take her.  You know,

13  that she wasn't suicidal and, again, she wasn't off of

14  her medication, so they felt like the family needed to

15  just kind of work with her and deal with the situation.

16  Q.    So he literally stopped your vehicle as you were

17  pulling out of the --

18  A.    No.  I hadn't even gotten to my vehicle yet.  I

19  was still looking for my vehicle.

20  Q.    Tell me what that means.

21  A.    It means that our cars are never parked in the

22  same spot.  Like we have to look for your car, like

23  you're at a mall.

24  Q.    I'm not going to go down there.

25  A.    Yeah.

1   Q.    I don't think it's too relevant.

2         But the officer, how was he aware that there was

3   another call then to that address?

4   **A.    He heard it, he heard it come over the air and**

5   **he heard them ask for a supervisor.**

6   Q.    What did you learn over the air about why the

7   officers at the Ansel address would want a supervisor?

8   **A.    I didn't learn anything over the air.  I**

9   **honestly did not know.**

10        **Once I got there and saw what was going on, I**

11  **just assumed that they needed me because there was some**

12  **kind of physical struggle between the officers and the**

13  **female.**

14  Q.    When you were still back at the district, what

15  do you call them, stations?

16  **A.    M-hm, the district.**

17  Q.    At the district and Officer Muniz was talking to

18  you, did you have any indication -- you knew that there

19  was going to be -- that there was a request for a

20  supervisor, right, at that point?

21  **A.    Yes.**

22  Q.    And did you have any indication at that point as

23  to why there was a request for a supervisor?

24  **A.    I didn't have an indication.  My assumption at**

25  **that point was that they wanted me to try and talk to**

1   her, because sometimes females are a little bit better

2   having like a calming effect on people.

3         So I thought maybe -- because a lot of times

4   that happens.  When officers have just kind of, you

5   know, gotten to the end of their -- they just say, I

6   don't know what else to do.  Like let's try someone

7   else, bring someone else in, maybe they can talk some

8   sense into this person.

9         So that's kind of what I thought as I'm driving

10  there.

11  Q.    Prior to driving there and while you were still

12  talking to Muniz did you have any concrete information

13  as to why the officers at 1374 Ansel had requested a

14  supervisor?

15  A.    No.

16  Q.    What are the usual reasons that you're going to

17  get called to a scene?

18  A.    I would say on a daily basis they call a

19  supervisor for the reason I just stated, they sometimes

20  feel like a supervisor might be better at

21  communicating, sometimes people will listen to a

22  supervisor because they think this is someone of

23  authority that is maybe telling them, maybe not what

24  they want to hear, but can explain things in a way that

25  they'll be more accepting of it.  So I would say I deal

1  **with that more than anything.**

2  Q.    Okay.  And this whole run was a mental health

3  run.

4  **A.    Right.**

5  Q.    And how common was it for you to be involved in

6  reinforcing officers on mental health runs?

7  **A.    Actually pretty common because I'm -- well, I'm**

8  **crisis intervention trained.  And I just think that**

9  **over the years anyone that's worked with me knows that**

10  **that's one of my strong points.**

11  **So, again, that's really why I assumed they were**

12  **calling.**

13  Q.    When were you crisis intervention trained?

14  **A.    I don't remember the exact date.  I believe it**

15  **was -- it was before I got promoted, so 2007 maybe.  It**

16  **was right before I was issued my taser.**

17  Q.    And just to help me understand what your options

18  were, when you would get involved with these mental

19  health runs where there's no crime, it's simply a

20  person who's having a mental health crisis, what was

21  the usual way that you would proceed on a run like

22  that?

23  **A.    Well, really I would just try and build a**

24  **rapport.  I mean, there's a short amount of time.  You**

25  **don't have forever and a day to do that, but, you know,**

Page 16

```
1    just kind of use my skills that I learned when I was a
2    sex crimes detective to kind of build some sort of a
3    relationship in that short amount of time with that
4    person so that they trust you.
5          And if you can build that trust, then they're
6    more apt to believe that you're there to help them.
7    You know, it's intimidating when they see people in
8    uniform.  Sometimes a little less intimidating if it's
9    female.
10         So, you know, oftentimes it ended up where we
11   would have to get physical and just, you know, escort
12   them out because talking just, you know, sometimes
13   they're too far gone, you can't talk to them.  And I
14   think that's where Tanisha was.
15   Q.    If you had no reported crime how did you
16   understand your authority to get physical?  How is that
17   grounded?
18              MR. MALLAMAD:                Objection.
19                   You can answer.
20   A.    We would explain to them that it was a matter of
21   their own safety.  You know, more often than not it was
22   a situation where they were putting themselves or
23   others at risk.
24         So, you know, usually that was -- not usually,
25   that had to have been the case, because without them
```

Page 17

1   being pink slipped by a doctor, we really didn't have

2   authority.

3           And in this case with Tanisha, that was the

4   case, she was putting herself at risk.

5   Q.      But Officer Muniz said that she wasn't, right?

6   A.      Right, but everything had escalated.  You know,

7   they had been there, if I had to guess, maybe an hour,

8   hour and a half before, and everything just escalated

9   by the time Officer Aldridge and Officer Myers got

10  there.

11  Q.      So you proceeded after talking to Muniz to the

12  scene, but all you knew at that point was what Muniz

13  told you and what -- and that dispatch was telling you

14  to go to the scene because the officers had asked for a

15  supervisor; is that fair?

16  A.      Right.  And then I had -- well, I also heard

17  Officer Aldridge ask for a supervisor over the air.

18  Q.      And what did he say when he asked for a

19  supervisor?

20  A.      I don't recall.  I just remember hearing his

21  voice.

22  Q.      I mean, was there any explanation as to why he

23  was --

24  A.      No.  He just wondered if one was coming, because

25  dispatch had requested me, and then I don't know if he

1    didn't copy that they were sending me, but I do

2    remember he asked if a supervisor was coming.

3    Q.     So how long after you were dispatched to 1374

4    Ansel did you hear him get on the air asking if one was

5    coming?

6    A.     I don't recall.

7    Q.     So you get there.

8    A.     Yes.

9    Q.     What happens?  What do you see?

10   A.     I got out of the car, I got out of my car, and

11   that's when I observed -- well, I saw the officer

12   standing there, and then I saw Mrs. Anderson laying on

13   the -- I think it was a tree lawn.

14          And there were other people standing on the

15   sidewalk.  I didn't know who they were at that point.

16   She was handcuffed from behind.

17          And so my first thought before getting any

18   information from Officer Aldridge was that there must

19   have been some kind of use of force situation.  At that

20   point I figured that's why they must have called me,

21   because just seeing her in handcuffs, that was my first

22   thought.

23          But then he explained to me that she had

24   willingly walked out of the house.  He said, you know,

25   we took our time with her, calmed her down, she went on

1    her own, got in the back of the zone car, and then all

2    of a sudden she got real anxious and said no, no, no

3    no, I don't like police cars and jumped -- went to jump

4    out.

5         And so honestly I don't know what happened.  I'm

6    just going by what he told me.  I wasn't there for

7    this, but at that point I think that's when they must

8    have taken a hold of her to try and get her back in the

9    car.

10    Q.    What else happened?  So you saw her on the

11    sidewalk?

12    A.    I saw her on the grass, and then when he told me

13    that there was a struggle, I bent down and I rolled her

14    to like her side, more on her -- like to her back, and

15    just checked to make sure that she was conscious.  And

16    at that point she was not.

17         So I asked if they had EMS responding and he

18    said no.  And then Officer Myers called at that point

19    for EMS.

20    Q.    When you first saw her as you got out of your

21    car, were you parked on Ansel?

22    A.    Yes.

23    Q.    And --

24    A.    I believe.  Honestly I don't remember.  I think

25    I just pulled right up on Ansel, but I don't recall for

1  sure.

2  Q.    And you saw the zone car that Aldridge and Myers

3  had arrived in?

4  **A.    I don't recall if theirs was parked right in the**

5  **front.  I think it was.**

6  Q.    And was their zone car parked in such a way that

7  the passenger side was -- would open toward the houses?

8  **A.    Yes.**

9  Q.    And Tanisha was on the tree lawn.  If you could,

10  position her for me in terms of where she was located

11  on the tree lawn compared to where their car was.

12  **A.    In my mind I want to say that it was close to**

13  **where their car was, like right by the door, but I**

14  **can't say for sure.**

15  Q.    Can you give me a diagram that roughly places

16  the car, the tree lawn, the sidewalk, and the house?

17  **A.    Okay.  So this is Ansel.  This is the tree lawn.**

18  **This is the house.**

19  **From what I recall, we were -- actually we were**

20  **a little ways up here from the house.**

21  **Like here's the car, and then I remember**

22  **standing kind of, like we were over here, but I think**

23  **she was like -- she was by the back door of the car**

24  **from what I remember.**

25  Q.    There's an intersection near this portion of

Page 21

1  Ansel, isn't there?  Do you know?

2  **A.      I don't know.**

3  Q.      Okay.  So put TA next to where you think Tanisha

4  was, and if you could make her into a stick figure so

5  that I get a sense of where her --

6  **A.      This is the zone care.**

7  Q.      You have placed her perpendicular to the zone

8  car, is that --

9  **A.      She was not perpendicular, from what I recall.**

10  **Honestly I don't remember.**

11  Q.      Okay.  All right.  And then you have another

12  circle there --

13  Q.      That's us.

14  Q.      -- and is that the tree lawn?

15  **A.      No.  Well, this is the police, this is where I**

16  **was standing.**

17  Q.      And is that the sidewalk or the tree lawn?

18  **A.      This is -- we were on the tree lawn, and then**

19  **right here was the sidewalk, because family was**

20  **standing here.**

21  Q.      Okay.  And label that sidewalk, if you would,

22  please.

23  **A.      Sure.**

24  Q.      And label the other tree lawn.  And if you could

25  just put a divot pointing so that I can tell which is

Page 22

1    the front of the zone car.  You know, like put a --

2    **A.      This is the front.**

3    Q.      Okay.  That's good.

4                MR. GERHARDSTEIN:              Let's mark

5                this.

