IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

ELIZABETH GOODWIN,            )
            Plaintiff,        )
                              )
      v.                      )  Case No.  1:15-CV-0027
                              )  Judge Donald C. Nugent
CITY OF CLEVELAND, et al.,    )
            Defendants.       )

- - -

THE DEPOSITION OF LIEUTENANT ROBERT TUCKER
WEDNESDAY, JUNE 8, 2016

- - -

        The deposition of LIEUTENANT ROBERT TUCKER, a
witness, taken as if upon cross-examination by the
Plaintiff, under the Federal Rules of Civil Procedure,
taken before me, Janet M. Hoffmaster, Registered
Professional Reporter and Notary Public in and for the
State of Ohio, pursuant to Notice, at Burke Lakefront
Airport, 1501 North Marginal Road, Cleveland, Ohio,
commencing at 12:59 p.m., the day and date above set
forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK
1360 WEST 9TH STREET, SUITE 440
CLEVELAND, OHIO  44113
(216) 621-2550
FAX: (216) 621-3377
1-888-595-1970

Page 2

```
 1    APPEARANCES:

 2    On behalf of the Plaintiffs:

 3         ALPHONSE A. GERHARDSTEIN, ESQ.
           Gerhardstein & Branch
 4         441 Vine Street, Suite 3400
           Cincinnati, OH  45202
 5         (513) 621-9100 Ext. 17

 6         DAVID B. MALIK, ESQ.
           Law Office of David B. Malik & Associates
 7         Chester Professional Building
           8437 Mayfield Road, Suite 101
 8         Chesterland, OH  44026
           (440) 729-8260
 9

10    On behalf of the Defendant City of Cleveland:

11         SHAWN M. MALLAMAD, ESQ.
           Assistant Director of Law
12         Department of Law
           601 Lakeside Avenue, Room 106
13         Cleveland, OH  44114
           (216) 664-3774
14

15    On behalf of the Defendants Scott Aldridge and Bryan
      Myers:
16
           JOHN P. BACEVICE, JR., ESQ.
17         Assistant Director of Law
           Department of Law
18         601 Lakeside Avenue, Room 106
           Cleveland, OH  44114
19         (216) 664-2807

20                          - - -

21

22

23

24

25
```

1                             INDEX

2                                            PAGES

3   CROSS-EXAMINATION BY

4        MR. GERHARDSTEIN                      4

5

6                        -  -  -

7

8   PLAINTIFF'S EXHIBITS MARKED

9        42                                   16

10

11                       -  -  -

12

13  OBJECTIONS BY

14       MR. MALLAMAD       24(3), 28, 39(2), 41, 44, 47,
    48, 49(2), 58(3), 59(2), 60, 61, 65, 66, 77, 78(2),
    79(3), 80(2), 81(3), 82(2), 83(2), 84(2), 85(2), 86,
15  87, 88(3), 89(2), 90, 92(5), 93(2), 94, 95, 98, 100(4),
    101(2), 103(2), 104(2), 105(3), 106(3), 107

16       MR. BACEVICE       16, 54, 58(3), 59(3), 60(2),
    61, 62, 63(3), 65, 66, 68, 70(2), 72(2), 74, 76(2), 77,
17  78(3), 79(3), 80, 81(2), 82(2), 83(3), 84(2), 85(4),
    86(4), 87(2), 88(2), 89, 90(2), 92(4), 93(2), 94, 99,
18  100(3), 101(3), 103(2), 104(2), 105(3), 106(3), 107

19

20                       -  -  -

21

22

23

24

25

Page 4

1                    LIEUTENANT ROBERT TUCKER

2     a witness, called for examination by the Plaintiff,

3     under the Rules, having been first duly sworn, as

4     hereinafter certified, was deposed and said as follows:

5                        CROSS-EXAMINATION

6     BY MR. GERHARDSTEIN:

7     Q.      Good afternoon.

8     **A.      Good afternoon.**

9     Q.      State your full name.

10    **A.      First name is Robert, middle name is Anthony,**

11    **last name is Tucker, T-U-C-K-E-R.**

12    Q.      And where do you work?

13    **A.      City of Cleveland, Division of Police.**

14    Q.      What rank are you?

15    **A.      I'm a lieutenant.**

16    Q.      What's your highest level of education?

17    **A.      One year of college.**

18    Q.      And briefly trace your employment with

19    Cleveland.

20    **A.      I started at the police academy in February of**

21    **'98.  Graduated from the police academy I believe in**

22    **June of '98.  I was assigned to the Third District**

23    **basic patrol at 2001 Payne Avenue.  I spent 10 years**

24    **there.  I was promoted to sergeant I want to say in**

25    **April or May of 2008.**

1            I was then sent to the city's east side which

2     was the Fifth, the northeast side which is the Fifth

3     District.  I was a patrol sergeant from 2008 to 2012.

4            2012 up until January of 2014 I was the officer

5     in charge of the Fifth District Vice Unit.  In January

6     of 2014 I was assigned to the Bureau of Integrity

7     Control, Internal Affairs Unit.

8            In June of 2015 I was promoted to lieutenant at

9     which time I was assigned to my current position which

10    is the officer in charge of the Inspections Unit which

11    is also under the umbrella of the Bureau of Integrity

12    Control.

13    Q.     Okay.  What did you do to get ready for this

14    deposition?

15    A.     Met with Shawn briefly yesterday for about an

16    hour, and I reviewed my written reports.

17    Q.     Your written reports regarding Tanisha Anderson?

18    A.     Yes.

19              MR. GERHARDSTEIN:              I don't

20              have those.

21                  Yeah, I have references to them in

22              the report from the lady who took the

23              pictures, and I got references to them in

24              Borden, but I don't have anything from

25              him.

Page 6

1          MR. MALLAMAD:                Is this

2          the totality of it?

3               This is your written report.

4          THE WITNESS:                 Yes.

5          MR. MALLAMAD:                Had no

6          idea, sorry.

7               I assume that that was produced, but.

8          MR. MALIK:                   Do they

9          have a copy machine here?

10         MR. MALLAMAD:                I don't

11         know.

12         MR. BACEVICE:                Probably

13         somewhere.

14    BY MR. GERHARDSTEIN:

15    Q.    Well, it looks like you got multiple copies

16    here, right?

17    **A.    I don't believe -- I don't believe those are**

18    **multiple copies.  I believe they're all -- they may**

19    **appear similar, but --**

20         MR. GERHARDSTEIN:           I see.

21         And I suppose we can't make copies here,

22         huh?

23         MR. BACEVICE:                If you

24         want to take a minute to review that and I

25         can walk around and see if there's an

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

1                   office where we can make copies, take five

2                   minutes.

3                   MR. GERHARDSTEIN:         Do you

4                   mind if we go ahead then?

5                   MR. BACEVICE:         Go ahead.

6  BY MR. GERHARDSTEIN:

7  Q.    Did you know -- well, you looked at your

8  reports, you met with Shawn, did you do anything else?

9  **A.    No.**

10  Q.    Did you look at anybody else's reports, talk to

11  anybody else?

12       You have to say yes or no, I'm sorry.

13  **A.    I'm sorry, no.**

14  Q.    You and I are communicating --

15  **A.    I know, I was just --**

16  Q.    -- but we're making a record here.  All right.

17       Talk to anybody who's been deposed in this case?

18  **A.    No.**

19  Q.    All right.  Let me just make sure I understand

20  what the Inspection Unit is.

21       Tell me about it.

22  **A.    So we're under the Bureau of Integrity Control,**

23  **and basically our main function in the division is to**

24  **ensure compliance with division policy and procedures.**

25  Q.    Ensure compliance with division policy and

Page 8

1    procedures in all respects for everything?

2    **A.      Yes.**

3    Q.      I mean are we talking procurement and contracts

4    as well as officer conduct?

5    **A.      Mainly officer conduct in reference to our**

6    **general police orders and our manual of rules and**

7    **regulations and any other directive, division notices,**

8    **memos.**

9    Q.      And you said you're under the Bureau of

10   Integrity Control.  How does that relate to Internal

11   Affairs?

12   **A.      The Bureau of Integrity Control consists of the**

13   **Inspections Unit and Internal Affairs.  So Internal**

14   **Affairs is tasked with conducting criminal**

15   **investigations involving members of the division of**

16   **police, and the Inspections Unit does not.  We mainly**

17   **focus on administrative matters.**

18   Q.      So any recommendations for discipline would come

19   out of the Inspection Unit?

20   **A.      They could come out of both.  When an Internal**

21   **Affairs investigation, the criminal part is concluded,**

22   **they're also tasked with identifying violations of**

23   **policy regarding that investigation.**

24   Q.      So do investigations have both Internal Affairs

25   and Inspection Unit personnel tagging along behind the

Page 9

1    people doing the actual investigation?

2    **A.     No.   If there's any criminality, it will go to**

3    **Internal Affairs.   Internal Affairs will handle the**

4    **criminal investigation.   When that is exhausted,**

5    **they'll look at the event administratively.**

6            **We may be giving -- we may be given, the**

7    **Inspections Unit may be given an invest if there's no**

8    **criminality, if there's no allegations of criminality.**

9    **Could be police misconduct, violations of policy and so**

10   **on and so forth.**

11   Q.     What was the role of the Inspections Unit with

12   respect to the Tanisha Anderson death in custody?

13   **A.     To my -- to my knowledge, none.**

14   Q.     So you got involved because at that point you

15   were part of Internal Affairs.

16   **A.     Correct.**

17   Q.     But I just read a memo which we'll mark as an

18   exhibit where you actually are the one making a

19   recommendation on discipline.

20   **A.     Correct.**

21           **Would you like me to explain that?**

22   Q.     Yeah, yeah.

23   **A.     So when there is a use of deadly force, and an**

24   **in custody death would constitute a use of deadly force**

25   **investigation, the Homicide Unit is the primary**

1  investigating unit for -- for what we would consider an

2  UDFIT.

3  Q.     A Use of Deadly Force Investigation Team?

4  A.     Correct.  The Internal Affairs Unit, and at

5  times the Inspection Unit, but in this case just the

6  Internal Affairs Unit would monitor that investigation.

7       So there would be a response from the Internal

8  Affairs Unit and we would monitor what the Homicide

9  Unit is doing, essentially.

10      The interviews, any type of measurements that

11 were taken, a canvass of the area, subsequent

12 interviews, so on and so forth, we would basically

13 monitor that.

14      When the Homicide Unit would conclude their

15 investigation, they would then forward the case file to

16 the Internal Affairs Unit and then an administrative

17 review would be conducted of that investigation to

18 ensure everything was done properly and professionally

19 and in a thorough manner.

20 Q.     Okay.  But at this point we're still within

21 Internal, and you're saying that in that instance

22 Internal's the one that makes recommendations on

23 discipline?  Because it came up out of a criminal

24 investigation?

25 A.     Yes.

1    Q.     Sort of an odd division of responsibilities

2    because it's sort of happenstance, the only reason this

3    is a criminal investigation is that there was a death,

4    right?

5    **A.     Correct.**

6    Q.     So you want the highest level of scrutiny, I

7    assume?

8    **A.     Correct.**

9    Q.     So with your new hat, now that you're in

10   Inspection Unit, if this had occurred today would it be

11   investigated any differently?

12   **A.     Given other circumstances, potentially yes.**

13   **Because prior to and after the Tanisha Anderson**

14   **incident and a few other incidents things are starting**

15   **to change in the division as to how these matters are**

16   **investigated.**

17   Q.     Tell me about that.

18   **A.     Well, there's been conversations with the county**

19   **prosecutor, the Department of Justice is currently**

20   **here.  I believe an MOU was actually drafted at some**

21   **point regarding outside agencies potentially handling**

22   **these types of incidents, UDFITs, so we're kind of in**

23   **that -- in that phase of this, you know, of reforming**

24   **how things are done, for lack of better words.**

25   Q.     Well, as it stands today is anything in place

1   that would make an investigation of an incident like

2   this different than what occurred starting on November

3   12, 2014?