6                    (Thereupon, Plaintiff's Exhibit 48

7                to the deposition of SERGEANT ROCHELLE

8                BOTTONE was marked for identification.)

9    BY MR. GERHARDSTEIN:

10   Q.      Can you describe Tanisha for us?

11   **A.      She was a larger black female.  It's hard for me**

12   **to really tell you how tall she was because she was**

13   **never standing up, but, yeah, that's really all I can**

14   **say.**

15   Q.      Larger like?

16   **A.      Larger like --**

17   Q.      Over 200 pounds?

18   **A.      Yes.**

19   Q.      And what was she wearing?

20   **A.      From what I remember it was just like a --**

21   **almost just like a nightgown.  I don't know how else to**

22   **describe it.  I know she didn't have pants on.**

23   Q.      So that her legs were exposed to the elements?

24   **A.      Yeah, because I remember Officer Aldridge saying**

25   **he was trying to -- because she kept kicking and he was**

Page 23

1   trying to get her -- she didn't have any pants on, so

2   he was trying to like get her to put her legs down.

3           You know, he mentioned that.  He said, you know,

4   she wasn't -- she was exposing herself, so.  He was

5   trying to control her legs.

6   Q.      Did she have underwear on?

7   A.      I don't know.  I don't remember.

8   Q.      The sense you got from the officer talking about

9   her kicking and exposing herself, was it that she

10  didn't have underwear on?

11  A.      No, no.  No.  I believe she did have underwear

12  on, but.

13  Q.      And in addition to the nightgown did she have

14  anything else on?  Shoes?

15  A.      Not that I recall.

16  Q.      Gloves?  Coat?

17  A.      No.  I don't recall anything else.

18  Q.      So what you recall is just the nightgown.

19  A.      M-hm.

20  Q.      You have to say yes.

21  A.      Oh, I'm sorry.  Yes, yes.  Sorry.

22  Q.      You know that from court, right?

23  A.      It's been a while.

24  Q.      Now, tell me a little more precisely.  You said

25  you rolled Tanisha.

1    When you walked up on her, was she on her back

2  or on her front?

3  **A.     She was on more -- like on her stomach, and I**

4  **wanted to see her face and I couldn't, like her face**

5  **was kind of on her side and so I pulled her, I pulled**

6  **her over onto her back.**

7  Q.    Was it raining?  What was the weather like?

8  **A.     No, it was just cold.**

9  Q.    How cold?

10  **A.     I couldn't tell you the exact temperature.**

11  Q.    I mean, under freezing?

12  **A.     No, it was not freezing.  It was November, we**

13  **were all wearing winter coats and hats.**

14  Q.    Was there some snow on the ground?

15  **A.     I don't recall snow.**

16  Q.    So she was prone on the ground as you walked up

17  to her.

18  **A.     She was.**

19  Q.    Where were her arms?

20  **A.     Behind her back.**

21  Q.    And you say that she was not conscious.  Did she

22  say anything to you?  Did you say anything to her?

23  **A.     No.  That's what I was trying to -- I wanted to**

24  **talk to her.  So, and then at that point I realized she**

25  **could not talk, so we called for EMS.**

1          So, you know, I asked Officer Aldridge if they

2     were en route and he said no because, you know, the

3     family said she's fine, she's sleeping, she does this

4     all the time.

5          And I thought -- I thought it was odd that he

6     described it as sleeping, but that's what the family

7     said, that's what they said that she does all the time.

8          She gets -- she has these episodes where, you

9     know, she's very anxious and -- I don't know.  The way

10    they described it to me was almost like manic behavior.

11         I didn't see it firsthand, so I couldn't tell

12    you, but then they say that the family said then she

13    just kind of just exhausts herself and falls asleep.

14    Q.    Now, this is information you got secondhand from

15    Aldridge?

16    A.    Yes.

17    Q.    Did you get any of the information you just

18    shared with us from the family?

19    A.    I did not.

20    Q.    At any point did you talk to the family?

21    A.    Yes.

22    Q.    Okay.  We'll get to that.

23         But as you were assessing Tanisha, Aldridge was

24    saying that she has these episodes, he thought she was

25    sleeping and he thought the family thought she was

Page 26

1    sleeping; is that fair?

2    **A.      Exactly.  Yes.**

3    Q.      Now, did he indicate that the family told him

4    that he shouldn't call EMS?

5    **A.      No, he never indicated that.**

6    Q.      Did he indicate whether he had checked Tanisha's

7    breathing and pulse?

8    **A.      No, he did not.**

9              MS. DINEHART:            Did not

10             indicate?

11             THE WITNESS:            He did not

12             indicate that.

13   BY MR. GERHARDSTEIN:

14   Q.      Did you ask him?

15   **A.      I didn't ask.  I just -- I just checked it and**

16   **what he told me was that this was -- I honestly think**

17   **everything just escalated quickly as far as her need**

18   **for medical attention.**

19             **I think that prior to my arrival, like I stated,**

20   **the family had no concern.  In fact, when I got out of**

21   **the car, their first words to me was -- I think they**

22   **thought I was there because -- to check on the**

23   **officers, as if the officers, you know, maybe he**

24   **thought, oh, a supervisor is here, I want to make sure**

25   **the officers don't get in trouble.  And his first words**

1   out of his mouth to me were, you know, they were just

2   doing their job, and they were -- you know, she does

3   this all the time.

4         You know, he was just reassuring me that

5   basically in my mind that they did what they had to do

6   to restrain her.

7   Q.    Did you check Tanisha for respiration and for a

8   pulse?

9   A.    I tried to, but because she's a, you know, she's

10  a larger woman and it was hard to feel her pulse on her

11  neck or her, like her wrists.

12        So I basically had to visibly watch her chest

13  rise to make sure she was breathing.  And Officer

14  Aldridge did the same, you know, I unbuttoned like,

15  like opened up her gown.

16        And then once EMS got there, you know, that's

17  when they told us that she did have a low, I forget how

18  they said it, a low pulse rate I believe.

19  Q.    Prior to EMS getting there did you confirm

20  whether she had a pulse?

21  A.    I did not confirm whether she had a pulse.  I

22  just saw her breathing.

23  Q.    And what was your basis for thinking she was

24  breathing?

25  A.    Because I could see her chest rising.

Page 28

1    Q.     While she was prone?

2    **A.     No.  When I turned her over.**

3    Q.     And when you say you saw her chest rising, was

4    this breathing labored, slow?

5    **A.     Very slow.**

6    Q.     Was there any frost or anything, I mean, you

7    know, when people breathe when it's cold sometimes you

8    see evidence of that in the air.

9    **A.     No, no.  It wasn't that cold.**

10   Q.     Did you find out how long she had been on the

11   sidewalk?

12                   MR. MALLAMAD:                    Objection.

13                        Go ahead.

14   **A.     I don't know.  I just know how long -- I**

15   **basically know how long it took after going back and**

16   **looking at the time that they had been there and then**

17   **the time they called me.**

18        **If I had to guess, maybe 10 minutes.  I don't**

19   **even know if it was that long.**

20   Q.     Did you say anything else to Aldridge and did he

21   say anything else to you before you observed her

22   breathing while she was on her back?

23   **A.     I'm sorry.  Can you repeat that?**

24   Q.     Did you have any other conversation with

25   Aldridge prior to observing her breathing?

1  **A.      No.  He just told me what happened as far as why**
2  **she ended up in handcuffs.**

3  Q.      And he told you that before you assessed her
4  breathing?

5  **A.      No.  Oh, no, I'm sorry, he did tell -- yes, he**
6  **did.  He did.**

7  Q.      So tell me what he said.  I just want to know
8  everything he said before you assessed her breathing.

9  **A.      Okay.  He said that they got a call there**
10 **because the family wanted her to go to the hospital.**
11 **They said that they calmed her down enough to get her**
12 **to go on her own.**

13 **        But then once she got to the zone car she became**
14 **very anxious, didn't want to go.  And he said that she**
15 **kind of, you know, jumped out of the car, they tried to**
16 **get her back in, and then they struggled with her, and**
17 **that's how they ended up cuffing her.**

18 **        And then at that point is when I had Bryan Myers**
19 **call for EMS, and then while we were waiting was when**
20 **he gave me more details.**

21 Q.      Did you call for EMS before you had assessed her
22 breathing?

23 **A.      Yes, I did.**

24 Q.      Why?

25 **A.      Because she was unconscious and I wanted to get**

1    them there as quickly as possible.

2    Q.    When Scott Aldridge told you she jumped out of

3    the car and then he said he tried to get her back in,

4    did he describe during this conversation what he did to

5    try and get her back in?

6    A.    I don't recall.  I don't recall his exact words.

7    Q.    And did he describe how she came to be in

8    handcuffs?

9    A.    Well, he said that once they tried to get her

10   back into the car there was just a struggle, you know,

11   she started kicking them, and I don't know, I really

12   don't recall the details of it.

13   Q.    Did they cuff her while she was, according to

14   his statement to you, while she was standing, sitting,

15   in the car, on the ground?

16   A.    No, they had to -- in order to get her under

17   control, because she was kicking, they took her to the

18   ground and, you know, the way it was described to me

19   was that, you know, because she was a larger woman, the

20   best way to gain control of her was just to put his

21   weight on her back to get her arms behind her back,

22   because it was just the two of them, Officer Aldridge

23   and Officer Myers.

24         And I think she had a lot of adrenaline going

25   and so, you know, that was just the most effective way

1  to get her cuffed.

2          It wasn't that they were trying to hurt her,

3  because I know the family mentioned, you know, I don't

4  know, that was the only negative thing they said to me,

5  you know, they said I don't understand why they had to

6  put their knee on her back like that.

7          And I explained to them, you know, why, but, you

8  know, other than that, everything was very positive

9  that they said.  And I think they understood that after

10  I explained it.

11          But that was just the best way to get her to

12  comply, you know, to secure her.

13  Q.     So Scott Aldridge told you he had to put his

14  knee in her back?

15  A.     M-hm, yes.

16  Q.     And did he indicate what side he was on her?

17  A.     No.

18  Q.     And did he indicate what Bryan Myers was doing

19  while Aldridge was putting his knee on Tanisha

20  Anderson's back?

21  A.     No, he didn't.

22  Q.     And it was by virtue of that conduct by the

23  officers that they were able to bring her arms behind

24  her back; is that what your understanding is?

25  A.     That's my understanding, that that's how they

1  were able to secure her in the handcuffs.

2  Q.    When you observed her, a lot of larger people

3  need a couple of cuffs, was it one set or two?

4  **A.    I don't recall.  I think it was one.  I don't**

5  **recall two sets.**

6  Q.    So but her arms were pulled tightly behind her

7  back?