4   **A.        I don't believe anything's finalized.  I think**

5   **that if there was an UDFIT right now, I think that our**

6   **Homicide Unit would respond and our Internal Affairs**

7   **would respond, and if it was a full UDFIT, possibly**

8   **members from the Inspections Unit would respond as**

9   **well.**

10  Q.        And by full you're contrasting that with a light

11  call-out?

12  **A.        Correct.**

13  Q.        So tell me the difference between full and

14  light?

15  **A.        So when there's an UDFIT, whether it be an**

16  **officer involved shooting or an in custody death, at**

17  **the time it would have been Commander Chura or Deputy**

18  **Chief Tomba would make a determination whether it was a**

19  **light or full UDFIT.  And that would refer to the**

20  **response.**

21  **        If it was an officer involved shooting and there**

22  **were several persons involved in it and you had an**

23  **expansive crime scene, that would probably be a full**

24  **call-up, meaning basically more personnel would**

25  **respond.**

1          **Something, maybe an in custody death may be a**

2     **light call-up.  In this case, in the Tanisha Anderson,**

3     **it was a light call-up which means it wasn't a full**

4     **response.**

5     Q.     When there's a full call-up, and I think you

6     just mentioned this, you could have people from

7     Internal and from Inspections both monitoring the UDFIT

8     team.

9     **A.     Correct.**

10    Q.     Is that a total duplication?  What's the real

11    division of labor there?

12    **A.     Well, what would happen, members from the**

13    **Internal Affairs Unit and members from the Inspection**

14    **Unit during a full call-up, we would basically attach**

15    **ourselves to investigators; could be homicide**

16    **detectives, could be crime scene investigators, and we**

17    **would monitor their investigation.**

18          **That member would then report, would write a**

19    **report, documenting what they observed.**

20    Q.     So correct me if I'm wrong, but the sense I'm

21    getting is the full call-up, yes, involves both

22    Internal and Inspection, but what you really need are

23    more monitors because you have more investigators and

24    you're doing man-for-man defense or one-on-one

25    monitors.

1    **A.        You wouldn't be wrong by saying that, that's**

2    **part of it, sure.**

3    Q.      Okay.  And the way you monitor is, as you say,

4    attaching yourself to an investigator.  So if I'm

5    right, in Tanisha Anderson you attached yourself to

6    David Borden?

7    **A.        Correct.**

8    Q.      And then you just watched what he did and wrote

9    up a summary of what he did and whether it followed

10   policy and procedure.

11   **A.        Correct.**

12   Q.      And if you had even more David Bordens out

13   there, UDFIT team members doing investigations, you'd

14   need more Tuckers because you're doing one-for-one.

15   **A.        Correct.**

16   Q.      Okay.

17   **A.        That would be the goal.**

18   Q.      These reports that you prepare as a monitor of

19   the UDFIT team, where do those go?  Since I had such

20   trouble getting it, but that's aside.

21   **A.        They would go to the person that is assigned**

22   **that case.**

23   Q.      The person in Internal?

24   **A.        Yes.**

25   Q.      Assigned that case?

1    **A.       They may go through the OIC first, so if -- if**

2    **just -- if you had three Inspection Unit sergeants that**

3    **monitored an UDFIT, they would complete a monitoring**

4    **report and then they would then forward that -- well,**

5    **it would go through the chain of command, it would go**

6    **through our commander, but it would ultimately go to**

7    **the investigator in Internal Affairs that would be**

8    **charged with handling that case.**

9    Q.      So the investigator in Internal Affairs charged

10   with handling the Tanisha Anderson case was Monroe

11   Goins?

12   **A.       It was me.  Monroe Goins was the lieutenant and**

13   **still is the lieutenant in the Internal Affairs Unit.**

14   Q.      Okay.  But your memos -- okay.  So your memos

15   went to him because he's your lieutenant.

16   **A.       The chain of command, correct.**

17   Q.      But that's also sort of pro forma.  I mean, is

18   he really monitoring your work, or is every memo you

19   write on the case to him, or both?

20   **A.       No.  He -- he's monitoring and --**

21   Q.      Or supervising your work.

22   **A.       Correct.  But as a matter of, yes, I would, in**

23   **this case, from me to Monroe Goins, I am addressing my**

24   **reports to him because he was my lieutenant at the**

25   **time.**

1    Q.     All right.

2                   MR. GERHARDSTEIN:              Let's mark

3              this.

4                   (Thereupon, Plaintiff's Exhibit 42

5              to the deposition of LIEUTENANT ROBERT

6              TUCKER was marked for identification.)

7              MR. BACEVICE:              Can you

8              note an objection to Exhibit 42, please,

9              and all subsequent questions?

10   BY MR. GERHARDSTEIN:

11   Q.     I'm going to show you what's been marked as

12   Exhibit 42.  Do you recognize that?

13   **A.     Yes.**

14   Q.     And that's a seven-page set of memos that you

15   wrote as part of your duties in the Tanisha Anderson

16   case?

17   **A.     Yes.**

18   Q.     There's three memos there?

19   **A.     Yes.**

20   Q.     And all of them are directed to your lieutenant

21   at the time who was Monroe Goins.

22   **A.     Correct.**

23   Q.     And just -- I'm sticking with just understanding

24   how this works.

25              So the actual file is in Internal in the custody

1   of Monroe Goins?

2   **A.      A copy of that file should be in the Internal**

3   **Affairs Unit and it should contain these documents.**

4   Q.      And did you also maintain a file?

5   **A.      No.  I maintained the reports that I produced.**

6   Q.      And did you, as far as this case goes, did you

7   have as an Internal Affairs monitor -- is that what

8   you're called?

9   **A.      Investigator.**

10   Q.      Investigator, did you have as an Internal

11   Affairs investigator any duties beyond monitoring the

12   work of David Borden?

13   **A.      Yes.  I was directed to complete an**

14   **administrative review of the incident.**

15   Q.      And who directed you to do that?

16   **A.      If I remember correctly, could have been**

17   **Lieutenant Goins and/or Commander Heffernan, one or**

18   **both of them.**

19   Q.      And an administrative review of the incident

20   involves your recommendations as to whether based on

21   all the facts from all of the investigators you found

22   any violations of policy and procedure.

23   **A.      Correct.**

24   Q.      Is that fair?

25   **A.      Correct.**

1   Q.      And that would involve both Myers and Aldridge.

2   **A.      Correct.**

3   Q.      Was there anyone else you were looking at?

4   **A.      I would look at the entire incident from**

5   **beginning to end.**

6   Q.      And would you look at it for observations about

7   maybe the policy was followed but you would see a

8   deficiency in the way the policy is written?

9   **A.      Yes.**

10  Q.      And would you make observations about that type

11  of problem as well?

12  **A.      Yes.**

13  Q.      And when you say that you're making a

14  determination as an administrative reviewer, have you

15  had any particular training in how to take a bundle of

16  facts and determine which policies and procedures apply

17  and whether they were followed or not?

18  **A.      Specific to policy and procedures, I can't say**

19  **that I have, but I'm -- I'm a certified Internal**

20  **Affairs investigator.**

21  Q.      What does that mean?

22  **A.      That means I attended an accredited school that**

23  **-- how would I say -- I obtained training.  There are**

24  **several different agencies that will offer training in**

25  **these types of matters, one of them is the Police**

Page 19

1   **Agency Training Council.**

2   Q.      Where is that?

3   **A.      Where is it headquartered at?**

4   Q.      Yeah.

5   **A.      I'm unsure.**

6   Q.      Where did you get your training?

7   **A.      Nashville, Tennessee.**

8   Q.      And how is training as an Internal Affairs

9   investigator different than training as a homicide or

10  other type of investigator?

11  **A.      When you have training for Internal Affairs,**

12  **officer misconduct, managing police discipline, it**

13  **focuses on the actual agency, if that makes any sense,**

14  **and its members.**

15  Q.      Well, keep talking to me.  What does that mean?

16  **A.      Well, if you take a course in investigations,**

17  **some investigations would both help you with**

18  **investigating police officers and I guess it could help**

19  **you investigating civilians.**

20  Q.      Okay.

21  **A.      But some of the training, when you're talking**

22  **about managing police discipline and internal**

23  **investigations, focus on investigating law enforcement**

24  **officers.**

25  Q.      So give me an example, what's unique about

1    investigating law enforcement officers.

2    **A.      Just given the profession itself, there are**

3    **unique situations.  You have union issues, you have**

4    **rank issues, they're sworn law enforcement which adds**

5    **unique characteristics to what you may be looking at.**

6            **Interviewing, Garrity versus Miranda.  And then**

7    **you have the discipline side of things, consistent and**

8    **fair discipline, discipline matrix.  Some of this would**

9    **fall under different leadership courses that -- that,**

10   **you know, so on and so forth.**

11   Q.     Is there any manual or set of guidelines unique

12   to Cleveland that you follow as -- or you followed as

13   an Internal Affairs investigator?

14   **A.      There is a manual.**

15   Q.     What's that called?

16   **A.      I believe it's called the Cleveland Division of**

17   **Police Internal Affairs Manual.**

18   Q.     And is that still -- is there such a manual

19   that's still current?

20   **A.      Yes.**

21   Q.     Is there a similar manual for the Inspection

22   Unit?

23   **A.      Yes.**

24   Q.     So there's an Inspection Unit manual and an

25   Internal Affairs manual.

1   **A.       Correct.**

2   Q.       And do these manuals guide the work of the

3   investigators who monitor UDFIT?

4   **A.       Yes.**

5   Q.       Do the investigators who monitor UDFIT actively

6   do things during the investigation or do they literally

7   shadow and observe?

8   **A.       They shadow and observe.**

9   Q.       So what if they see something going down that's

10  wrong?

11  **A.       Then -- then they need to address it.**

12  Q.       Okay.  And that should be done in real time.

13  **A.       Correct.**

14  Q.       They don't just wait and play gotcha.

15  **A.       Correct.**

16  Q.       So if a statement's being taken that -- and the

17  Garrity status of the person giving the statement is

18  unclear, the investigator might speak up and say, you

19  know what, maybe we ought to clear this up before you

20  proceed.

21  **A.       Sure.**

22  Q.       That kind of thing.

23  **A.       Sure.**

24  Q.       All right.

25          So with respect to Tanisha Anderson, would you

1  say that that UDFIT investigation was only monitored by

2  Internal and not by Inspections.

3  **A.      To the best of my knowledge it was Internal**

4  **Affairs.**

5  Q.     And if it were monitored by both, wouldn't the

6  administrative recommendations for discipline come out

7  of Inspections?

8  **A.      No.**

9  Q.     Okay.  Tell me about that.

10 **A.      Because it was an UDFIT, that would**

11 **automatically make it Internal Affairs.**

12 Q.     So the only reason Inspections might get

13 involved in an UDFIT is, again, when you need more

14 bodies.

15 **A.      Correct.**

16 Q.     Did you know Officer Aldridge --

17 **A.      I did not.**

18 Q.     -- prior to this?

19        You have to say yes or no.

20 **A.      I'm sorry, no, I did not -- no, I did not.**

21 Q.     And what about Myers, did you know him at all?

22 **A.      I did not.**

23 Q.     Let's go to November 12, 2014.

24        Well, first of all, you were transferred to

25 Internal after many years in patrol, right?

1  **A.      Correct.**

2  Q.      Did you want to go there?

3  **A.      Yes.**

4  Q.      It can't be very popular.

5  **A.      It's not.**

6  Q.      Why did you want to do that?

7  **A.      The experience.**

8  Q.      Why?

9  **A.      You gain a tremendous amount of investigative**

10  **experience.**

11  Q.      Well, and I suppose it would help you with if

12  you want to compete for a higher rank, if you've had

13  that kind of responsibility as well, right?