8  **A.    I don't know if it was tightly, but they were**

9  **behind her back.**

10 Q.    Did Scott Aldridge in this conversation before

11 you assessed Tanisha Anderson's breathing, did Scott

12 Aldridge indicate how long she resisted while they were

13 cuffing her?

14 **A.    No.  I mean, in all honesty, at that point I**

15 **really wasn't concerned with how this happened.  I just**

16 **wanted her to get medical attention.**

17 Q.    That's fair, and I understand that.  I'm just

18 trying to make sure I get the transfer of all the

19 information you have.

20 **A.    Right.**

21 Q.    Did he indicate how long she was conscious while

22 she was on the sidewalk?

23 **A.    He didn't.  He didn't and, again, I think that**

24 **the only thing that he stressed to me, and it's of huge**

25 **relevance, is that the family didn't think anything of**

1    what was going on.  It was something that they saw on a

2    regular basis.  So it didn't draw alarm to him.

3           I think as far as by the, you know, by the time

4    I got there, I think at that point she was in need of

5    medical attention, but prior to my arrival I don't know

6    that that was the case.  From what he told me and from

7    the reaction of the family, I don't believe it was.

8    Q.    Did Scott Aldridge tell you anything about

9    drawing his taser?

10   A.    He told me at the hospital.

11   Q.    Okay.  Well, we'll get to that then.

12   A.    Sure.

13   Q.    Did you learn anything else from him prior to

14   assessing Tanisha Anderson's breathing, other than what

15   you've already told me?

16   A.    No.

17   Q.    And did you have any independent conversation

18   with Bryan Myers?

19   A.    I had -- I didn't have any conversation with

20   Bryan because he was a probationary at the time.  I did

21   have independent conversation with Officer Muniz and I

22   got additional information as far as what was told to

23   him the first time that they were there.  That was

24   actually a day or two later.

25   Q.    Okay.  We'll get to that, too.

Page 34

1      At the scene, though, did you have any

2   conversation with Bryan Myers?

3   **A.      No.**

4   Q.     All right.  So you have rolled Tanisha over, you

5   think you see her breathing.

6   **A.      Yes.**

7   Q.     And did she continue to breathe in your

8   assessment using observing her chest all the way up

9   until EMS got there, or did there come a time when she

10  stopped?

11  **A.      No.  We stayed on the -- I stayed next to her**

12  **and kept monitoring her.  The family brought a blanket**

13  **out and, you know, I wanted to keep a close eye on her**

14  **in case I needed to begin CPR, and it wasn't necessary.**

15  Q.     Were you trained in CPR?

16  **A.      I was not trained.  I was trained -- I should**

17  **say I was not certified.  We were trained years prior.**

18  **I think it might have been in the academy, I don't even**

19  **recall the date.**

20  Q.     And your hire date again was?

21  **A.      '97.**

22  Q.     So from '97 till 2014 had you had any refresher

23  courses?

24  **A.      There was one refresher course and I want to say**

25  **it may have been like 2009.  Maybe prior to that.**

Page 35

1    Q.    Did you have first aid equipment in your zone

2    car?

3    **A.    No, we did not.**

4    Q.    And had that always been the case from '97 to

5    2014 that you would be trained in first aid but not

6    have any first aid equipment?

7    **A.    Unless we bought our own.**

8    Q.    You mean literally?

9    **A.    We literally would have to buy our own.**

10   Q.    Like out of your own pocket?

11   **A.    Yes.**

12   Q.    Prior to EMS arriving did you have any

13   conversations the family?

14   **A.    Yes, I did.**

15   Q.    Who did you speak with?

16   **A.    I spoke with -- well, it was just briefly with**

17   **the brother and that's when he, like I said, he told me**

18   **that they were just, you know, that they were doing**

19   **their job.**

20   Q.    Well, tell me as best you can recall what you

21   said to him and what he said to you?

22   **A.    That was it.  Honestly, I didn't have a**

23   **conversation with the family at that point.  I didn't**

24   **feel like it was appropriate.  I wanted to wait until**

25   **everything was okay with Tanisha.**

Page 36

1  Q.      And so --

2  **A.      I didn't want to start asking them questions.**

3  Q.      But what did he say?

4  **A.      It was just when I first got out of the car and**

5  **that's when he said that, you know, these officers were**

6  **just doing their job.**

7  Q.      That's it?

8  **A.      He said something in regard to Tanisha.  I don't**

9  **want to misquote him.  It was something -- something**

10  **along the lines that, you know, she brought this on,**

11  **basically.**

12  Q.      Did any other family member have anything to

13  say?

14  **A.      Not on scene.**

15  Q.      Where was the brother when you spoke to him?

16  **A.      That was right on the sidewalk.**

17  Q.      Were there any other family members close by

18  him?

19  **A.      I want to say it was her mother and then maybe**

20  **his wife.**

21  Q.      Did you say anything to them?  Did they say

22  anything to you?

23  **A.      I don't recall.  I just recall my conversation**

24  **with them at the hospital.**

25  Q.      Any other conversations with anyone prior to EMS

Page 37

1    arriving?

2    **A.      No.**

3    Q.      Were you on the radio with anyone prior to EMS

4    arriving?

5    **A.      No, not that I recall.**

6    Q.      Did you call for EMS or did one of the officers?

7    **A.      Bryan Myers called for EMS.**

8    Q.      When EMS arrived did you know the EMS crew?

9    **A.      No.**

10   Q.      What did you say to them, and what did they say

11   to you?

12   **A.      I don't remember saying anything to them.  They**

13   **just basically started doing their thing, checking her**

14   **out, and we unhandcuffed her.**

15   **        I did explain to them, you know, that I kept her**

16   **cuffed because we weren't so sure that she wasn't**

17   **faking.  I didn't want to take the cuffs off and then**

18   **have her start fighting again.**

19   Q.      So the cuffs were removed only when EMS got

20   there?

21   **A.      Yes.**

22   Q.      And who removed the cuffs?

23   **A.      I don't recall.  I don't recall who took them**

24   **off.  I remember helping, but.**

25   Q.      What did you do to help?

1  **A.      I don't know if I actually -- if I was the one**

2  **-- because sometimes they're hard, it's hard to see.**

3  **Depending on how they're positioned, it's hard to see**

4  **the little hole to get them uncuffed.**

5  **So I don't remember if I held her hands or if I**

6  **actually uncuffed them.  I remember helping, though.**

7  Q.     What did EMS do as they -- what do you mean by

8  they did their thing, what did you observe?

9  **A.      Well, they actually put her on the stretcher and**

10  **took her to the EMS wagon.  And, well, they did put her**

11  **-- see, I'm sorry, I'm not --**

12  Q.     That's okay.

13  **A.      I don't know what they did exactly, but they**

14  **made sure that, you know, that she had a pulse because**

15  **it's my understanding if she didn't they would have**

16  **probably started CPR immediately.**

17  **But they put her on the stretcher and took her**

18  **to the wagon.**

19  Q.     So they did not start CPR while she was out on

20  the sidewalk.

21  **A.      No.**

22  Q.     They put her on the stretcher, put her in the

23  wagon.

24  Did you observe, did they do any other

25  interventions prior to her going inside the ambulance?

1   **A.      Not that I observed.**

2   Q.      And then when she was in the ambulance did you

3   observe what they were doing?

4   **A.      I didn't.**

5   Q.      Did they run any assessments, electrocardiogram,

6   the AED machine?

7   **A.      I'm sorry, I don't know.**

8   Q.      Did they speak to you at all before they left

9   the scene?

10  **A.      They didn't speak to me.  I know they -- I**

11  **remember them telling the family, you know, because the**

12  **family obviously at that point was concerned.  And I**

13  **just remember the EMS supervisor was there and she**

14  **said, you know, we're doing all that we can and**

15  **reassured the family and that was it.**

16  Q.      Did she -- was this a man or woman, this EMS

17  supervisor?

18  **A.      It was a female.**

19  Q.      Did she indicate the condition of Tanisha at

20  that point?

21  **A.      No.**

22  Q.      Did she indicate whether there was heart

23  activity or --

24  **A.      She didn't.**

25  Q.      And did she share that information with you?

Page 40

1   **A.      No.  I didn't know anything until we got to the**

2   **hospital.**

3   Q.      Did you make any radio broadcast before you went

4   to the hospital?

5   **A.      I don't recall for sure, but I would imagine I**

6   **told radio that we were going to the hospital.  That's**

7   **usually standard protocol.**

8   Q.      When you arrived at 1374 Ansel, was there any

9   representative of the union there?

10  **A.      At Ansel, no.**

11  Q.      Before you left and went to the hospital, was

12  there a union representative there?

13  **A.      At the hospital?**

14  Q.      No, no.  At the house.

15  **A.      No.**

16  Q.      So before you went to the hospital was there any

17  other Cleveland Police representative present at 1374

18  Ansel other than you, Myers, and Aldridge?

19  **A.      No.**

20  Q.      How long were you at 1374 Ansel before leaving

21  for the hospital?

22  **A.      I don't know.  I'm sorry.**

23  Q.      More than 15 minutes?

24  **A.      Yes, it was more than 15 minutes.**

25  Q.      More than 30 minutes?

1   A.      Probably if I had to guess, closer to a half

2   hour, 45 minutes at least.

3   Q.      Did there come a time when you called in to your

4   supervisor the status of what was going on?

5   A.      Yes.  When I got to the hospital I called my

6   lieutenant to let him know, that was right after I got

7   information from the hospital that she -- that Tanisha

8   had expired.  So I called my lieutenant to let him

9   know.

10          And then I believe he made the call to our

11  dispatch.  Usually with an incident like this they'll

12  put out what's called a group 1 page, so they'll notify

13  all the, from the best of my knowledge, I think it's

14  all the command staff becomes aware of it, and they

15  send out our Use of Deadly Force Investigation Team.

16          And I think when they make that page is when I

17  believe that page also includes, I don't know if radio

18  notified the union, I know I didn't.

19  Q.      Okay.

20  A.      But somehow they were notified.

21  Q.      So you got to the hospital and you said earlier

22  that you spoke with Aldridge at the hospital.

23  A.      Yes.

24  Q.      What did he tell you?

25  A.      Well, he told me -- he just -- he said, sarg,

 1    you know, I don't understand.  We spent so much time

 2    calming her down, and he's like we did breathing

 3    exercises with her, you know, everything was fine, we

 4    walked her to the car, she was, you know, completely

 5    cooperative.