14  **A.      It could help you in the promotional process.**

15  Q.      Have you -- having been both in Inspections and

16  in Internal, do you like it now?

17  **A.      The Internal Affairs Unit or the Inspections**

18  **Unit?**

19  Q.      Either one.

20  **A.      I like both.**

21  Q.      Yeah.  What do you like about it?

22  **A.      Again, as far as Internal Affairs goes, probably**

23  **the investigative aspect of it.**

24  **        The Inspections Unit, it's not as heavy on**

25  **investigative work, but we're really, really busy and**

1    **we're part of the DOJ implementation with the**

2    **settlement agreement, so we have an active role in that**

3    **and we're -- we're very busy.**

4    Q.     Do you think just from your own perspective

5    having been around so long before the DOJ agreement and

6    now that the Cleveland Police Department will be better

7    off with the implementation of the consent agreement?

8                   MR. MALLAMAD:                    Objection.

9                        You can answer.

10   **A.      For the most part.**

11   Q.     Why?

12                  MR. MALLAMAD:                 Same

13                  objection.

14                       Go ahead and answer.

15   **A.      Why would it be better?**

16   Q.     Yeah.

17   **A.      We needed reform in some areas.**

18   Q.     What areas did you think you needed reform?

19                  MR. MALLAMAD:                 Just to,

20                  if it's okay, show a standing objection --

21                  MR. GERHARDSTEIN:               That's

22                  fine.

23                  MR. MALLAMAD:                    -- to

24                  these questions about the DOJ, but you can

25                  answer.

1          THE WITNESS:                Answer?

2          Okay.

3   A.      One, record-keeping, how we track the use of

4   force, how we track pursuits, the use of force, motor

5   vehicle collisions for one.

6   Q.      Okay.

7   A.      How we track our training.

8   Q.      Okay.  Any other areas where you thought you

9   needed changes?

10  A.      I think the -- it will provide supervisors with

11  training that will benefit the division.  I think

12  that's important.

13  Q.      Have you observed any gaps in training as a

14  result of your work implementing the decree?

15  A.      We haven't really -- we haven't focused on that

16  aspect of it.

17  Q.      What is your role with respect to implementing

18  the changes?

19  A.      Initially when the monitor was named, I and two

20  of my sergeants, my commander, and Deputy Chief

21  O'Neill, we were given the role of this implementation

22  team.

23          And basically initially what it was was

24  providing them with all of the documents that they

25  requested to perform a baseline, if you will, or to

1    gain an understanding of the division, how the division

2    works.

3              Initially that was what we did.  I'll attend

4    meetings on our policy implementation.  We have a team

5    that is rewriting policy, I'll attend those meetings.

6              The monitors, maybe not anymore, but initially

7    they were involved in a lot of ride-alongs.  We would

8    schedule all of those ride-alongs and introduce them to

9    the command staff and get them around.

10             We've established a webpage that was part of the

11   settlement agreement with our IT people, so we got that

12   webpage up and running.

13             One of the two of us sergeants attends the

14   meetings with the Cleveland Police Commission, the

15   community meetings, she attends those and reports on

16   those, things of that nature.

17   Q.    So are you still part of the implementation

18   team?

19   A.    I am.

20             And also software, to track, analyze, report on

21   use of force, pursuits, motor vehicle collisions,

22   firearm discharges, commendations, all of those types

23   of things, we have a software that's up and running,

24   and I'm also part of that.

25   Q.    That's the employee tracking system?

1    **A.      Yeah, it's an early warning --**

2    Q.      Yeah.

3    **A.      -- system.  Blueteam IAPro.**

4    Q.      And there was one, at least on paper, prior to

5    the decree, right?  An early warning system.

6    **A.      We -- we -- it actually -- we started that prior**

7    **to the monitor being named.  We started using IAPro in**

8    **January of 2015.**

9    Q.      Was there not a time when you had a software

10   package like that but that employees were allowed to

11   opt out of any tracking?

12   **A.      Okay.  So that -- that, what you're referencing,**

13   **was through our employees assistance program.**

14   Q.      Oh.

15   **A.      If that's what you're referencing, and actually**

16   **Blueteam and IAPro is also, the -- yeah, the**

17   **administrator of Blueteam and IAPro is actually a**

18   **detective in the Employees Assistance Unit.**

19   **        But there was a program that I think that you're**

20   **referencing that, yes, they could, it was a voluntary**

21   **type thing.**

22   Q.      Right.  But from a supervision point of view you

23   really don't want to have officers opting out of your

24   employee tracking system if you want a comprehensive

25   look at the conduct of the officers in all of these

1    fields, right?

2         I mean, it doesn't work if they opt out.

3              MR. MALLAMAD:              Objection.

4                   You can answer.

5    BY MR. GERHARDSTEIN:

6    Q.    Right?

7              MR. MALLAMAD:              You can

8              answer.

9    **A.    I would say with the current system that we have**

10   **in place, it -- it tracks your employees more**

11   **efficiently.**

12   Q.    And it tracks all of them, right?

13   **A.    Correct.**

14   Q.    So you no longer have employees opting out of

15   the tracking in these various areas that are monitored

16   by the Blueteam or -- software?

17   **A.    Well, I can't really speak for the Employees**

18   **Assistance Unit because, you know, there's other issues**

19   **beyond the use of force and vehicle pursuits and so on**

20   **and so forth.**

21        **There are other issues that the Employees**

22   **Assistance Unit deals with when you're talking about**

23   **opting out or not, voluntary -- you know.**

24   Q.    Okay.

25   **A.    Getting into these things, I really can't speak**

1    to that part of it.

2    Q.       But use of force, attaboys, commendations,

3    discharge of firearms, missing court, sick days, those

4    are all things you're tracking for everybody, right?

5    **A.       We're not currently tracking sick days in**

6    **Blueteam and IAPro yet.**

7    Q.       But you will.

8    **A.       I believe -- but I believe we can, but to answer**

9    **your question, for the most part, yes.**

10   Q.       So let's go to November 12, 2014.

11           How did you become involved with the Tanisha

12   Anderson case?

13   **A.       Early morning, November 13th, I believe it was**

14   **after one -- between one and two o'clock, I received a**

15   **text message directing me to respond to the location.**

16   Q.       From who?

17   **A.       Commander Brian Heffernan.**

18   Q.       And where is he on the food chain?

19   **A.       He's a commander of the Bureau of Integrity**

20   **Control.  He's in charge of the Inspection Unit and the**

21   **Internal Affairs Unit, and he's who I report to.**

22   Q.       Now.

23   **A.       Now, correct.**

24   Q.       Right.  So on November 13th who were his direct

25   reports?

1    **A.        Who -- who did Commander Heffernan report to?**

2    Q.     No.  Who were the people that reported to him.

3    **A.        Oh, Captain Robert -- or, I'm sorry, then**

4    **Lieutenant Robert Simon and Lieutenant Monroe Goins.**

5    Q.     And it was Simon, Inspections?

6    **A.     Yes.**

7    Q.     And Goins was Internal.

8    **A.     Yes.**

9    Q.     And then Goins had how many direct reports,

10   people that reported to him?

11   **A.        Oh, then?  The unit has changed since and we**

12   **were pretty short at the time.  I would probably say --**

13   **I want to say four.**

14   Q.     And you're all sergeants --

15   **A.     Yes.**

16   Q.     -- at the time?

17   **A.     Yes.  I don't know exactly how many, but it was**

18   **maybe four, maybe five at that time.**

19   Q.     And Simon similarly had sergeants reporting to

20   him?

21   **A.     Yes.**

22   Q.     Now, you used the term officer in charge.

23          How does that fit in this table of organization?

24   **A.        So right now as a lieutenant I'm the officer in**

25   **charge of the Inspection Unit, and Lieutenant Goins is**

Page 31

1     the officer in charge of the Internal Affairs Unit.

2          That just means that essentially we're the

3     highest ranking officers in that unit.

4     Q.    So is that a formal title, officer in charge, or

5     is it just another way of saying lieutenant?

6     A.    No.  You could be an officer in charge, you could

7     be a sergeant.

8     Q.    Okay.

9     A.    Officer in charge is a term that's used quite

10    frequently throughout the division.  Right now in every

11    district there's an officer in charge of a district and

12    it's a sergeant and he's sitting in the office and he's

13    in charge of that district.

14          So it's sometimes used interchangeably,

15    but when you're referring to a unit, it's the highest

16    ranking member in that unit.

17    Q.    Because some units might be led by people of

18    different rank depending on --

19    A.    Correct.

20    Q.    -- the total deployment?

21    A.    But when I was in the Vice Unit, I was the

22    officer in charge of the Vice Unit and I was a

23    sergeant.

24    Q.    But you could have been -- you could be replaced

25    by a lieutenant?

1   **A.      Correct.  At the time the plan was to have a**
2   **sergeant in charge of the Vice Unit, but, yes, to**
3   **answer your question, yes.**
4   Q.      Okay.  So you get a text from Heffernan, and
5   what's it say?
6   **A.      Said something to the extent, the address on**
7   **Ansel, the exact address escapes me now, the 1300 block**
8   **of Ansel, light call-up, and I believe there was a**
9   **mention that it was an in custody death.**
10  Q.      All right.  Then what happened?
11  **A.      I got out of bed and responded there.**
12  Q.      So what time did you get there?
13  **A.      I would probably say within an hour of receiving**
14  **the text message.  The exact time is probably**
15  **documented somewhere.  It may actually be in this**
16  **report.**
17          **Would you like me to reference the report?**
18  Q.      That's okay.
19          So who was there when you got there?
20  **A.      Lieutenant Goins.  I think we arrived almost at**
21  **the same time.**
22  Q.      And who else was there from the --
23  **A.      Sergeant Maruniak.**
24  Q.      So these, both Goins and Maruniak are Internal?
25  **A.      Yes.**

1   Q.      So you're assembling your light call-out team in

2   order to attach yourselves to the UDFIT counterparts.

3   **A.      Correct.**

4   Q.      All right.  So then what happened?

5   **A.      We -- I arrive, I pulled next to Lieutenant**

6   **Goins in our vehicles and no one was there.**

7   **         He had some information that everybody was at**

8   **the hospital and that they were going to return.**

9   **Slowly personnel started returning back to the scene.**

10  Q.      Okay.  So who came back to the scene?

11  **A.      I could tell you who came to the scene because**

12  **I'm not exactly sure who was at the hospital.**

13  Q.      Okay.

14  **A.      So I don't know if they came --**

15  Q.      All right.  That's fine.

16  **A.      -- where they came from, but I remember**

17  **Detective Borden was there from the Homicide Unit,**

18  **Detective Rhonda Gray from the Homicide Unit, Sergeant**

19  **Diedre Jones from the Homicide Unit, a crime scene**

20  **detective showed up, her name escapes me right now, the**

21  **Third District Officers Aldridge and Myers.**

22  Q.      Carla Crowell, was that the crime scene

23  detective?

24  **A.      That could be her name, yes.**

25  Q.      Okay.  And who was the next one?

1  **A.       Officers Myers and Aldridge showed up, Sergeant**

2  **Rochelle Bottone, and I want to say her lieutenant**

3  **arrived on scene, and his name escapes me.**

4  Q.      Okay.  And what happened as these people drifted

5  in?