 6          And then he said, and then she just went crazy

 7    once she got to the zone car.  She sat in the back seat

 8    and I don't know if it just had a very negative effect

 9    on her.

10          And I asked him again, you know, what had

11    happened as far as, you know, the struggle with her,

12    and then that's when he explained, because the family

13    mentioned to me again, I don't remember if it was the

14    sister or the mother, and she said, you know, they did

15    -- because she said to me, reiterated what Scott had

16    told me and officer Aldridge.

17          And she said they even went and got her shoes

18    for her and, you know, they were so patient and they

19    took their time talking to her.

20          And she said but, she said, I just don't

21    understand why -- I think it was -- I think it was

22    Tanisha Anderson's sister-in-law that said this, if I

23    remember correctly.

24          And then that's when she said, you know, it just

25    seemed like he didn't really have to put his knee in

Page 43

1    her back like that.  And I explained to her, and then,

2    you know, I asked Scott to explain to me how it

3    happened again.

4         And he said, you know, she was kicking and she

5    was, you know, she was just out of control.  We had to

6    take her down to the ground to get her cuffed.

7    Q.    Did he explain how he took her down to the

8    ground?

9    A.    No.  I don't recall any of the details.  You

10   know, once we got to the hospital I knew that the

11   investigation was being taken over by the use of deadly

12   force team, so I really didn't ask many more questions.

13   Q.    But on at least two occasions, both at the house

14   and at the hospital, he indicated that he had taken her

15   to the ground to get her cuffed, and in the course of

16   that use of force he had placed his knee on her back;

17   is that fair?

18   A.    Right.

19   Q.    In either of those discussions with Scott

20   Aldridge about what happened did he indicate how far

21   she had moved away from the car before he took her to

22   the ground?

23   A.    He didn't.

24   Q.    While you were talking with Scott Aldridge and

25   he was explaining these facts to you, was Bryan Myers

Page 44

1    within earshot?

2    A.      I don't recall where Bryan was.

3    Q.      Where in the hospital did you have this

4    discussion with Scott Aldridge?

5    A.      We were -- it was outside of the emergency room.

6    The only thing I can remember is that the family room

7    was like right there.  I remember the door to the

8    family room.  You know, usually they have that private

9    room where they can go sit away from the waiting area.

10           I just remember we were standing there and

11   because two -- well, no, that's when I talked to I

12   think it was the sister-in-law again.

13           And that's when she, she kept, for whatever

14   reason, she kept talking, discussing her medication.

15   Like I never questioned anything about the medication,

16   she kept bringing it up.

17           She's like, you know, she doesn't have access to

18   it, I don't know what happened, you know, we don't let

19   her have it.

20           And it really didn't make sense to me why she

21   kept bringing it up until I had a conversation days

22   later with Officer Muniz, and that's when he told me,

23   well, the reason she kept bringing it up is because she

24   told me that they couldn't control her so they gave her

25   her second dose of medication early.  Now, I don't know

Page 45

1    what this medication was for.  And then they gave her a

2    sleeping aid along with it.

3           And then he said, he goes, in her words she said

4    we gave her a sleeping aid and it was enough to knock a

5    horse out.

6           So in my mind the family had told us at the

7    hospital that she had a heart condition, so I'm

8    thinking whatever this mix of medication and this

9    sleeping aid, maybe that had an adverse reaction to

10   whatever was going on with her.

11   Q.    So you're talking to what family members at the

12   hospital?

13   A.    Again, I don't know exactly their relation, but

14   I believe it was the brother's wife and then her mother

15   I think was there.

16   Q.    Anyone else?

17   A.    I think her son.  I just remember two juveniles,

18   there was a boy and a girl, they were like teenagers.

19   Q.    Okay.

20   A.    Because I remember he came out of the family

21   room and he was basically singing the officers'

22   praises.  He's like thank you, we appreciate what you

23   do, we know you have a tough job, and she's in a better

24   place now, and like he was very accepting of it.  And I

25   do believe that was her son.

1    Q.      Anyone else present?

2    **A.      There might have been, but I don't recall.**

3    Q.      Were there any other police department

4    representatives present when you had this conversation

5    with family members?

6    **A.      Officer Aldridge might have been standing there,**

7    **but I don't believe anybody else.**

8    Q.      And did -- you told me that the son was saying

9    that what you believe to be his mother was in a better

10   place now, and you said he was singing the officers'

11   praises.

12           What was he saying?

13   **A.      Well, just saying, you know, you guys have a**

14   **very tough job and we appreciate what you do, and that**

15   **was the extent of it.  It was nothing specific.**

16   Q.      What did the mother say?

17   **A.      I don't recall what the mother said.**

18   Q.      So the only family member that talked to you

19   about what actually happened was the woman that you

20   believe to be the brother's wife?

21   **A.      Yes, and I just -- again, you know, she kept --**

22   **she was just concerned.  She wanted us to know that,**

23   **you know, everything was fine with her medication, that**

24   **she doesn't have access to it, and like, you know, it**

25   **was like she wanted us to know that there was no way**

1   **she got to her meds.  Kind of like she just wanted us**

2   **to know that they keep control of them.**

3   Q.     But she volunteered also that they had given her

4   a second dose of medication early?

5   **A.     She didn't say that to me.  She said that to**

6   **Officer Muniz.**

7   Q.     All right.  And so this other statement about

8   giving her a sleeping aid, enough to knock a horse out,

9   that was to Muniz?

10  **A.     Yes.**

11  Q.     Okay.  So to you she said that Tanisha didn't

12  have access to her meds, the family controlled all

13  that.

14         Any other statements to you about her

15  medication?

16  **A.     Nothing about the medication.  Just that, you**

17  **know, she explained to me how well the interaction had**

18  **gone with Officer Aldridge and Tanisha.**

19  Q.     What do you mean by that?  What did she say?

20  **A.     That's when she said to me, you know, they**

21  **really took their time with her and they were patient.**

22  **You know, they did -- I don't know if she told me they**

23  **did breathing exercises with her.  I think she might**

24  **have told me that.  I know Scott told me that.**

25         **And then, yeah, just basically she was very**

1   **grateful that they were able to calm her, have like a**

2   **calming effect on her and to get her to go willingly to**

3   **the hospital.**

4   Q.    And did she have anything to say about how the

5   officers conducted themselves after she -- after

6   Tanisha no longer wanted to go to the hospital?

7   **A.    That wasn't until the use of deadly force team**

8   **arrived.  As soon as --**

9   Q.    Okay.  Well, let's --

10  **A.    That's when she --**

11  Q.    I want to get to that, but I want to also just

12  make sure I get everything you had when you're alone

13  with her and Scott.

14      Anything else volunteered at that point?

15  **A.    Not at that point.**

16  Q.    Any other information you get from family

17  members at that point?

18  **A.    Nothing other than that they had mentioned that**

19  **she did have a heart condition.**

20  Q.    Okay.

21  **A.    They weren't specific about that, but, you know,**

22  **she did have medical issues was the information that we**

23  **got.**

24  Q.    And you're still there and the use of deadly

25  force team arrives.

Page 49

```
 1          And prior to the use of deadly force team
 2  arriving have I learned everything you knew or you had
 3  learned from the family and from Scott Aldridge, or is
 4  there something else that we haven't talked about?
 5  A.     No, that was everything.
 6  Q.     But then you observed or heard some stuff go
 7  down and some conversation after the use of deadly
 8  force team arrived.  Tell me about that.
 9  A.     Well, that's when the sister-in-law approached
10  me.  I don't know if it was because she felt -- I don't
11  know if she saw these men in suits and just thought,
12  well, things kind of changed.
13  Q.     Well, Rhonda Gray was there, right?
14  A.     Rhonda Gray was there, yes.  And I don't know at
15  what point, I just -- I know that they introduced
16  themselves to the family.
17  Q.     And who introduced themselves?
18  A.     That was Sergeant Dierdre Jones and Detective
19  Gray.
20  Q.     All right.
21  A.     I don't recall who else was there.
22  Q.     Was Borden there?
23  A.     I don't remember.  I'm sorry.
24  Q.     Were any of the internal people there yet?
25  Heffernan?  Goins?
```

1  A.      I want to say they went to Ansel, because I know

2  half were at the hospital and then they went to Ansel

3  because they had to do their walk-through with the

4  prosecutor, I think.

5  Q.      Anyway, Dierdre Jones, Detective Gray, maybe

6  some others introduced themselves --

7  A.      Right.

8  Q.      -- and then what happened?

9  A.      Well, I think it was concerning to them when

10  they heard them say we're from the Homicide Unit.  So

11  then I think all of a sudden in their minds they're

12  like, wow, these officers must have really done

13  something wrong here, because why is the Homicide Unit

14  here.

15      So that's when the sister-in-law approached me

16  and said, you know, I don't think it was right.  I

17  don't know why he had to put his knee in her back like

18  that.

19      And that's when I proceeded to explain to her

20  what was told to me by Officer Aldridge.  And she

21  seemed to be understanding of it, but I don't know.

22  Q.      The brother had also mentioned concerns about

23  that back at the house, right?

24  A.      I don't remember the brother saying anything to

25  me about it.

Page 51

1    Q.    Okay.  So she mentioned that.  And did she say

2    anything else other than her concern about the knee

3    on --

4    **A.    No, and that was, again, that was the first time**

5    **I heard anything negative from any of the family.**

6    Q.    The concern she was raising was based in facts

7    that even Scott Aldridge had told you, right?

8                    MR. MALLAMAD:                    Objection.

9                    You can answer.

10   BY MR. GERHARDSTEIN:

11   Q.    I mean, he had said to you that he had put his

12   knee on Tanisha Anderson's back.

13                   MR. MALLAMAD:                    Objection.

14                   You can answer.

15   **A.    Oh, right, I did know that that took place and I**

16   **-- yes.**

17   Q.    All right.  Did you learn anything else from the

18   family after the use of deadly force team showed up?

19   **A.    The only thing I learned, it wasn't from family,**

20   **but apparently the family had mentioned something to,**

21   **and I apologize, I don't know if it was at the hospital**

22   **or at the house, but somehow Lieutenant Goins, I**

23   **believe, had gotten information that Officer Aldridge**

24   **had pulled a taser.**

25           **He didn't mention that.  I don't know if it was**

Page 52

1   because he didn't use it, so he just didn't, you know,

2   and so then when I asked, I said, Scott, did you at any

3   time pull your taser, he says yes, I did, he said, but

4   I didn't use it.  He goes, I would have never used it

5   on her.