6  **A.       I was assigned to monitor Detective Borden's**

7  **investigation.**

8  Q.      How did that come about?

9  **A.       I was assigned to do that through Lieutenant**

10 **Goins.**

11 Q.      Why did Goins make the assignments?

12 **A.       I don't know.**

13 Q.      Is he the senior officer, or --

14 **A.       He -- he was -- because he was the officer in**

15 **charge of the Internal Affairs Unit, he would give**

16 **direction.**

17 Q.      And who was -- who did Goins follow?

18 **A.       I do not know.**

19 Q.      And there was another one of you there, oh,

20 Maruniak, what did he do?

21 **A.       I believe Detective Gray, Detective Rhonda Gray.**

22 Q.      Okay.  So what's that mean, you were assigned to

23 Borden, you literally just walk around with him?

24 **A.       Yeah.**

25 Q.      And do you make notes?

1    **A.      You could, and ordinarily, yes, I would.**

2    Q.     Do you have those notes?

3    **A.      I do not.**

4    Q.     What do you do with those notes?

5    **A.      I could not tell you where those notes are**

6    **today.**

7    Q.     Well, why do you take notes and then not -- do

8    you ever reference them, I mean, what's the --

9    **A.      Yes.  When -- when I do my monitoring report, it**

10   **would be -- I would write down what time I received the**

11   **page; I would write down what time I responded on**

12   **scene; I would write down who I monitored; I would**

13   **write if I cleared one scene and responded to another;**

14   **if I went to a hospital or into someone else's home, I**

15   **would write down that.**

16   **       If I was monitoring someone that was canvassing**

17   **a street, I would write down addresses, so on and so**

18   **forth.**

19   **       The homicide detective that's actually doing the**

20   **investigation is obviously taking more notes than I.**

21   **I'm making sure that everything is handled properly, so**

22   **my notes would be brief and would basically consist of**

23   **arrival times, departure times, maybe an address or who**

24   **a detective was interviewing, a name.**

25   Q.     Does all that get transferred into your memo?

1    **A.    Yes.**

2    Q.    And then at the end of that process where you've

3    transferred it into the memo, what do you do with your

4    handwritten notes?

5    **A.    I don't know what I did with these notes.**

6    Q.    What do you normally do?

7    **A.    If I made sure that they were properly**

8    **transcribed and all of the information was on there, I**

9    **may shred them, I may discard them in some way, as long**

10   **as all of the information was on there and I was**

11   **satisfied that it was accurate.**

12   Q.    Is there any direction to investigators in the

13   Internal Affairs manual about what you should do with

14   notes?

15   **A.    No.**

16   Q.    Is there any established policy or practice

17   about what you do with your handwritten notes?

18   **A.    No.**

19   Q.    So is it just up to the individual?

20   **A.    Sure.**

21   Q.    Do you ever audiotape the work that you're

22   monitoring?

23   **A.    As an Internal Affairs investigator?**

24   Q.    Correct.

25   **A.    Always.**

1    Q.      So as you were walking around with Borden were

2    you taping him?

3    **A.      No.  In my work that I did as an Internal**

4    **Affairs investigator, every interview that I did,**

5    **whether it be a phone interview, an in-person**

6    **interview, I either video recorded it or audio recorded**

7    **it.**

8    Q.      Okay.  But we are monitoring.

9    **A.      We are monitoring.**

10   Q.      So --

11   **A.      So I did not, because I was not the investigator**

12   **of that incident.**

13   **        That's something that the Homicide Unit would do**

14   **or not do on their own.**

15   Q.      So the UDFIT team are the investigators of the

16   incident and you're monitoring the UDFIT team.

17   **A.      Correct.**

18   Q.      As part of your monitoring do you assess whether

19   they are properly audiotaping or videotaping the

20   subject interviews?

21   **A.      Yes.**

22   Q.      And, for example, I know that there was a

23   walk-through --

24   **A.      M-hm, yes.**

25   Q.      -- in the Tanisha Anderson case.

Page 38

1          Did anyone audiotape or videotape the

2    walk-through?

3    **A.        To the best of my knowledge, no.**

4    Q.    And is that consistent with appropriate

5    investigatory technique to fail to audiotape or

6    videotape a walk-through?

7    **A.        In my opinion -- ask me the question one more**

8    **time, please, how you phrased it.**

9    Q.    Well --

10   **A.        Is it -- did you ask me if it was appropriate?**

11   Q.    -- is that the way you're supposed to do it?

12         Yeah.

13   **A.        In my opinion, no.**

14   Q.    Okay.  So you were there.

15   **A.        M-hm.**

16   Q.    I didn't see that called out in your memo.

17   **A.        Correct.**

18   Q.    Why is that?

19   **A.        At the time that this happened it was not in any**

20   **policy that the Homicide Unit video walk-throughs or on**

21   **scene interviews.  So it was not a policy violation.**

22   Q.    But of course the benefit of the walk-through is

23   that you're seeing the explanation occur in context,

24   right?

25   **A.        Agreed.**

1   Q.    I mean, you're on scene, you're -- you're seeing

2   the cruiser, you're seeing the sidewalk, you're seeing

3   things in addition to hearing them verbally described,

4   right?

5   **A.     Correct.**

6   Q.    And are you saying that as of November 12th,

7   13th, 2014 there was no requirement of videotaping a

8   walk-through?

9   **A.     To the best of my knowledge there was not a**

10  **requirement.**

11  Q.    And there is now.

12  **A.     To the best of my knowledge there is not a**

13  **requirement right now.**

14  Q.    But when you went to PATC school, did you learn

15  that the standard in the industry is to videotape

16  walk-throughs?

17  **A.     I don't know if I gained that information from**

18  **the PATC, but in other training, yes.**

19  Q.    Have you made any recommendations to the City of

20  Cleveland that they commence videotaping walk-throughs?

21  **A.     Yes.**

22              MR. MALLAMAD:                    Objection.

23                   You can answer.

24  BY MR. GERHARDSTEIN:

25  Q.    And how did that go when you made those

Page 40

1    recommendations?

2              MR. MALLAMAD:              Just show

3              a continuing objection to this subject

4              area, but go ahead, Lieutenant.

5    **A.    To the best of my knowledge it -- there has not**

6    **been a policy established regarding.**

7    Q.    So how did you go about making the

8    recommendation that that policy be implemented?

9    **A.    I noted it in my reports.**

10   Q.    In your DOJ related reports?

11   **A.    No, sir.  UDFIT reports, as similar to this.**

12   Q.    Okay.  Well, I read that really quickly.

13         Is there such a notation in Exhibit 42?

14   **A.    I believe there -- I believe there is, there's**

15   **like --**

16   Q.    Yeah, see if you can find it.

17   **A.    This portion --**

18   Q.    Okay.  You're looking at page 1 of 1 dated

19   February 10, 2015.  Go ahead.

20   **A.    This bullet point, the second bullet point on**

21   **that page references an interview from the Homicide**

22   **Unit, and the second -- and the last paragraph of that**

23   **page references the recordings of interviews.**

24   Q.    Okay.  So the one bullet point says Sergeant

25   Bottone was never -- wasn't required to submit to a

Page 41

1    recorded interview, and you're suggesting that that

2    should have been done.

3    **A.      Yes.**

4    Q.    So that's a good example of something that you

5    could have addressed in real time, right?

6    **A.      Not really.  What they would do is the Homicide**

7    **Unit would, as a standard, have officers respond to the**

8    **Homicide Unit so that they can record them, whether it**

9    **be upon just clearing the scene or the next day.**

10         **It was common practice to have the officers**

11   **actually respond to the Homicide Unit.**

12   Q.    And that didn't happen here?

13   **A.      To the best of my knowledge, no.**

14   Q.    And so that was a deviation from common

15   practice.

16   **A.      Correct.  Again, not -- not technically part of**

17   **a policy, but would have been a good idea.**

18   Q.    So I'm not going to see when I read through the

19   Internal Affairs manual something that just says make

20   sure every principle who handled a person who later

21   died is required to go through a recorded interview?

22   **A.      I don't believe so.**

23   Q.    But that should be a requirement, right?

24              MR. MALLAMAD:              Objection.

25                   You can answer, Lieutenant.

Page 42

1    A.       I think that in this case, given her

2    involvement, I think that she should have been

3    interviewed and it should have been recorded.

4           And I don't recall that being in the manual

5    currently or at the time.  I don't recall that being --

6    Q.       Well, if you want to make notes about what

7    should go in a manual going forward, that's fine.

8           Now, you -- you do point out, and I appreciate

9    this, in addition, and I'm reading, the interviews

10   taken on the scene by homicide investigators were not

11   recorded as discussed in meetings prior to the

12   incident.

13          Did I read that correctly?

14   A.       Yes.

15   Q.       Interviews taken on the scene by homicide

16   investigators, what are you referring to?

17          Does that include the walk-through?

18   A.       It -- it could.

19   Q.       Well, did you intend it to?

20   A.       What I was referencing here were the individual

21   interviews at the homicide.  I was not referencing the

22   walk-through.  And what I'm referencing here were the

23   interviews that were taking -- that were taken by the

24   homicide detectives.

25   Q.       Okay.  And those are the interviews of family

1   members right after they learned that Tanisha died, and

2   some of them went to your interview rooms, others

3   stayed in their homes.

4   **A.      Correct.  Some interviews of the witnesses were**

5   **taken at the Homicide Unit.**

6   Q.      Right.

7   **A.      But I don't believe all of them were.**

8   Q.      Right.  And do you know whether all of the

9   people who were interviewed, whether done in Homicide

10  or back at the house, were offered the opportunity to

11  be taped?

12  **A.      They were.**

13  Q.      So you're saying they should have been taped?

14  **A.      I'm saying that on the scene it would be a good**

15  **practice to at least audio record the interviews.**

16  Q.      And were -- was Joell, were Theresa Overton,

17  Casandra Johnson, were they all offered the opportunity

18  to be audiotaped?

19  **A.      I believe they were asked to respond to the**

20  **Homicide Unit to be -- to -- where a recorded interview**

21  **would have been conducted.**

22  Q.      Now, of course, they're in -- it's the worst day

23  of their lives, their family member just died in front

24  of their house.  I mean, you're not criticizing them

25  for failing to go down to the Homicide Unit, right?

Page 44

1          MR. MALLAMAD:                        Objection.

2               You can answer.

3     **A.     No.**

4     Q.     But you're saying since they did agree to some

5     level of interview at their home, it would have been

6     good to record them there.

7     **A.     Yes.**

8     Q.     And do you know if that offer was made to record

9     them at the interview in their home?

10    **A.     To the best of my knowledge, no.**

11    Q.     Okay.  And that's what you're referring to in

12    your memo.

13    **A.     Correct.**

14    Q.     So let's go back to the walk-through.

15          We got onto this because you have testified that

16    you think it would be a good idea to video the

17    walk-throughs so that you have audio and visual, right?

18    **A.     Yes.**

19    Q.     And is that recommendation embraced in your

20    materials from the Tanisha Anderson case?

21    **A.     Specific to the walk-through?**

22    Q.     Right.

23    **A.     No.**

24    Q.     Now, you talk in this memo at the page you

25    pointed out, in addition, the interviews taken on scene

1   were not recorded as discussed in meetings prior to the

2   incident.

3        Tell me about these meetings prior to the

4   incident.

5   A.      Prior to this there were a few meetings where

6   these things were discussed.  I cannot tell you the

7   exact date and time of the meeting, and I --

8   Q.      Well, what things?  What do you mean?

9   A.      UDFIT investigations.

10  Q.      Okay.

11  A.      Things that it's just -- debriefings, things

12  like that, training, that we attended as an Internal

13  Affairs investigator, what we -- what we got from that

14  training, that type of thing.

15       And these matters were discussed and I

16  recommended that there be -- these such interviews be

17  recorded.

18  Q.      So take me back to meetings prior to this

19  incident.  Are we talking about UDFIT investigators and

20  Internal together?

21  A.      Sure.  Again, I can't tell you exactly who was

22  there at the -- at the meetings, but these matters were

23  discussed prior to this.

24  Q.      Are these meetings UDFIT investigator training,

25  is that what we're doing?