6          And he said I just wanted -- he's like I just --

7   I wanted her to comply.  I think he wanted -- he

8   thought maybe if he pulled that, that he wouldn't --

9   there wouldn't have been such a struggle.  He thought

10  maybe it would intimidate her a little bit.

11  Q.    Did Scott Aldridge tell you that Tanisha

12  Anderson's brother had urged him not to use his taser?

13  A.    He did.

14  Q.    And did he indicate that he complied with the

15  brother's request, that he put the taser away?

16  A.    Yes.

17                    MR. MALLAMAD:                 Objection.

18                    You can answer.

19  A.    Oh, I'm sorry, yes.

20         But he did, he reiterated, he said, sarg, I

21  would have never used it, I would have never used it.

22  He just -- because he felt like, you know, using it on

23  -- I think things being the way they are with our

24  department, I think unfortunately that's almost what

25  we've come to.  The guys are, they just know that it

Page 53

1   looks bad.

2   Q.      What do you mean?

3   A.      He felt like if he were to use a taser on

4   someone that was having, even though that's why they

5   were initially issued to us, they're now, the media has

6   made it so that if we use them on somebody that's

7   mentally ill or disabled in any way that, you know,

8   that we're like bullies, and I think that was in the

9   back of his mind.

10  Q.      Did he say that?

11  A.      Well, no, but he said, he just said, I would

12  have never used that on her.

13          Because, you know, he knew she was on medication

14  and he knew she was having issues, and I think he

15  thought that that probably wasn't the right course to

16  follow.

17  Q.      Did you learn anything else while you were still

18  at the hospital about what had happened?

19  A.      No.

20  Q.      How did you come to learn that Tanisha had

21  passed?

22  A.      The hospital staff told me.  They were working

23  on her for a bit in the ER.  And then -- actually, no,

24  I'm sorry.  I think it was the paramedics that told me.

25  Yeah, I think it was the paramedics that brought her

1  **in.**

2  Q.    Was it your understanding that she had died on

3  the way to the hospital?

4  **A.    No.  My understanding was that she died at the**

5  **hospital.**

6  Q.    So when you say the paramedics told you, tell me

7  the sequence of events.

8  **A.    Well, they stayed at the hospital while the**

9  **hospital staff was -- and when I say working on her,**

10  **I'm sorry, I don't know exactly what was going on in**

11  **the emergency room, but so eventually I approached them**

12  **and asked them.  I said, you know, what is her status,**

13  **and then that's when they said that she had expired.**

14  Q.    How long after you got to the hospital did you

15  have that conversation with the EMS people?

16  **A.    I don't believe much time had gone by, maybe 10**

17  **minutes.  Could have been longer than that.**

18  Q.    And how long after that did the family learn she

19  had died?

20  **A.    I don't recall, I'm sorry.  I don't even**

21  **remember who told her.  It was probably around the same**

22  **time, though.**

23  Q.    And forgive me if I have this wrong, do I recall

24  correctly that you called your lieutenant for the first

25  time from the hospital?

1   **A.      I did.**

2   Q.      And that you believe triggered the protocol on

3   getting the use of deadly force team out and so on?

4   **A.      Well, I knew that was the protocol.**

5   Q.      Right.

6   **A.      I just wanted to go up the chain of command.**

7   Q.      But it was your call that started it, right?

8   **A.      Yes.**

9   Q.      Because they wouldn't have known about it

10  otherwise.

11  **A.      Yes.  Yes, yes.**

12  Q.      So how long after you made that call to your

13  lieutenant did the use of deadly force team show up at

14  the hospital?

15  **A.      I don't recall.**

16  Q.      I mean, an hour?

17  **A.      I don't believe it was that long.**

18          **I know that they had already -- they were --**

19  **they had been out on another homicide, so they might**

20  **have never even gone home.  I think they came right to**

21  **ours.**

22  Q.      Have I covered everything that you learned while

23  you were at the hospital?

24  **A.      I believe so.**

25  Q.      There came a time a couple days later when you

1  had a conversation with Officer Muniz that you were

2  going to tell me about, but now I'm ready to hear it.

3  **A.      Okay, sorry.**

4  Q.     So tell me about that.  When was that and where

5  was it?

6  **A.      Well, I saw him at the district again maybe two**

7  **days later, and we were discussing what had taken**

8  **place.**

9  **        And he said, you know, that family told me that**

10 **they had to give her her medication early because they**

11 **couldn't get her to calm down, they were kind of at**

12 **their wits' end, they really didn't know what to do.**

13 **        And so they gave her her second dose early and**

14 **then they gave her a sleep aid thinking that that would**

15 **again calm her or put her to sleep.  And he said in**

16 **their words, it was enough to knock a horse out.**

17 Q.     Did he indicate what meds they were talking

18 about?

19 **A.      No.**

20 Q.     Did he indicate whether he had shared this

21 information with anyone else?

22 **A.      He didn't.**

23 Q.     Did you advise him one way or the other as to

24 whether he should share that information with anyone

25 else?

1   A.     Well, I requested him at the time, I said, well,

2   I think that's important for you to report.  And he

3   said okay.  And he just wanted to double-check on how

4   to go about it, so he consulted his union

5   representative.

6          And they knew that -- the union representative

7   knew that he was going to be called down for a

8   statement.  I believe it was Internal Affairs, so he

9   said, well, you give them all the details at that

10  point.

11         And he explained that to me, and I was fine with

12  that.  I just wanted to make sure that whoever was

13  investigating this was made aware of it.

14  Q.    Did you have any additional conversations with

15  Muniz about statements he had heard from the family or

16  anything else?

17  A.     No.  You know, he just, again, reiterated that

18  when they were there on scene, he said there really was

19  no reason for us to force her to the hospital.

20         You know, we explained to the family, like if

21  you think that she needs medical attention, you know,

22  by all means, we'll have EMS respond, but we can't

23  force her to go for a psychiatric evaluation if, you

24  know, she's not at risk for suicide or she didn't

25  overdose or anything.

Page 58

1          And, you know, like he said, he said, I think it

2   just all escalated and then an hour and a half, two

3   hours later, we got called back.

4   Q.     Is it your understanding that the statement

5   about giving her sleep aid sufficient to knock a horse

6   out, that that was made when Muniz was at the house

7   during the initial run to 1374 Ansel?

8   A.     It's my understanding that that's when he was

9   given that information from the family.

10  Q.     Right, because he didn't have any other contact

11  with him, right?

12  A.     No.

13  Q.     Who from the family told him that?

14  A.     I don't know.  He probably told me, I just don't

15  remember.  I'm sorry.

16  Q.     His partner was McGrath?

17  A.     Yes, he was also I believe a probationary

18  officer at the time.

19  Q.     Did you ever have any conversations with McGrath

20  about that first run?

21  A.     I did not.

22  Q.     So you've told me what you learned at the

23  hospital, you told me what you learned from Muniz a

24  couple of days later.

25          Going back to the hospital, what did you do?  Is

1   there anything else you did while you were at the

2   hospital on the night or the early morning hours of the

3   13th, I guess we are now.

4   **A.     Once the Use of Deadly Force Investigation Team**

5   **got there, it's basically just turned over to them.  So**

6   **at that point Sergeant Tucker needed the taser**

7   **downloads, because they wanted to ensure that the**

8   **tasers weren't used by either officer.**

9   **        So that was really the last part I had in this,**

10  **was turning that taser download over to Sergeant**

11  **Tucker.**

12  Q.    How did you go about securing the taser

13  download?

14  **A.     We -- I apologize.  I can't remember if -- I**

15  **don't remember who actually took the tasers from the**

16  **officers, but we, myself and Sergeant Tucker, took the**

17  **tasers back to the district, downloaded them on the**

18  **computer, and then got the actual printout which**

19  **details every spark test, every use of that taser going**

20  **back to when it was issued.**

21  **        And then that download was taken back to**

22  **Internal Affairs by Sergeant Tucker.**

23  Q.    Did you notice anything significant when you

24  downloaded the taser --

25  **A.     No, they didn't use their tasers.**

Page 60

1  Q.     Did they even spark test them before the shift

2  began?

3  **A.     Honestly I don't remember.**

4  Q.     You'd agree that in 2014 Cleveland did not have

5  in place any system for measuring the amount of actual

6  current that was discharged by a taser when it was

7  being used, right?

8                 MS. DINEHART:              Objection.

9                 MR. MALLAMAD:              Objection.

10                    You can answer.

11 **A.     I actually can't answer that.  I don't know.**

12 Q.     Well, you carry a taser, right?

13 **A.     I do.**

14 Q.     Did you ever test the amount of energy it was

15 outputting?

16 **A.     No.**

17 Q.     Anybody ever tell you that there was a system

18 for testing the amount of energy that it was putting

19 out?

20 **A.     Not that I'm aware of.**

21 Q.     So you go back to the district, you get the

22 taser downloaded with Lieutenant Tucker?

23 **A.     He was sergeant at the time, yeah.**

24 Q.     And then what did you do?

25 **A.     I don't even know what time it was at that**

1   point.  I know I had breakfast and did my paperwork.

2   Q.     Did you ever go back to 1374 Ansel?

3   A.     I want to say that we went back, that's where we

4   went to get the tasers, but I can't recall a timeline.

5   I think we went after the hospital to 1374.

6   Q.     Did Tucker join you at the hospital?

7   A.     I don't remember.

8   Q.     But he needed to find Aldridge and Myers to

9   retrieve their tasers.

10  A.     I just remember -- I don't remember retrieving

11  the tasers from them.  I think that maybe Lieutenant

12  Goins did.  I could be wrong.  I'm sorry, I just don't

13  remember.

14  Q.     But he was at the house.

15  A.     He was at the house.  That's why I say, I want

16  to say we went back to the house from the hospital,

17  because once I got back to the district, I never went

18  back to the scene or the hospital.  I started my

19  reports.

20  Q.     As you reflect on this going back to the house

21  from the hospital, did you have occasion to be present

22  when the two officers did the walk-through with the use

23  of deadly force team?

24  A.     I wasn't part of the walk-through.  I might have

25  been on the street, but I wasn't part of the

1  **walk-through.**

2  Q.     Did you hear anything that was said during that?

3  **A.     I didn't.**

4  Q.     Do you have as we sit here today any

5  recollection of observing them doing the walk-through?

6  **A.     I don't.**

7  Q.     When you went back to the scene -- well, at any

8  time, was there ever a crime scene log established?