Page 46

1    A.      No.   The meetings could have been, you know, an

2    informal meeting or a debriefing about an UDFIT or

3    about an investigation where we would talk about what

4    occurred, you know, what can we do better, the

5    response, so on and so forth.

6            And that's when -- that's what I -- that's what

7    the reference is here.

8    Q.      Who else do you recall attending these meetings?

9    A.      I -- I would be guessing.  I would.  I really

10   would not -- I don't want to guess.

11   Q.      How many meetings did this topic come up of

12   recording interviews in real time when you're in the

13   middle of these UDFIT investigations?

14   A.      I would say twice.

15   Q.      And from the UDFIT side who are the most likely

16   candidates of people that would be present?

17   A.      At the -- at any homicide, any homicide

18   investigator.

19   Q.      Could any homicide investigator be assigned to

20   an UDFIT team?

21   A.      Yes.  And I believe at the time the Homicide

22   Unit had certain individuals that were -- they would

23   primarily go to for UDFITs and maybe others that were

24   not primary for UDFITs.

25           But to answer your question, any of the homicide

Page 47

1   investigators could be assigned to an UDFIT given

2   availability.

3   Q.     Was there an UDFIT manual?

4   A.     Yes.

5   Q.     Was there a homicide manual?

6   A.     I don't know if homicide has a manual.  I have

7   to believe that they do.

8   Q.     Does the UDFIT manual address what interviews to

9   record?

10  A.     I do not think that it does, to the best of my

11  knowledge.

12  Q.     Why was it your recommendation that interviews

13  be recorded?

14          MR. MALLAMAD:              Objection.

15          You can answer.

16  A.     For accuracy.

17          May I say something --

18  Q.     Sure, go ahead.

19  A.     -- referring to the manuals?

20          In the UDFIT manual, the Homicide manual, the

21  Internal Affairs manual, it -- it may touch on recorded

22  interviews, but to the best of my knowledge it does not

23  address recording interviews on scene, at least an

24  audio interview, if that makes any sense, if I can

25  clarify.

Page 48

1    Q.      So if the manuals talk about recorded

2    interviews, you think they're likely to be talking

3    about taking somebody into an interview room and you've

4    got the cameras --

5    A.      Yes.

6    Q.      -- the whole deal.

7    A.      Yes.  And that's -- that's what I believe that

8    it references.

9    Q.      But in the real world where you were operating

10   you know that some people get into that room and a lot

11   of people don't.

12   A.      Correct.

13   Q.      And so those who don't get into that room still

14   could be taped with a cassette recorder or with a

15   handheld video or with an iPhone.

16   A.      Correct.

17   Q.      Right?

18           And you're saying, especially with technology

19   being so easy, I suppose, even an iPhone video would be

20   better than just taking notes.

21                   MR. MALLAMAD:                Objection.

22                      You can answer.

23   A.      Correct.

24   Q.      Okay.  And you were saying that before the

25   Tanisha Anderson case.

Page 49

1   A.      **Correct.**

2   Q.      And it still isn't established policy.

3   A.      **To the best of my knowledge, no.**

4   Q.      But you're working on it?

5               MR. MALLAMAD:              Objection.

6                   You can answer.

7   A.      **Several policies are being revisited.**

8   Q.      Do you have a commitment that that will change,

9   or is it still in discussion?

10              MR. MALLAMAD:              Just show

11                  a continuing objection to this line of

12                  questioning, but go ahead, Lieutenant.

13  A.      **I've had no part of that, writing that policy or**

14  **rewriting that policy, no.**

15  Q.      Okay.  Well, we're making progress.

16          I think you got to the scene and you were just

17  assigned from Goins to work with Borden?

18  A.      **Correct.**

19  Q.      And does that mean you just follow him, whatever

20  Borden's up to?

21  A.      **Yes.**

22  Q.      All right.  So what happened?

23  A.      **Borden took measurements of the front yard and**

24  **he interviewed a female, and if I remember correctly**

25  **her name was Overton.**

1  Q.      How was it determined that he should take

2  measurements of the front yard?  How did they divide up

3  their work; do you know?

4  **A.      I do not know.**

5  Q.      And what else did he do that night?

6  **A.      That's all I recall him doing.**

7  Q.      He participated in the walk-through, right?

8  **A.      Okay, yes.**

9  Q.      And so you tagged along.

10  **A.      I was there for that, yes.**

11  Q.      And the walk-through occurred before or after

12  the measurements?

13  **A.      I want to say it was after.**

14  Q.      And the walk-through occurred before or after

15  the Overton interview?

16  **A.      I want to say the walk-through was the last**

17  **thing that was done, so I want to say that it was**

18  **after.  It could have been before, but if my memory**

19  **serves me correctly, it was after.**

20  Q.      What's your recollection of the Overton

21  interview?

22  **A.      I recall Overton being a family member of**

23  **Tanisha Anderson.  I'm not exactly sure in what -- how**

24  **she's a family member.**

25          **I recall her telling Borden that she was in the**

Page 51

1    house at the time of the incident.

2              I recall her telling Borden that she was going

3    back and forth from the picture window into the other

4    side of the house.

5              And I recall her telling Borden that there was

6    another family member, a younger person, if you will, a

7    juvenile that was standing at the picture window and

8    she was walking back and forth to that person.

9              I don't believe she told Borden that she went

10   outside during the incident.  I recall her telling

11   Borden that Joell Anderson was outside, and I want to

12   say that she was detailing her 911 call to Borden, or

13   at least explaining or telling him about the 911 calls

14   and -- and Tanisha Anderson's activity, how she was

15   behaving and things that she was doing.

16   Q.    What did she say about the initial 911 call?

17   A.       I recall her telling Borden that they called

18   once and that they had to call back a couple times, I

19   believe.

20   Q.    After they called once, they had a response from

21   officers, right?

22   A.       Correct.

23   Q.    Did you ever get involved in interviewing those

24   initial responding officers?

25   A.       No, I did not, but Homicide did.

1  Q.    And you actually read everything in order to

2  come up with your case assessment, right?

3  **A.      When I did the administrative review --**

4  Q.    Right.

5  **A.      -- the first time, I did not have a completed**

6  **homicide file.  In one of these -- in one of the**

7  **reports I outline what I had to conduct that review.**

8  **          So I had a certain amount of material, but I**

9  **didn't have a completed homicide case file because it**

10 **wasn't completed yet.**

11 **          So I was told to do the review with this**

12 **information, and this is what information I had to do**

13 **the review.  That's why I outline that information and**

14 **it's based on this set of information.**

15 Q.    Let me see your -- tell me where it says what

16 you had.

17 **A.      Second paragraph.**

18 Q.    So I apologize for jumping around, but this is

19 helpful.

20           So this paragraph says what you looked at in

21 order to come up with your administrative review,

22 right?

23 **A.      Correct.**

24 Q.    What was missing as of then when you say it

25 wasn't a complete file?

Page 53

1    **A.      There are several -- there'll be several**

2    **documents in an UDFIT file.**

3    Q.      Right.

4    **A.      There could be duty reports, there could be**

5    **measurements, there could be -- I don't know if -- the**

6    **medical examiner's report.**

7    Q.      Yeah, I was going to say, the autopsy's not

8    there, is it?

9    **A.      Right.**

10   Q.      Do you agree?  The medical examiner's

11   information isn't in there, right?

12   **A.      The medical examiner's information is not listed**

13   **here, but I can't say that I did not have the medical**

14   **examiner's report.**

15   Q.      It was done on January 5th.

16   **A.      Right.  I just might not have received it from**

17   **Homicide.  I may have had a copy of it, but I'm**

18   **detailing in this paragraph what I received from**

19   **Homicide.**

20   Q.      Okay.  It's not like you didn't know she was

21   dead.

22   **A.      Right.  So --**

23   Q.      But the way the medical examiner described the

24   death and the cause of death, was that before you?

25   **A.      Before I did this review?**

1  Q.     Yeah.

2  **A.     I have to say that it was.**

3  Q.     Okay.

4  **A.     This report was completed on January 26th.**

5  Q.     Okay.  So as you sit here today did you ever go

6  back and do another administrative review based on a

7  complete UDFIT file?

8  **A.     Sure.**

9          **So -- where did it go.  So on February 10th I**

10  **received the completed UDFIT file.  And this is an**

11  **addendum to the report that I would have forwarded on**

12  **January 26th.**

13  Q.     As a result of your receipt of the complete

14  UDFIT file, you didn't recommend any additional

15  discipline, right?

16  **A.     No.  I made these recommendations here, or I**

17  **noted these two issues here.**

18  Q.     Right.  They failed the spark test and that

19  Sergeant Bottone didn't get interviewed.

20              MR. BACEVICE:              Objection.

21  **A.     Right.**

22  Q.     Now, it wasn't too late to interview Bottone,

23  right?  I mean, it's only February.

24  **A.     Correct.**

25  Q.     So did she ever get interviewed?

1  **A.        To the best of my knowledge, no.**

2  Q.        Why not?

3  **A.        I don't know.**

4  Q.        Well, you're the Internal Affairs, when you find

5  a mistake can't you just tell them to go fix it?

6  **A.        In some instances maybe yes on the scene.   After**

7  **the fact I would make my recommendation and then that**

8  **would have to come from somebody above me.**

9  Q.        So this is a memo to Goins.   It would be up to

10  Goins to tell a lieutenant in Homicide to go get that

11  done.

12  **A.        Or -- or make that recommendation as well and**

13  **send that to the commander who then would send that to**

14  **the deputy chief who then would send that to the chief**

15  **of police.**

16  Q.        And then back down.   I mean, somehow it's got to

17  get over to Homicide, right?

18  **A.        Correct.**

19  Q.        And did all that happen?

20  **A.        I don't know.   To the best of my knowledge, no.**

21  Q.        All right.   I want to finish going through what

22  happened on the night and then I want to get back to

23  your review of the situation.

24  **A.        Okay.**

25  Q.        So you talked to -- you listened to the

1  interview of Overton, and just summarize to the best of

2  your recollection what she said about the content and

3  the activity following those 911 calls that preceded

4  the actual physical encounter with Tanisha Anderson and

5  Officer Aldridge and Myers.

6  **A.      Summarize it?**

7  Q.      Yeah.

8  **A.      The entire -- the entire interview?**

9  **         She started from the beginning, and what I had**

10  **explained to you earlier may have been a little out of**

11  **order, but she started from the beginning and she**

12  **talked about Tanisha Anderson's behavior, what prompted**

13  **them to call 911.  She talked about the 911 calls.**

14  Q.      What was Tanisha Anderson's behavior?

15  **A.      She -- she was explaining to Borden that she was**

16  **acting in a way that caused them alarm, that she wasn't**

17  **making sense, she was turning light switches off and**

18  **on, she was counting repeatedly, rapidly counting.  She**

19  **was -- and, you know, more so she was running in and**

20  **out of the house.  It was colder temperatures and she**

21  **was running in and out of the house.**

22  **         She was explaining that type of behavior.  She**

23  **-- I think -- I believe she told Borden, she described**

24  **Tanisha Anderson's history of mental illness,**

25  **potentially the hospital that she was at last,**

1  **potentially medications that she was taking and so on**

2  **and so forth.**

3  Q.     Have you ever been through a crisis intervention

4  training?

5  **A.     Yes.**

6  Q.     Have you done mental health runs?

7  **A.     Yes.**

8  Q.     Have you supervised officers who are CIT

9  trained?

10  **A.     Yes.**

11  Q.    And have you had people fill out those crisis

12  intervention reports?

13  **A.     Yes.**

14  Q.     So you have a lot of personal experience with

15  police intervention with people who aren't committing

16  crimes but are in need of support and assistance in

17  getting medical treatment.