9  **A.     I did not establish one.**

10  Q.     Why not?

11  **A.     Well, I guess because at the time there was no**

12  **-- it wasn't protocol.  She was -- it was a crisis**

13  **intervention situation and we don't do crime scene logs**

14  **for that.  There was -- it wasn't a crime.**

15  Q.     Well, as early as the time you uncuffed her and

16  let the EMS take custody of Tanisha you knew that there

17  had been force used to secure her in handcuffs and

18  place her on the ground, right?

19  **A.     Right, but we still don't do crime scene logs or**

20  **use of force investigations.  The only time we would do**

21  **a crime scene log is if it was a use of deadly force**

22  **situation.  At that point it was not.**

23         **So I believe that from -- while I was at the**

24  **hospital, it's my understanding that they went back,**

25  **secured the scene, and from that point did their**

Page 63

1   walk-through.

2   Q.      Who went back and secured the scene?

3   A.      **Well, it would have had to have been the Use of**

4   **Deadly Force Investigation Team, because they took over**

5   **the investigation.  But, again, I don't -- I don't know**

6   **for certain.**

7   Q.      Were you working in the days that followed?  You

8   didn't go away on vacation or --

9   A.      **No.**

10  Q.      So you were working?

11  A.      **I was working.**

12  Q.      Were you ever interviewed by the Use of Deadly

13  Force Investigation Team?

14  A.      **I was not.**

15  Q.      Were you ever interviewed by any supervisor

16  regarding your own personal involvement in the facts

17  surrounding Tanisha Anderson?

18  A.      **I was not interviewed.**

19  Q.      Did you ever write any detailed report of your

20  encounter with Tanisha and the statements made by

21  Officer Aldridge?

22  A.      **I did.**

23              MR. MALLAMAD:               Just for a

24              second, I see these are both 48 here,

25              Janet.

Page 64

```
1          THE NOTARY:                    This
2          should be 49, I'm sorry.
3                 So let me remark this.
4          MR. GERHARDSTEIN:              And we'll
5          put it on the record after you do it.
6                 (Thereupon, Plaintiff's Exhibits 49,
7          50, and 51 to the deposition of SERGEANT
8          ROCHELLE BOTTONE were marked for
9          identification.)
10  BY MR. GERHARDSTEIN:
11  Q.    Showing you what's been marked as Exhibit 50,
12  can you tell what that is?
13  A.    It's my daily duty report.
14  Q.    And when was that created?
15  A.    November 12th, 2014.
16  Q.    Now, you went off duty on the 13th, right?
17  A.    At 8:00 a.m., yes.
18  Q.    So do you write that up at the end of the day?
19  A.    Yes.
20  Q.    Do you do this every day at the end of your
21  shift?
22  A.    Yes, I do.
23  Q.    So was this prepared on the 13th at the end of
24  your shift?
25  A.    Yes.
```

1  Q.     At 12:30 in the morning it looks like you

2  indicate that, it says conveyed to Cleveland Clinic.

3  Do you mean that that's when Tanisha was conveyed

4  there?

5  **A.     Yes.**

6  Q.     Expired at hospital, use of deadly force team

7  notified, family notified by medical, confer with

8  Homicide Unit.  Is that you conferring with Homicide

9  Unit?

10 **A.     I conferred with Sergeant Jones at the hospital**

11 **and that's when she advised me that she would need this**

12 **what we call Form 1 documenting my involvement in the**

13 **incident.**

14 Q.     And when did you talk to her at the hospital?

15        Was that before or after your conversation with

16 Scott Aldridge and with the family?

17 **A.     It would have been after.**

18 Q.     And what else did you say to Sergeant Jones and

19 what did she say to you?

20 **A.     I don't recall exactly.  I just know that I gave**

21 **her a brief rundown of what took place on scene and**

22 **that was really it, because I knew she was going to**

23 **interview everybody.**

24 Q.     Then this also says, at least at I read it, that

25 you conferred with Internal Affairs Unit, Lieutenant

Page 66

1  Goins; am I reading this right?

2  **A.      Yes.**

3  Q.      So what did you say to Goins and what did he say

4  to you?

5  **A.      I honestly don't remember talking to Lieutenant**

6  **Goins.  I'm sure I did, but.  It could have only been**

7  **that, let's see, I know I talked to -- that might have**

8  **even been -- some of these were a landline, because**

9  **like Captain Bentley was never there.  I talked to him**

10  **on the phone.**

11  Q.      So Lieutenant Goins, you don't have any specific

12  recollection of what you said to him?

13  **A.      I don't.**

14  Q.      And what about Captain Bentley?  You called him

15  on the phone, what did he say?

16  **A.      He called me.**

17  Q.      Okay.

18  **A.      Yeah, he called me.  He just wanted to make sure**

19  **everything was okay.**

20  Q.      What's that mean?

21  **A.      Well, because of there being a use of force**

22  **call-up, use of deadly force investigation call-up,**

23  **that's just part of the union's, their representation.**

24  **They just want to make sure that we don't need to**

25  **discuss anything with them regarding the facts of the**

Page 67

1    -- it's just procedure.

2    Q.     And the FOP was your union.

3    A.     My union.

4    Q.     Because that's sergeants and up?

5    A.     Yes.

6    Q.     And then the CPPA was Aldridge and Myers' union?

7    A.     Right.

8    Q.     And did you talk to Follmer?

9    A.     I spoke with him briefly, but it was nothing

10   related to this.  It was just hi, how are you, because

11   we used to work together.

12   Q.     Did you speak to him at the hospital or at --

13   A.     It was on Ansel.

14   Q.     Was it before you went to the hospital or when

15   you went back?

16   A.     I want to say it was when I went back.

17   Q.     And does any of this refresh your recollection

18   as to whether he was there before Tanisha Anderson left

19   for the hospital?

20   A.     I'm sorry, can you say that again?

21   Q.     Does any of this help you remember one way or

22   the other whether Follmer was there prior to Tanisha

23   Anderson leaving for the hospital?

24   A.     Oh, he was not.  He definitely wasn't.

25   Q.     And then if I'm reading this right, it looks

Page 68

1    like you also talked to Detective Crowell?

2    **A.      That took the photos.**

3    Q.      All right.

4    **A.      Yeah.**

5    Q.      And what did you say to Detective Crowell?

6    **A.      Well, because they're on here, it doesn't mean**

7    **that -- see, right here it says confer with Homicide**

8    **Unit, Internal Affairs, Lieutenant Goins.**

9    Q.      Right.

10   **A.      I didn't confer with Detective Crowell about**

11   **anything.  I just put her name because she was there**

12   **for the photos.**

13   Q.      All right.

14   **A.      That's probably a little misleading.  I**

15   **apologize.**

16   Q.      That's all right, I just need to know.

17           And what about Captain Heffernan?

18   **A.      I don't remember speaking with him.  I just put**

19   **him there because he was on scene.**

20   Q.      And it's your understanding -- so this does

21   confirm that you did go back to Ansel?

22   **A.      Yes.**

23   Q.      And but it's your testimony that you don't

24   recall having any conversation with Crowell or

25   Heffernan.

1   **A.      No, I don't.**

2   Q.      Confer with UDFIT c/w walk-through, what's that

3   mean.

4   **A.      Oh, connection with the walk-through.  They were**

5   **basically just telling me that that's what they were --**

6   **that was the next part of the investigation, but I**

7   **wasn't part of it.**

8   Q.      So you were not present at the walk-through or

9   you --

10  **A.      I was on Ansel but I was not -- I mean, they**

11  **didn't want me there with them as part of it.**

12  Q.      When the walk-through did occur, did both Myers

13  and Aldridge do the walk-through together?

14  **A.      That I don't know.  I would imagine they would**

15  **do it separately, but I can't answer that.**

16  Q.      Have you ever been part of the UDFIT team?

17  **A.      No.**

18  Q.      Prosecutor's office notified by UDFIT.

19          Was that something you were involved in?

20  **A.      No.  From my understanding they usually want a**

21  **prosecutor there for the walk-through, but I don't know**

22  **that a prosecutor ever responded.**

23  Q.      Did you observe a prosecutor present during the

24  walk-through?

25  **A.      I don't recall seeing a prosecutor.**

1  Q.      And why would in your memo there be any

2  reference to the notification of the prosecutor?

3          I mean, did you witness it?

4  **A.      Probably because I was given that information**

5  **that they were notified and I didn't want it to appear**

6  **that anything was overlooked as far as on my end.**

7          **So even though that was not necessarily my**

8  **position to make that notification, because I was aware**

9  **of it, I put it in there.**

10  Q.      Did you witness the notification?

11  **A.      I did not.**

12  Q.      Then we have the downloads, we have the printout

13  going to Tucker, and then we have breakfast.

14  **A.      Yes.**

15  Q.      Monitor radio is simply what you normally do.

16  **A.      Right, just listening to make sure everyone's**

17  **answering their assignments.**

18  Q.      And then we get back to this case, Third

19  District, confer with Sergeant Jones of Homicide Unit

20  by a landline, Form 1 to be completed as beginning of

21  next tour of duty.

22          What's that mean?

23  **A.      Well, I spoke with her because I didn't know if**

24  **she wanted my report immediately or if it was okay --**

25  **because I started it and then I just wanted to take a**

Page 71

1   day, look at it the next day with fresh eyes, and then

2   forward it to her.

3           So I completed it the next day and gave it to

4   her.

5   Q.     And is Exhibit 51 the Form 1?

6   A.     Yes, it is.

7   Q.     So Exhibit 51 is the document you prepared

8   summarizing the Tanisha Anderson incident?

9   A.     Yes, it is.

10  Q.     And that's a Form 1?

11  A.     Yes.

12  Q.     And do you type this up on a computer at the

13  district?

14  A.     I do.

15  Q.     Is it saved to the system?

16  A.     It's saved to my personal flash drive.

17  Q.     You keep your documents on a flash drive?

18  A.     Yep.  Yes.

19  Q.     So they aren't part of any networked --

20  A.     Well, they are now.  They've created a new --

21  they implemented a new software within our department,

22  so this is all -- it's all handled differently now.

23  Q.     When was this written?

24  A.     It was 2014.

25  Q.     And what date did you write it?

1  **A.      It would have been my next tour of duty, but it**

2  **was after midnight, so it's dated November 14.**

3  Q.      And you looked at this before you testified

4  today, right?