18  **A.     Yes.**

19  Q.     Would you agree that Tanisha Anderson was such a

20  person?

21  **A.     Yes.**

22  Q.     Wasn't doing any crime, right?

23  **A.     Correct.**

24  Q.     She was simply in need of help in getting

25  medical assistance.

1          MR. MALLAMAD:                    Objection.

2          MR. BACEVICE:                    Objection.

3          MR. MALLAMAD:                    You may

4          answer.

5     BY MR. GERHARDSTEIN:

6     Q.     Right?

7     **A.     Correct.**

8     Q.     So as you listened to the report of her conduct,

9     and based on your experience, did you hear anything

10    that made you come to any conclusion as to whether

11    Tanisha Anderson was engaged in conduct that would

12    support involuntary hospitalization?

13          MR. BACEVICE:                    Objection.

14          MR. MALLAMAD:                    Objection.

15               You can answer.

16    **A.     Possibly.**

17    Q.     I mean, part of your job is to monitor -- or is

18    to investigate the UDFIT team.  They're looking at the

19    conduct of the officer.

20          Would you agree that there came a time when the

21    officer was trying to forcibly take Tanisha Anderson to

22    the hospital?

23          MR. BACEVICE:                    Objection.

24          MR. MALLAMAD:                    Objection.

25               You can answer.

1  **A.      Yes.**

2  Q.      And so did you come to any conclusion about

3  whether she did enough conduct that looked like a

4  serious risk of harm to herself or others that

5  supported that officer in starting to forcibly take

6  action toward taking her to a hospital?

7                    MR. BACEVICE:               Objection.

8                    MR. MALLAMAD:               Objection.

9                        You can answer.

10  **A.      At the time of the Theresa Overton interview, or**

11  **after the fact.**

12  Q.      Well, let's take it a step at a time.

13          As you're listening to Theresa Overton.

14                    MR. BACEVICE:               Objection.

15  **A.      I -- I could not draw a conclusion at that time.**

16  Q.      Okay.  So Theresa Overton has told you about the

17  911 call, and then let me just finish this thought,

18  after the fact when you looked at everything tell me

19  what -- how you came out on that issue of -- of the

20  need -- of whether there was support for forcibly

21  taking her to the hospital.

22                    MR. BACEVICE:               Objection.

23                    MR. MALLAMAD:               Objection.

24                        You can answer.

25  **A.      Okay.  I believe that it was reasonable to**

Page 76

1    stopped talking, I believe that the officers should

2    have called EMS as well as contacting a supervisor.

3    Q.     Why?

4    A.     The --

5                    MR. BACEVICE:                    Objection.

6                    MR. MALLAMAD:                    You can

7                    answer, Lieutenant.

8    A.     I think that in taking the totality of the

9    circumstances, it would have been prudent for the

10   officers to call EMS because of her mental state, her

11   history of mental illness, her -- the fact that she was

12   very -- wearing -- she wasn't wearing appropriate

13   weather -- or appropriate clothing for the weather,

14   that she suddenly stopped moving and talking, and that

15   she was laying on the ground and it was very cold.

16           I think given the totality of those

17   circumstances EMS should have been called right away.

18   Q.     Well, didn't you consider at least one of the

19   salient points to be that she stopped moving and

20   talking after being placed in restraints, prone on the

21   sidewalk, and after having pressure put on her back;

22   was that important to you?

23                    MR. BACEVICE:                    Objection.

24                    MR. MALLAMAD:                    Objection.

25                    You can answer.

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 77

1  A.      The position -- the position that Aldridge took

2  on Tanisha Anderson really, for me, I could not know

3  exactly where he placed his knee, given the witness

4  statements and his statement.

5         I know that he placed his knee somewhere near

6  her shoulder, her back, her mid back, I'm not exactly

7  certain where he placed his knee and I'm not exactly

8  certain for how long his knee was on her back.

9         So is it an important fact?  Sure, yes, but in

10  my conclusion in whether he followed policy or not, the

11  other factors that I described to you were as important

12  as far as him not calling for EMS.

13  Q.     Well, what about any duty under policy and

14  procedure and subject control training to roll her back

15  off of her stomach?

16             MR. BACEVICE:                    Objection.

17             MR. MALLAMAD:                    Objection.

18                  You may answer.

19  BY MR. GERHARDSTEIN:

20  Q.     Did you address that?

21             MR. MALLAMAD:                    Sorry.

22                  You can answer.

23  A.      To the best of my knowledge there was no formal

24  training or policy that addresses that specific issue.

25  Q.     Well, I mean, you're familiar with positional

Page 78

1    asphyxiation, right?

2    **A.      I am.**

3    Q.      And are you saying there's no training on

4    positional asphyxiation?

5                    MR. BACEVICE:                    Objection.

6                    MR. MALLAMAD:                    Objection.

7                        You can answer.

8    **A.      To the best of my knowledge, there is not.   And**

9    **there was not prior to this.**

10   Q.      Were there any policies and procedures that

11   addressed positional asphyxiation?

12                   MR. BACEVICE:                    Objection.

13                   MR. MALLAMAD:                    Objection.

14                       You can answer.

15   **A.      At this time, no.**

16   Q.      How did you become familiar with it?

17   **A.      Just common knowledge that the condition exists.**

18   Q.      But nothing specific from your training within

19   the Cleveland Police Department?

20   **A.      No.**

21                   MR. BACEVICE:                    Objection.

22   BY MR. GERHARDSTEIN:

23   Q.      Are you aware that persons who have a big belly

24   or heavy are more at risk of positional asphyxiation if

25   they're prone when restrained than persons who don't

Page 79

1   have a lot of extra weight?

2              MR. BACEVICE:              Objection.

3              MR. MALLAMAD:              Objection.

4   **A.    I am.**

5              MR. MALLAMAD:              You may

6              answer.

7   BY MR. GERHARDSTEIN:

8   Q.    Would you agree, given whatever knowledge you

9   have of positional asphyxiation, that the risk of

10  interrupting Tanisha Anderson's breathing would have

11  been reduced had she been rolled promptly onto her back

12  after she became unresponsive as opposed to leaving her

13  prone?

14             MR. BACEVICE:              Objection.

15             MR. MALLAMAD:              Objection.

16  **A.    That's reasonable, yes.**

17  Q.    So are you saying that that should have happened

18  but these officers weren't trained to do it?

19             MR. BACEVICE:              Objection.

20             MR. MALLAMAD:              Objection.

21  **A.    I'm saying that to the best of my knowledge the**

22  **officers were not trained to do it.  I wish that would**

23  **have happened.**

24  **      I don't know their level of knowledge, but I**

25  **know that they more than likely did not receive**

1   **training in that and it's not in a policy.**

2   Q.     So why isn't that a bullet point in your report

3   that officers receive proper training in positional

4   asphyxiation in order to minimize the risk of breathing

5   interruption in detained people?

6                 MR. BACEVICE:                    Objection.

7                 MR. MALLAMAD:                    Objection.

8   **A.     I believe that to the best of my knowledge after**

9   **this incident there was a divisional notice or a memo**

10  **or something that came through the chain of command**

11  **talking about positional asphyxiation.**

12         **I don't -- I can't cite it.  I recall it being**

13  **an issue and being discussed.  I don't exactly know.**

14  **But that probably should have been part of this report.**

15  Q.     Because as we talked about earlier one of your

16  jobs is to pick up failings in policy -- in the very

17  policy and procedure itself, not just find failure to

18  comply.

19                 MR. MALLAMAD:                    Objection.

20  BY MR. GERHARDSTEIN:

21  Q.     Right?

22  **A.     Correct.**

23  Q.     So you'd agree that this report should have

24  included some notice to the higher-ups that they

25  implement better training on subject control so that it

1   include clear direction on positional asphyxiation.

2   **A.      I would agree.**

3            MR. MALLAMAD:                  Objection.

4                 Go ahead, you can give your answer

5                 now.

6   **A.      I would agree.**

7   Q.      Did you talk to the medical examiner?

8   **A.      I did not.**

9   Q.      What does it mean to you that the medical

10  examiner ruled this death a homicide?

11           MR. BACEVICE:                  Objection.

12           MR. MALLAMAD:                  Objection.

13  **A.      Just that, that it was ruled a homicide.   I**

14  **read --**

15  Q.      So what's that mean, though --

16  **A.      -- the medical examiner's report.**

17  Q.      -- you're -- I mean in the police world?

18          The civilian would say, wow, homicide, you know.

19  Is that a significant fact for you as you perform your

20  duties as an Internal Affairs investigator?

21           MR. BACEVICE:                  Objection.

22           MR. MALLAMAD:                  Objection.

23                 Go ahead and answer.

24  **A.      From this -- from a criminal investigation,**

25  **maybe, but I did not conduct a criminal investigation.**

1    **I was tasked with conducting an administrative review**

2    **of it, which would be focused on policy and did the**

3    **officers violate policy or not.**

4    Q.    Now, the policy you thought they did violate was

5    failing to call EMS quicker.

6              MR. BACEVICE:              Objection.

7              MR. MALLAMAD:              Objection.

8    **A.    Yes.**

9    Q.    And that's part of the use of force policy,

10   right?

11   **A.    Yes.**

12   Q.    This duty to call EMS.  And if you'd look at in

13   the book there --

14             MR. MALLAMAD:              What's the

15             number?

16             MR. GERHARDSTEIN:              Yeah, I'm

17             looking.

18   BY MR. GERHARDSTEIN:

19   Q.    It's 14.  And is the -- it's the section you're

20   relying on when you made a recommendation on discipline

21   on page 8 of 15 at Roman numeral 5, capital A.

22             MR. BACEVICE:              Objection.

23             MR. MALLAMAD:              Objection.

24   **A.    Page 8?**

25   Q.    8 of 15, yeah.  And under it --

Page 83

1   **A.      Yes.**

2   Q.      And it says in the second full sentence, members

3   shall obtain necessary medical assistance for persons

4   appearing to be injured or complaining of injury.

5           Did I read that correctly?

6   **A.      Yes.**

7   Q.      And is that the basis for recommending

8   discipline?

9                   MR. BACEVICE:              Objection.

10                  MR. MALLAMAD:              Objection.

11  **A.      I believe so.**

12  Q.      What training did Aldridge and Myers have to

13  know that the need to call for medical assistance

14  should have been done right away?

15                  MR. BACEVICE:              Objection.

16  BY MR. GERHARDSTEIN:

17  Q.      And I guess what kind of first aid training did

18  they have, I guess, is the question.

19                  MR. BACEVICE:              Objection.

20                  MR. MALLAMAD:              Objection.

21  Q.      Do you know?

22  **A.      I do not know.**

23  Q.      What would you expect officers to have as

24  members of the sworn force in the Cleveland Police

25  Department?

1          MR. BACEVICE:                    Objection.

2          MR. MALLAMAD:                    Objection.

3   **A.     As far as first aid?**

4   Q.     Yeah.

5   **A.     Training to assess potential injury.**

6   Q.     And how often do they get that or did they get

7   it prior to December -- or November 12th, 2014?

8          MR. MALLAMAD:                    Objection.

9   **A.     As far as training records go, I don't know.  I**

10  **could say that prior to this incident I received a**

11  **block of instruction in first aid training to involve**

12  **CPR, and I think that in that training it did include**

13  **some type of injury assessment, if you will.**

14         **I can't tell you the year that I received that**

15  **training.  And I believe I received two blocks of it in**

16  **two different years.**

17         **As far as Aldridge and Myers, I could not tell**

18  **you if they received that same training or not.**

19  Q.     Isn't that kind of training just done as part of

20  annual in-service?

21  **A.     Yes.**

22  Q.     So it's more likely than not that they got the

23  same thing you did, right?

24         MR. BACEVICE:                    Objection.

25  **A.     I'm not even sure when -- the exact hire date of**

1   these officers.