5  **A.      Yes, I did.**

6  Q.      Did you look at anything else before you

7  testified today?

8  **A.      I did not.**

9  Q.      Did you listen to any radio traffic before you

10 testified today?

11 **A.      No, I did not.**

12 Q.      You mention a Medic Sherman being present and

13 reporting that Tanisha Anderson's pulse was faint.

14         Did I read that correctly?

15 **A.      Yes.**

16 Q.      Towards the bottom?

17 **A.      Yes.**

18 Q.      Do you know Sherman?

19 **A.      I do not.  I asked him his name and badge**

20 **number.**

21 Q.      Have you ever seen the EMS run sheet?

22 **A.      I have not.**

23 Q.      And then how soon after the EMS vehicle did the

24 fire department arrive?

25         I see you've got CFD Number 22.

Page 73

1   **A.     I honestly, they came at the same time.  It was**

2   **pretty much the same time.**

3   Q.     What kind of unit was the fire unit?

4   **A.     I don't recall.**

5   Q.     Was it a big truck or --

6   **A.     Usually they send either an engine or their**

7   **actual medic unit, but I don't recall.**

8   Q.     Did you have any conversations with Lieutenant

9   Martin Corrigan whose name you have in here that you

10  haven't told us about?

11  **A.     No.  I just remember him -- I remember him**

12  **approaching -- I remember him approaching me and just**

13  **-- but I don't remember what he said.  It was nothing**

14  **of any relevance.**

15  Q.     And what about EMS Captain Number 646, did you

16  talk to him?

17  **A.     That's the female that I spoke with and she was**

18  **the one that primarily was interacting with the family**

19  **and reassuring them that they were doing the best they**

20  **could with their family member.**

21  Q.     From '97 to the time that this use of force

22  occurred on Ansel on November 12th, '14, did you ever

23  have any training on positional asphyxiation?

24  **A.     I did.**

25  Q.     When?

1  A.      I don't recall if it was -- I don't recall if it

2  was maybe like an in-service training where they just

3  did a brief maybe like an hour block, but I do remember

4  receiving it.

5  Q.    And what did you learn about it?

6  A.      Well, what they stressed to us is that you never

7  want to what they would call like hog-tying a prisoner,

8  that we just don't -- that's not part of our protocol.

9  We don't do that.

10        And then aside from that you would never want to

11  secure someone in handcuffs and put them in the back of

12  a zone car or any enclosed area where there wasn't

13  going to be a lot of circulation of air and have them

14  on their stomach while they're in handcuffs.

15  Q.    Did you learn anything in this positional

16  asphyxiation instruction about the risks of putting

17  pressure on someone's back who's prone while you're

18  cuffing them?

19  A.      I don't recall the pressure on their back.  I

20  just know that, again, if it's an enclosed area and

21  they're with their cuffs behind their back, you just

22  want to make sure they're sitting up and not on their

23  stomach.

24  Q.    Do you think it's critical being in an enclosed

25  area, or is there an equal risk to respiration simply

Page 75

1   by having a prisoner prone on the ground when you're

2   cuffing them?

3                   MS. DINEHART:                Objection.

4                   MR. MALLAMAD:                Objection.

5                   You can answer.

6   **A.      Well, my understanding is, what I remember is**

7   **more of an enclosed area.**

8   Q.      From your training did you have any practice of

9   after you have cuffed someone who's prone on the ground

10  trying to get them to sit up or at least moved from the

11  prone position, or was that not an issue for you?

12                  MR. MALLAMAD:                Objection.

13                  You can answer.

14  **A.      So have I ever had an issue with somebody being**

15  **in that position where I had to move them?**

16  Q.      Is that just something that you would take

17  precautions on?

18          Was it your practice to try and move someone

19  away from the prone position after you cuff them?

20                  MS. DINEHART:                Objection.

21                  MR. MALLAMAD:                Objection.

22                  You can answer.

23  **A.      It is.  I would not want to secure somebody in**

24  **the back seat of my car in that position.  I would want**

25  **them sitting up.**

Page 76

1    Q.      What about on the sidewalk?

2    **A.      On the sidewalk?**

3    **          It's been practice, especially when there is a**

4    **struggle like that, if that's -- if somebody's kicking**

5    **and they're fighting and that's how they end up**

6    **handcuffed, I've seen it happen many times where**

7    **they're just left in that position for a minute until**

8    **they can calm down and, you know, the officer regroups.**

9    **          It's very difficult for an officer to transition**

10   **from dealing with somebody that's trying to hurt them**

11   **and then all of a sudden, you know, render medical aid**

12   **to them.**

13   Q.      What I'm trying to get at is whether you have

14   been trained to recognize any risk to the respiration

15   of a prisoner who's been cuffed behind her back and is

16   prone on the ground?

17   **A.      We have been trained to not leave them in the**

18   **prone position for any extended amount of time in an**

19   **area where they cannot breathe properly and have proper**

20   **air circulation, ventilation.**

21   **          Nothing to do with them being -- it's not just**

22   **solely in that prone position.  It's everything**

23   **combined.**

24   Q.      So is it your understanding that as long as

25   they're in the open air, leaving them in the prone

Page 77

1    position poses no risk to their respirations?

2    **A.      My understanding, as long as it's not for an**

3    **extended amount of time.**

4    Q.      Well, what is --

5    **A.      And as long as you can -- as long as you feel**

6    **that they're still able to breathe, as long as they're**

7    **-- and by extended amount of time, I mean, you would**

8    **never -- I couldn't give you a number, but.**

9    Q.      I mean, more than two, three minutes, more than

10   -- what are you talking about?

11         How soon would you want to move somebody from

12   the prone position to an upright position once they've

13   been secured?

14              MS. DINEHART:              Objection.

15   BY MR. GERHARDSTEIN:

16   Q.      And assuming that they're not kicking anymore,

17   don't pose any of those risks.

18              MR. MALLAMAD:              Objection.

19              You can answer.

20   **A.      It's my understanding that they should probably**

21   **be moved as soon as it's safe to move them, safe for**

22   **themselves and safe for the officer, so I can't give**

23   **you a time.**

24   Q.      Is that understanding that you've just expressed

25   something you would expect the officers you supervise

Page 78

1    to also know?

2                MS. DINEHART:              Objection.

3                MR. MALLAMAD:              Objection.

4                   You can answer.

5    **A.    I don't know what training they received.  I**

6    **just know what training I received.**

7            **I've been on the department a lot longer than**

8    **they have and I know, you know, just like first aid,**

9    **you know, some officers had it, some officers had**

10   **recertification, some officers didn't.**

11           **So I really don't know.  I just know what I know**

12   **and what's expected.**

13   Q.    Was the in-service or training, that one-hour

14   training you got on positional asphyxiation, something

15   you got through the Cleveland Police Department?

16   **A.    From what I recall, it was.**

17   Q.    Did you get it at the Cleveland Clinic?

18   **A.    Cleveland Clinic?**

19   Q.    Yeah.

20   **A.    I don't believe so.**

21   Q.    Okay.  Would there be a written record in your

22   training file of that training?

23   **A.    I would imagine there would be.  I've never seen**

24   **it, but.**

25   Q.    Did you get any written materials in connection

1    with that training?

2    **A.    I don't recall.**

3    Q.    Have you been a field training officer?

4    **A.    Yes.**

5    Q.    What years did you do that?

6    **A.    That would have been two thousand -- I want to**

7    **say 2005 to 2008, approximately.**

8    Q.    During that period as part of the many things

9    that you had to supervise the new officers regarding,

10   was positional asphyxiation on the list?

11   **A.    I'm sorry, I don't recall when I received that**

12   **training.**

13   Q.    Well, do you recall reinforcing lessons about

14   the risks of positional asphyxiation with the officers

15   that you were serving as a field training officer for?

16   **A.    I don't.  And really the training that I**

17   **received might have been as a supervisor, because we go**

18   **through a week of training as a supervisor when we get**

19   **promoted, so it might have been there that I had it.**

20   Q.    And you were promoted when?

21   **A.    In 2008.**

22   Q.    Who taught you subject control in the supervisor

23   training?

24   **A.    I don't recall who our instructors were.**

25   Q.    I do have this backed up on my system and I have

Page 80

1    a copy that we are going to play for everybody.  Let me

2    just find it before we go any further.

3          And I have a copy that we're going to play.

4                      (Thereupon, an audio recording was

5              played.)

6    BY MR. GERHARDSTEIN:

7    Q.    You just heard a little piece of that; is that

8    you?

9                      MR. GERHARDSTEIN:            Off the

10             record.

11                      (Thereupon, there was a discussion

12             off the record.)

13   BY MR. GERHARDSTEIN:

14   Q.    So off the record I have just played a portion

15   of some radio traffic that's Bates No. 012383 labeled

16   by the city, Captain 2 updates, RC captain via land, LL

17   SUPS line.

18   **A.    That's probably the head dispatcher.  That might**

19   **be the supervising dispatcher because I don't know who**

20   **it is she's talking to, but --**

21   Q.    Well, it's called Captain 2, so I don't know,

22   maybe sergeants don't talk to captains.

23          Would you be -- would a -- and also, well, let

24   me go back.

25          When you notified your supervisor were you on a

Page 81

1  landline or --

2  **A.      No.**

3  Q.      You were on cell phone.

4  **A.      Yeah.**

5  Q.      Was it your personal cell phone?

6  **A.      M-hm.**

7  Q.      All right.  So who would you have called?

8  **A.      I called Lieutenant Sanders, Richard Sanders,**

9  **and then he responded to the hospital.**

10  Q.      So that wouldn't have -- and would you have

11  called him on a cell phone?

12  **A.      I called him on a cell phone, I did, but now --**

13  Q.      So there's no tape of it?

14  **A.      No.  No.**

15  **        But now I'm wondering -- I can't remember if**

16  **he's the one that had dispatch do the group 1 page or**

17  **if it was me.**

18  **        Either way, they were notified from the**

19  **hospital, whether it was him or I.**

20  Q.      So --

21  **A.      I don't know who that was.**

22  Q.      I'm going to play this through --

23  **A.      Okay.**

24  Q.      -- only because it appears to me that this

25  caller has information from the scene at the scene.

1      So let's just finish it up and maybe you can

2  help me figure it out.

3                  (Thereupon, an audio recording was

4          played.)

5  **A.    That's probably the EMS supervisor.**

6  Q.    Again, we finished playing that one taped call

7  and I'm looking for your wisdom on who that might

8  possibly be.