2   Q.     Okay.  Well, is that something you would check

3   before you recommend discipline?

4              MR. BACEVICE:                  Objection.

5   **A.       Not necessarily.  Because whether you received**

6   **specific training in injury assessment or not, I think**

7   **that given the circumstances a reasonable person would**

8   **or should have been able to assess that, particularly a**

9   **police officer given their experiences.**

10  Q.     Which goes back to the factors you were looking

11  at, I mean, mental state, suddenly stopped moving and

12  talking, cold, inappropriately dressed, not the kind of

13  situation you'd want to see prolonged any longer than

14  absolutely necessary, right?

15             MR. BACEVICE:                  Objection.

16             MR. MALLAMAD:                  Objection.

17  **A.       Correct.**

18  Q.     And that's why you're thinking they should have

19  at least known to call for EMS at the same time they

20  call the supervisor.

21             MR. BACEVICE:                  Objection.

22             MR. MALLAMAD:                  Objection.

23  **A.       Correct.**

24  Q.     Did you ever find out why they didn't call EMS?

25             MR. BACEVICE:                  Objection.

1   when taking -- when conducting a walk-through is

2   reasonable.

3   Q.      But you didn't do that, or -- Cleveland didn't

4   do that.

5                    MR. BACEVICE:                    Objection.

6   A.      To the best of my knowledge they were both

7   present.

8   Q.      And was that the way things are normally done

9   when UDFIT is doing a walk-through with officers who

10  were -- where more than one officer participated in an

11  incident that they would allow the officers to do the

12  walk-through together?

13                   MR. MALLAMAD:                    Objection.

14                   MR. BACEVICE:                    Objection.

15  A.      I'm trying to think of a -- of prior UDFITs.

16          It wouldn't surprise me that the prior UDFITs

17  were done in that manner, although I can't speak

18  exactly and tell you that they were all done in that

19  manner.

20          There may have been a time where they were

21  separated, but were potentially, just given that they

22  were in two geographic areas, one was here and maybe

23  one was down the street and they were separated, so I

24  can't tell you that they're consistently done like that

25  on purpose or not.

Page 88

1    Q.     If this incident were to be investigated today

2    would the officers be separated?

3                  MR. BACEVICE:                        Objection.

4                  MR. MALLAMAD:                        Objection.

5    A.     I don't know.

6    Q.     Has there been any dialogue among those of you

7    in Inspections or in Internal about the practice of

8    permitting officers to do the walk-throughs together

9    rather than be separated?

10                 MR. BACEVICE:                        Objection.

11                 MR. MALLAMAD:                        Objection.

12   A.     I don't -- I don't recall that dialogue, if

13   there was.

14   Q.     Have you ever made any recommendations on that?

15   A.     Specific to --

16                 MR. MALLAMAD:               I'm sorry,

17                 just let me get -- put my objection on.

18                      You can answer.

19   A.     Specific to the separating of the officers in a

20   walk-through, no.

21   Q.     As somebody who studies this and been trained in

22   it and now as a person who is an officer in charge, at

23   least of Inspections, do you have an opinion as to

24   whether it's appropriate to have the officers together

25   during a walk-through or whether they should be

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 89

1   separated?

2                    MR. BACEVICE:                Objection.

3                    MR. MALLAMAD:                Objection.

4   **A.      I would say separated would be a better**

5   **practice.**

6   Q.      Are you doing anything to make that the policy

7   going forward?

8                    MR. MALLAMAD:                Objection.

9   **A.      I am currently not, no.**

10  Q.      I'm giving you homework here.

11                   MR. MALLAMAD:                Al, let me

12                   know when it's okay to take a quick break.

13                   MR. GERHARDSTEIN:            We can

14                   take a break now.

15                        (Thereupon, there was a brief

16                   recess.)

17  BY MR. GERHARDSTEIN:

18  Q.      Thank you for bringing your report today.

19          I notice that at page 3 of the report written on

20  January 26, 2015 your narrative says, "The officers

21  were unsure if she fell asleep, was faking, or reacting

22  to her medications.  While outside Joell Anderson

23  commented to the officers that sometimes Tanisha will

24  just crash or pass out.  Also during this time Aldridge

25  periodically checked Anderson's pulse, which he

1   detected."

2          Did I read that correctly?

3   **A.      Yes.**

4   Q.     The words you summarize from Joell don't include

5   as much as you told us today.  I mean, it sounds like

6   the way you summarized it in your report that all Joell

7   said was that sometimes she crashes.

8                  MR. MALLAMAD:                  Objection.

9                  Go ahead.

10                 MR. BACEVICE:                  Objection.

11  **A.      That may have been -- that may have been taken**

12  **from the officers' interviews as well.  I would have to**

13  **go back and look at the officers' interviews.**

14  Q.     All right.  But your recollection is that Joell

15  said something about how she, what, plays possum?

16  **A.      Or she always does this, or something to that**

17  **extent.  I'm not --**

18  Q.     Well --

19  **A.      -- I don't think he used the word possum.**

20  Q.     Okay.  Well, and what I'm trying to get at, and

21  help me out, is did Joell actually say that his sister

22  would fake being passed out, or did he say that she

23  will pass out from time to time?

24  **A.      I don't --**

25                 MR. BACEVICE:                  Objection.

1    A.      I don't think he used the word fake or possum or

2    anything like that.  I think that the -- that due to

3    the dialogue between Joell Anderson and the officers,

4    my opinion is that the officers took it as Joell

5    Anderson was telling them that this is a type of a

6    normal situation, she'll just do this.

7            I don't think it was playing possum or faking

8    anything, that this is normal and this is not out of

9    the ordinary for her to do this.

10   Q.      To collapse.

11   A.      Or to -- I don't know collapse, but, you know,

12   stop moving in a way where she just, you know.

13   Q.      Is unresponsive.

14   A.      Right.

15   Q.      But she was in the officer's control.

16   A.      Correct.

17   Q.      She was cuffed.

18   A.      Correct.

19   Q.      She's prone.

20   A.      Yes.

21   Q.      She's on the sidewalk and it's 20-something

22   degrees.

23   A.      Correct.

24   Q.      And she's dressed inappropriately.

25   A.      For the weather, yes.

Page 92

1   Q.     So even if Joell said, she does this, it wasn't

2 appropriate for the officers to leave her in that state

3 at that location.

4                MR. BACEVICE:                   Objection.

5                MR. MALLAMAD:                   Objection.

6 BY MR. GERHARDSTEIN:

7   Q.     Without calling EMS.

8                MR. MALLAMAD:                   Objection.

9 **A.     Correct.**

10   Q.     Have you been in these situations where you

11 check people's pulses?

12 **A.     I -- I -- I can't say that I was in a use of**

13 **less lethal force where I had to check someone's pulse.**

14   Q.     You know from whatever training you've had that

15 that's actually kind of tricky, isn't it?

16                MR. MALLAMAD:                   Objection.

17                MR. BACEVICE:                   Objection.

18   Q.     Checking people's pulses.

19                MR. MALLAMAD:                   Objection.

20                MR. BACEVICE:                   Objection.

21 **A.     Tricky as in?**

22   Q.     It's easy to get it wrong.

23                MR. BACEVICE:                   Objection.

24                MR. MALLAMAD:                   Objection.

25 **A.     Sure, yes.**

Page 94

1    **government has an interest in protecting itself, but**

2    **yet also protecting a government employee at the same**

3    **time.  So I believe it's New Jersey versus Garrity**

4    **(1976).  I'm not sure what it is, but --**

5    Q.       '67.

6    **A.       '67?**

7    Q.       So would you agree that an officer who makes

8    statements after being given the protection of Garrity

9    can have those statements used against him or her in

10   administrative proceedings but not in criminal

11   proceedings?

12                   MR. MALLAMAD:                Objection.

13                   MR. BACEVICE:                Objection.

14   **A.       As long as he or she is telling the truth, yes.**

15   Q.       How does an officer secure Garrity protection in

16   Cleveland?  What happens?

17   **A.       In Cleveland?**

18   Q.       Yeah.  What's your process?

19   **A.       Garrity is offered and not necessarily assumed**

20   **by the officer, so several different ways.**

21           **If I send -- if I send an order to an officer**

22   **ordering them to appear in the Bureau of Integrity**

23   **Control for a statement under the terms of Garrity,**

24   **then I'm asking, I'm telling them that they have to**

25   **speak to me under the terms of Garrity.**

Page 95

1          If I -- I can verbalize to an officer, okay, you

2    know, I'm going to ask you some questions under --

3    under Garrity.

4    Q.    So Lieutenant Tucker can give Garrity

5    protection?

6              MR. MALLAMAD:              Objection.

7    A.    Well, in the case of an UDFIT, a prosecutor

8    would be consulted prior to that happening.

9    Q.    But if you're just doing an administrative

10   investigation, you can offer Garrity protection without

11   going to a prosecutor or somebody higher up?

12   A.    In the recent -- in recent months our city

13   prosecutor has communicated to the division that she

14   would like to be notified prior to any Garrity

15   statements taken.

16         At this time, at the time of this incident in

17   2015 the answer to your question would have been yes, I

18   can give Garrity to somebody and take a statement from

19   them.

20   Q.    In 2014.

21   A.    2014.  2014 or 2015.

22   Q.    Okay.  But today you'd have to call the

23   prosecutor.

24   A.    She has -- she has made that known to our

25   commander.  Yes.  She would like to be notified.

1          It's unclear, actually, whether she's referring

2     to an Internal Affairs investigator who's conducting a

3     potential criminal investigation, or someone in my

4     position that's not conducting a criminal

5     investigation.  But there's been discussion concerning

6     the practice of Garrity.

7     Q.    All right.  So that's one of those things that's

8     a little bit up in the air as to how it's done right

9     now.

10    A.    Yes.

11    Q.    Let's go back to 2014 --

12    A.    Okay.

13    Q.    -- November.  It's an UDFIT investigation, it's

14    the Anderson investigation.

15          Do you know how Garrity was secured for Aldridge

16    and Myers?

17    A.    Yes.  So if there was -- in an UDFIT situation

18    if there was an officer involved shooting that did not

19    result in a homicide, the person in charge of UDFIT,

20    for lack of better words, which would have been the

21    officer in charge of the Homicide Unit, they would

22    contact the city prosecutor.

23    Q.    The city prosecutor.

24    A.    The city prosecutor by phone and detail to them

25    the facts as he or she knew it at the time.  This is

1     what is going on, this is where I'm at, this is what's

2     happened.

3          The city prosecutor would then determine and/or

4     respond and give the go-ahead to provide -- or allow a

5     Garrity statement to be taken or not.

6     Q.    Have you ever had that discussion with a

7     prosecutor in any of the cases you've been involved

8     with?

9     A.    Well, I've never been the officer in charge of

10    the Homicide Unit.

11    Q.    Okay.

12    A.    So no.

13          But as an --

14    Q.    Well, don't you --

15    A.    -- Internal Affairs investigator --

16    Q.    Yeah, don't you monitor that call?

17    A.    -- several.

18    Q.    All right.

19    A.    All, actually.  As an Internal Affairs

20    investigator I would not have given somebody a Garrity

21    statement without talking to the city prosecutor first

22    because I was dealing with a criminal investigation.

23    Q.    Right.

24    A.    In the case of an UDFIT where there's a death,

25    the county prosecutor was also consulted.  We would

1     also call the county -- a county prosecutor, a

2     designated prosecutor.

3     Q.      Do you know who was called in this case?

4     A.      I want to say that it was Saleh Awadallah, but I

5     am not exactly positive.  I did not have a conversation

6     with Mr. Awadallah or our county prosecutor or the

7     officer in charge of the Homicide Unit regarding this.

8             And I don't -- I don't know if Lieutenant Goins

9     did or not.  I'm not sure.