9  **A.    I think that was the EMS captain, the supervisor**

10  **that came to the scene.**

11  Q.    Who was at the scene?

12  **A.    She was at the scene.**

13  Q.    But paging it out?

14  **A.    I know.  I don't know what her position is to do**

15  **that.  I don't know what paging it out means.**

16      **She was talking to our -- she was talking to our**

17  **police line?**

18  Q.    Again, it's labeled Captain 2, updates RC

19  captain via LL, SUPS line.

20      And I will tell you that other taped calls were

21  prefaced with medic.

22  **A.    I'm guessing that's who that was, because she**

23  **was on scene and that sounds like her, from what I**

24  **remember.**

25  Q.    But you don't think that that was anybody in

Page 83

1    your chain of command.

2    **A.      No.  Because they were --**

3    Q.      Jones?

4    **A.      No, that's definitely not Jones.**

5    Q.      Okay.

6    **A.      And it's not Rhonda.**

7    Q.      Right.

8    **A.      And there was no other female on scene.  That**

9    **was --**

10   Q.      And who else would have been around?  I mean she

11   literally says they're still working on her.

12   **A.      Because they were still working on her at the**

13   **hospital.  She probably called from the hospital.**

14   **Because her and the other paramedics were there for a**

15   **little bit after.**

16   Q.      And there is one line where she says she was in

17   V-fib for a minute, she's back in A-fib.  That doesn't

18   sound like the kind of knowledge you would have --

19   **A.      No.**

20   Q.      -- given your knowledge of medical stuff, right?

21   **A.      Fortunately, no.**

22   Q.      And so you think it might be the EMS supervisor

23   whose name is not in your --

24   **A.      It is in my report.**

25   Q.      Oh, it's that number --

Page 84

1  **A.      EMS Captain 646.  I just have her badge number,**

2  **I don't have her name.**

3  Q.      Okay.  Well, we'll still hunt around for it

4  then.

5  **A.      Okay.**

6  Q.      And I'm going to -- we haven't referred to this

7  because we've mislabeled it.

8              MR. GERHARDSTEIN:              Let me

9              just take a short break, okay?

10              MR. MALLAMAD:              Okay.

11              MR. GERHARDSTEIN:              Thank you.

12              (Thereupon, there was a brief

13              recess.)

14  BY MR. GERHARDSTEIN:

15  Q.      In any of the conversations you had with Scott

16  Aldridge did he mention statements Tanisha Anderson was

17  making while she was in the car, counting very rapidly,

18  saying the Lord's Prayer, calling out for relatives?

19  **A.      He did not mention that.  Or if he did, I don't**

20  **recall.**

21  Q.      Was there any body cams on you or the two

22  officers at the time of this incident?

23  **A.      Unfortunately, not.**

24  Q.      Were there any cruiser cams on you or the two

25  officers at the time of the incident?

Page 85

1    **A.      No, there were not.**

2    Q.      There's been testimony in this case about

3    Officer Muniz offering a CAD number to the family so

4    that they could reference it should they need to call

5    back about Tanisha.

6           Did he tell you about that?

7    **A.      I was not aware of that.**

8    Q.      And is that standard practice, is that

9    acceptable practice, what's your impression of an

10   officer giving a family an identifying number for an

11   incident?

12              MR. MALLAMAD:               Objection.

13              Go ahead and answer.

14   **A.      Well, I believe that the reason he did it was**

15   **because if they were to call back to dispatch, he would**

16   **want them, if they were able to say, you know, the**

17   **police were already out here and this is the CAD**

18   **number, then it would assist them in coding it, because**

19   **maybe they would know, okay, this might be more of an**

20   **emergency situation this time because we're getting**

21   **called back out there.**

22          **And maybe just to make them feel like he wasn't**

23   **discounting what they were saying, he wanted them to**

24   **know, like, hey, I understand that you're having issues**

25   **with your family member but unfortunately it's not a**

Page 86

1    police matter at this point.  But, you know, there's a

2    record of you calling if that's something that's going

3    to assist you in calling back.

4    Q.    In your experience in all the dialogue you have

5    to do with dispatchers in order to deploy your

6    officers, a repeat call can influence the code?

7                MS. DINEHART:                Objection.

8    A.    It can, not always.  In this situation I don't

9    know that it did, but there are circumstances where it

10   might.

11   Q.    Tell me about that, what are some of the

12   circumstances where a family calling again about

13   somebody who's having a mental health crisis might bump

14   it up from a 3 to a 2 or whatever the change would be?

15               MR. MALLAMAD:                Objection.

16               You can answer.

17   A.    Well, I can't really give you an example, but I

18   can make an example up.

19          If there was a call where the family went out

20   there and -- or, I'm sorry, where the police went out

21   there, spoke with the family, maybe there was just like

22   a verbal argument going on and maybe they said, well,

23   she has mental health issues and sometimes, you know,

24   that comes into play, but maybe not in that situation,

25   everything's taken care of, everything's calmed down,

Page 87

1    but then they get called back.

2         Well, maybe this time she's breaking furniture

3    or she's got a weapon or she's threatening to kill

4    herself or she's threatening, then obviously they're

5    going to code it a higher priority.

6    Q.    Is there anything wrong with an officer giving

7    the CAD number to the family?

8              MS. DINEHART:              Objection.

9    A.    There's nothing wrong with that.

10   Q.    And when a family does have a CAD number and

11   they share it with the dispatcher, would you expect the

12   dispatcher to look that previous encounter up?

13             MS. DINEHART:              Objection.

14             MR. MALLAMAD:              Objection.

15                  You can answer.

16   A.    I would expect that they would look it up, just

17   so they know what was being dealt with and they better

18   equip the officers that are responding the second time

19   around so they know what they're dealing with.

20         Again, it's not necessarily going to make it a

21   higher priority, but looking it up might give them

22   information that they would need to keep the officers

23   safe.

24   Q.    The more information, the better.

25   A.    Yes.

1   Q.      In your conversations with the family, do I

2   understand this correctly, none of the family members

3   ever told you directly that Tanisha played possum or

4   would pretend to go to sleep, right?

5   A.      They never told me that.

6   Q.      So you got something like that in some sort of

7   report from Aldridge, correct?

8   A.      Yes.

9   Q.      So tell me again what Aldridge said in that

10  regard.

11  A.      Aldridge said that the family after she, you

12  know, had this episode where she had gotten physical

13  with the officers and she's on the ground in handcuffs

14  and she goes to sleep.

15          Like basically, again, I thought it was odd that

16  he described it that way, but that's what happened.

17  And according to him and according to what the family

18  is saying, said to him, this is what she does.

19          And I kind of equated it to like a toddler

20  throwing a fit.  I mean, I could remember it with my

21  own kids where they would throw a fit on the floor and

22  then a second later they're asleep.

23          You know, because she gets all this adrenaline

24  going and then just, I mean, that's -- in my mind

25  that's what I'm visualizing.  I didn't see it

Page 89

1    **personally.**

2    Q.      But of course in whatever experiences the family

3    were trying to relate to Aldridge, it didn't involve

4    her being handcuffed, right?

5    **A.      It did not.**

6    Q.      And regardless of what history the family

7    purports to share with Aldridge, it's his duty as

8    officer on the scene to make sure that he adequately

9    calls for EMS when it's needed, right?

10   **A.      It is, and my understanding is that from his**

11   **perspective prior to my arrival it was not needed.**

12   Q.      And you don't think that a 200-plus-pound woman

13   in her nightgown lying unconscious, not talking, not

14   responding, on a sidewalk on a cold November day for up

15   to 14 minutes requires EMS?

16                   MS. DINEHART:              Objection.

17                   MR. MALLAMAD:              Objection.

18                        You can answer.

19   **A.      Well, to my understanding, that she was not**

20   **unconscious.  When I got there, she was.  I don't know**

21   **when that happened.**

22        **But, you know, she was talking to them and then,**

23   **again, they said she fell asleep.  And then when I got**

24   **there and I -- I went to talk to her, that's when I**

25   **observed that she was unconscious.**

Page 90

1          **So I couldn't tell you when that happened.**

2   Q.    Would you agree that if she was unresponsive to

3   verbal direction for more than five minutes they should

4   have called EMS?

5                    MS. DINEHART:                Objection.

6                    MR. MALLAMAD:                Objection.

7                        You can answer.

8   **A.    I believe that if she was unresponsive to verbal**

9   **direction, then yes.**

10  Q.    For more than five minutes.

11  **A.    For more than five minutes.**

12                   MR. GERHARDSTEIN:              I don't

13                   have any other questions.

14                       Thank you.

15                   MR. MALLAMAD:                Sergeant

16                   Battone would like to review her testimony

17                   and you can send the transcript to me.

18                            - - -

19                   (DEPOSITION CONCLUDED.)

20                            - - -

21

22

23

24

25

Page 91

1    I have read the foregoing transcript from page 1

2    through 92 and note the following corrections:

3    PAGE       LINE                REQUESTED CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                           _____

19                           Sergeant Rochelle Bottone

20       Subscribed and sworn to before me this _____ day

21    of _____ 2016

22

23                           _____

24                           Notary Public

25       My Commission expires:  _____

Page 92

1   State of Ohio,        ) SS:           CERTIFICATE

2   County of Cuyahoga.   )

3

4        I, Janet M. Hoffmaster, a Registered Professional
    Reporter and Notary Public within and for the State of
    Ohio, duly commissioned and qualified, do hereby

5   certify that the within-named witness, SERGEANT
    ROCHELLE BOTTONE, was by me first duly sworn to tell

6   the truth, the whole truth and nothing but the truth in
    the cause aforesaid; that the testimony then given by

7   her was reduced to stenotypy, and afterwards
    transcribed by me through the process of computer-aided

8   transcription, and that the foregoing is a true and
    correct transcript of the testimony so given by her as

9   aforesaid.

10

11       I do further certify that this sworn statement was
    taken at the time and place in the foregoing caption
    specified.

12

13       I am not, nor is the court reporting firm with
    which I am affiliated, under a contract as defined in

14  Civil Rule 28(D).

15

16       I do further certify that I am not a relative,
    employee, or attorney of either party, or otherwise
    interested in the event of this action.

17

18       IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my seal of office at Cleveland, Ohio, on

19  this 4th day of July 2016.

20

21       _____

22           Janet M. Hoffmaster, RPR and Notary Public
             in and for the State of Ohio.
             My Commission expires October 8, 2017.

23

24

25

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**