10    Q.      Was that before the walk-through?

11    A.      I want to -- if I remember correctly, it was

12    before the walk-through.

13    Q.      Should it have been before they took any

14    statement from the officer?

15                    MR. MALLAMAD:                    Objection.

16                       Go ahead and answer.

17    A.      Yes.

18    Q.      Was there a practice of the UDFIT team giving

19    Garrity and then talking to the prosecutor?

20    A.      Was there a practice of the UDFIT talking to the

21    officers, then talking to the --

22    Q.      Right.

23    A.      Not to my knowledge, no.

24    Q.      Okay.  Is Awadallah county or city?

25    A.      County prosecutor.

1  Q.     Would a member of Internal have monitored that

2  call?

3  **A.     Monitored as in --**

4  Q.     Like you're tracking whoever made the call to

5  get Garrity is an UDFIT team member, that would have

6  a --

7  **A.     Yes.**

8  Q.     I have this image of a parasite.  I don't -- I

9  don't mean that.

10         That would have a shadow from --

11  **A.     Yes.**

12  Q.     -- Internal, that person should have monitored

13  that call, right?

14  **A.     Yes.**

15  Q.     All right.  To your knowledge did any of the

16  Garrity protected statements in this case travel with

17  the homicide file into the hands of people responsible

18  for any criminal prosecution?

19                MR. BACEVICE:                Objection.

20  **A.     Within the Homicide Unit?**

21  Q.     Within the prosecutor's office.

22  **A.     I have no knowledge of that.**

23  Q.     Are you familiar with any of the controversy

24  around why it's taken 15 months to figure out if

25  there's going to be criminal charges in this case?

Page 100

1           MR. MALLAMAD:                Objection.

2   **A.      I have no real knowledge of it.  I -- the only**

3   **knowledge that I have of it is what I hear in the**

4   **media.**

5   Q.      Is this typical that officers would have a

6   criminal investigation pending with no charges for so

7   long?

8           MR. BACEVICE:               Objection.

9           MR. MALLAMAD:               Objection.

10  **A.      It has happened.**

11  Q.      This is lasting a lot longer than a normal

12  criminal investigation, right?

13          MR. BACEVICE:               Objection.

14          MR. MALLAMAD:               Objection.

15  **A.      For an officer, or for anyone?**

16  Q.      No, for anyone.

17          MR. BACEVICE:               Objection.

18          MR. MALLAMAD:               Same

19          objection.

20              Go ahead.

21  **A.      Yes.**

22  Q.      Do you have any advice as to how investigations

23  of officers could be -- the criminal determination of

24  charges or not could be wrapped up quicker so that

25  these families would not be left in limbo so long?

Page 101

1          MR. BACEVICE:                    Objection.

2          MR. MALLAMAD:                    Objection.

3    **A.      There are things that can be done to expedite**

4    **criminal investigations, sure.**

5    Q.     What would help in terms of what we're seeing in

6    Cleveland with these long delays?

7          MR. BACEVICE:                    Objection.

8          MR. MALLAMAD:                    Just show

9          a continuing objection.

10   **A.      Well, one, potentially an outside agency**

11   **investigating them would be an option.**

12   Q.     If it was an outside agency, you're recommending

13   or you're exploring that as an option for the criminal

14   investigation, right?

15         MR. BACEVICE:                    Objection.

16   **A.      I'm -- I'm not exploring that.  I gave that to**

17   **you as an option.**

18   Q.     Right, but --

19   **A.      And it's been discussed.**

20   Q.     -- didn't you say earlier that that was part of

21   the DOJ debates?

22   **A.      I -- I don't know what the DOJ's recommendation**

23   **is, but throughout the country this has been discussed**

24   **as far as outside agencies investigating criminal**

25   **matters.**

1   Q.      Would that still leave a role for Inspection and

2   Internal Affairs to proceed administratively?

3           I mean, that'd stay internal, right?

4   **A.      Right.**

5   Q.      So you'd still have somebody following the

6   outside agency.

7   **A.      Or conducting a concurrent administrative**

8   **investigation is an option.**

9   Q.      Which you could do -- yeah, because you have

10  Garrity.

11  **A.      And has been done, you know, throughout the**

12  **country, some people do it that way.**

13  Q.      Any other recommendations or thoughts as to how

14  these criminal cases could be speeded up?

15  **A.      Well, I mean, it -- it, you know, it could come**

16  **down -- it could boil down to manpower and I mean that,**

17  **you know, now we're talking about outside agencies**

18  **doing it, you know.**

19  **        I'm not exactly sure what we're --**

20  Q.      Well --

21  **A.      -- trying to --**

22  Q.      -- I mean, you're aware of the fact that no

23  charges have been brought so the criminal investigation

24  ultimately hasn't been concluded with a final

25  prosecutorial determination, now it's 18 months.

Page 103

1   **A.       Right.**

2   Q.      And that's unacceptable, right?

3                MR. BACEVICE:                    Objection.

4                MR. MALLAMAD:                    Objection.

5   BY MR. GERHARDSTEIN:

6   Q.      So I'm just looking for ideas on what the family

7   could advocate for in terms of changes in this type of

8   system.

9                MR. BACEVICE:                    I'm not

10                sure that's appropriate for discovery.

11                MR. GERHARDSTEIN:                Well, he

12                can answer, if he can.

13                MR. MALLAMAD:                    I have a

14                continuing objection, so go ahead.

15   **A.       I -- I don't know that I have anything to offer**

16   **specific to that.**

17   Q.      In this case Garrity was awarded -- Garrity

18   protection was awarded to the two officers who came and

19   went earlier in the evening.

20                Are you aware of that?

21   **A.       Yes.**

22   Q.      Why?

23                MR. BACEVICE:                    Objection.

24   **A.       I don't know.**

25   Q.      I mean, does the City of Cleveland just give

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 104

1   Garrity protection to anybody who wants it?

2                   MR. BACEVICE:              Objection.

3                   MR. MALLAMAD:              Objection.

4   **A.      I would say -- I would say no.**

5   Q.      But they -- there's no risk of criminal exposure

6   to those two officers, is there?

7                   MR. MALLAMAD:              Objection.

8   **A.      I -- I did not identify criminal exposure on**

9   **their part.  I can't speak for someone else's**

10  **decision --**

11  Q.      Well --

12  **A.      -- as far as the Garrity goes.**

13  Q.      -- would the unnecessary extension of Garrity

14  protection be something that you would include as a

15  recommendation for further review in a report like the

16  one you did in this case?

17                  MR. BACEVICE:              Objection.

18                  MR. MALLAMAD:              Objection.

19  **A.      That would be reasonable.**

20  Q.      And do you think those officers should have been

21  -- those first two officers should have been granted

22  Garrity protection?

23                  MR. BACEVICE:              Objection.

24                  MR. MALLAMAD:              Objection.

25  **A.      Probably not.**

Page 105

1  Q.    In this case Aldridge and Myers were granted

2  Garrity protection.  The city accepted your

3  recommendation and brought charges against them as you

4  suggested, right?

5              MR. BACEVICE:              Objection.

6              MR. MALLAMAD:              Objection.

7  **A.    Yes.**

8  Q.    And then the city entered into an agreement not

9  to pursue those charges until the criminal case was

10 concluded.

11     Are you aware of that?

12 **A.    I am.**

13             MR. BACEVICE:              Objection.

14             MR. MALLAMAD:              Objection.

15 BY MR. GERHARDSTEIN:

16 Q.    Help me understand why, if the officers have

17 Garrity protection, the city wouldn't just go ahead and

18 finish what you started as opposed to stopping it and

19 waiting on some unknown criminal case.

20             MR. BACEVICE:              Objection.

21             MR. MALLAMAD:              Objection.

22 **A.    I don't know why that agreement was created.**

23 Q.    Would you agree that Garrity protection would

24 continue through any predisciplinary hearing, any

25 arbitration, any administrative process those officers

Page 106

```
 1    would go through as a result of the charges you

 2    recommended?

 3                  MR. BACEVICE:              Objection.

 4                  MR. MALLAMAD:              Objection.

 5    A.      Yes.

 6    Q.      So at least in terms of the way the system was

 7    designed, there's really no reason to stop the

 8    discipline once you've started it if they've got

 9    Garrity protection, right?

10                  MR. BACEVICE:              Objection.

11                  MR. MALLAMAD:              Objection.

12    A.      That's reasonable, right.

13    Q.      Are you aware of what other cities do in this

14    situation?  Is Cleveland different?

15          Where does this practice of stopping discipline

16    in a situation like this, where does this sit in terms

17    of best practice, in terms of standards, in terms of

18    the procedure that's followed elsewhere?

19                  MR. BACEVICE:              Objection.

20                  MR. MALLAMAD:              Objection.

21    A.      I'm uncertain if other cities follow this type

22    of practice or not, to be quite honest with you.

23    Q.      There was another interview done with a person

24    in the mayor's office that you monitored?

25    A.      Yes.
```

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 107

1   Q.     She was called by Miss Overton, and then she was

2   interviewed about what Miss Overton told her, right?

3   **A.     Yes.**

4   Q.     What was that person's job in the mayor's

5   office?

6   **A.     I believe -- I believe she may have worked for**

7   **the mayor's action line, was a secretary, I'm not**

8   **exactly sure, but I know she held an administrative**

9   **position in the mayor's office.**

10  Q.     Did you interview the mayor in connection with

11  this?

12  **A.     I did not, no.**

13  Q.     Or was the mayor interviewed?

14  **A.     To the best of my knowledge, no.**

15  Q.     You looked at the whole file in making your

16  recommendation for discipline.

17         Is there any other fact that you found to be

18  particularly important in this file that you weighed in

19  making your recommendation for discipline that we

20  haven't discussed?

21              MR. BACEVICE:              Objection.

22              MR. MALLAMAD:              Objection.

23  **A.     Not that we haven't discussed, no.**

24              MR. GERHARDSTEIN:          Got

25              anything else?

Page 108

1          All right.  I don't have any other

2     questions.  Thank you.

3          MR. MALLAMAD:              Lieutenant

4     Tucker would like to review his testimony.

5                    - - -

6          (DEPOSITION CONCLUDED.)

7                    - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 109

1    I have read the foregoing transcript from page 1

2    through 110 and note the following corrections:

3    PAGE        LINE              REQUESTED CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    _____

19                    Lieutenant Robert Tucker

20        Subscribed and sworn to before me this _____ day

21    of _____ 2016

22

23    _____

24                    Notary Public

25        My Commission expires:  _____

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 110

```
 1   State of Ohio,        ) SS:          CERTIFICATE
 2   County of Cuyahoga.   )
 3
 4        I, Janet M. Hoffmaster, a Registered Professional
     Reporter and Notary Public within and for the State of
     Ohio, duly commissioned and qualified, do hereby
 5   certify that the within-named witness, LIEUTENANT
     ROBERT TUCKER, was by me first duly sworn to tell the
 6   truth, the whole truth and nothing but the truth in the
     cause aforesaid; that the testimony then given by him
 7   was reduced to stenotypy, and afterwards transcribed by
     me through the process of computer-aided transcription,
 8   and that the foregoing is a true and correct transcript
     of the testimony so given by him as aforesaid.
 9
10        I do further certify that this sworn statement was
     taken at the time and place in the foregoing caption
11   specified.
12
13        I am not, nor is the court reporting firm with
     which I am affiliated, under a contract as defined in
     Civil Rule 28(D).
14
15        I do further certify that I am not a relative,
     employee, or attorney of either party, or otherwise
16   interested in the event of this action.
17
18        IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Cleveland, Ohio, on
     this 21st day of June 2016.
19
20
21        _____
          Janet M. Hoffmaster, RPR and Notary Public
22        in and for the State of Ohio.
          My Commission expires October 8, 2017.
23
24
25
```

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**