IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

ELIZABETH GOODWIN, etc.,      )
                             )
          Plaintiff,         )
                             )
     v.                      )  Case No. 1:15-CV-0027
                             )  Judge Donald C. Nugent
CITY OF CLEVELAND, et al.,   )
                             )
          Defendants.        )

- - -

THE DEPOSITION OF SGT. JENNIFER KEMER

THURSDAY, APRIL 21, 2016

- - -

     The deposition of SGT. JENNIFER KEMER, a witness,
called for examination by the Plaintiff, under the
Federal Rules of Civil Procedure, taken before me,
Kristine M. Esber, a Notary Public in and for the State
of Ohio, pursuant to Notice, at Cleveland City Hall,
Department of Law, 601 Lakeside Avenue, Cleveland,
Ohio, commencing at 9:08 a.m., the day and date above
set forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK, SUITE 440
1360 WEST NINTH STREET
CLEVELAND, OH  44113
(216) 621-2550
FAX (216) 621-3377
1-888-595-1970

Page 2

1    APPEARANCES:

2    On behalf of the Plaintiff:

3         ALPHONSE A. GERHARDSTEIN, ESQ.
          Gerhardstein & Branch Co., LPA
4         432 Walnut Street, Suite 400
          Cincinnati, Ohio 45202
5         (513) 621-9100

6         DAVID B. MALIK, ESQ.
          SARA GEDEON, ESQ.
7         The Law Office of David B. Malik
          8437 Mayfield Road, Suite 101
8         Chesterland, Ohio  44026
          (440) 729-8260

9

10   On behalf of the Defendant City of Cleveland:

11        SUSAN BUNGARD, ESQ.
          Assistant Law Director
12        Department of Law
          601 Lakeside Avenue, Room 106
13        Cleveland, Ohio  44114
          (216) 664-2310

14

15   On behalf of the Defendants Scott Aldridge and Bryan
     Myers:

16

17        JOHN P. BACEVICE, JR., ESQ.
          Assistant Law Director
18        Department of Law
          601 Lakeside Avenue, Room 106
19        Cleveland, Ohio  44114
          (216) 664-2807

20

21                      - - -

22

23

24

25

Page 3

INDEX

                                        PAGES

CROSS-EXAMINATION BY

     MR. GERHARDSTEIN                      4


                    - - -


PLAINTIFF'S EXHIBITS MARKED

     41                                    20


                    - - -


OBJECTIONS BY

     MR. BACEVICE        8, 10, 12(2), 13(2), 14(3),
          15(2), 16, 19(4), 20, 21(2), 22(2), 24(2),
          25(3), 26(2), 27, 28(3), 29, 33, 34(2),
          35(3), 36(4), 37(3), 38, 42(3), 43, 44(2),
          45(4), 46(2), 47, 48(2), 49(3), 50, 51(2),
          52(2), 53(2), 56(2), 57, 58(2), 59


     MS. BUNGARD        8, 10, 13, 14, 15(2), 19(3),
          20, 21(2), 22, 24(2), 25(3), 26(2), 27,
          28(2), 29, 33, 34(2), 35(3), 36(4), 37(3),
          39(2), 40(3), 42(3), 43, 44(2), 45(4), 46,
          47(3), 48(2), 49(3), 50, 51(2), 52, 53(2),
          56(3), 57, 58, 59


                    - - -

1          SGT. JENNIFER KEMER

2    a witness, called for examination by the Plaintiff,

3    under the Rules, having been first duly sworn, as

4    hereinafter certified, deposed and said as follows:

5                    CROSS-EXAMINATION

6    BY MR. GERHARDSTEIN:

7    Q.    Good morning.

8    **A.    Good morning.**

9    Q.    State your name, please.

10   **A.    Jennifer Kemer.**

11   Q.    And what's your highest level of education?

12   **A.    Bachelor's Degree.**

13   Q.    And Kemer is with one M?

14   **A.    Correct.**

15   Q.    Where did you get the Bachelor's Degree?

16   **A.    Cleveland State University.**

17   Q.    When?

18   **A.    1997.**

19   Q.    And who do you work for?

20   **A.    City of Cleveland Police Department.**

21   Q.    When did you get hired?

22   **A.    March of 1997.**

23   Q.    Did you have any full-time jobs before working

24   for the City of Cleveland?

25   **A.    Yes.**

Page 5

1  Q.    What did you do?

2  A.    I worked for the Cleveland Public Library.  I

3  worked for Big Met golf course.

4  Q.    Are you a golfer?

5  A.    Not as much anymore.

6  Q.    So start in March of '97 and just tell me your

7  career path here in Cleveland.

8  A.    Okay.  About four and a half months in the

9  police academy.  After that I was assigned to the First

10  District.  I spent about six years at the First

11  District.

12        Then I got into a unit called the cops and

13  schools unit.  I was in that for about six years.  In

14  between I may have went back to the district on the

15  road for about six months.

16        Then I went to the police academy in '09.  I was

17  there for about five years.  Was promoted in 2014 and

18  I've done that for two years.

19  Q.    When were you promoted in 2014?

20  A.    March, March 25th I believe.

21  Q.    And that was to sergeant?

22  A.    Correct.

23  Q.    And then where did you go from there?

24  A.    I went to the Fifth District.

25  Q.    As a sergeant?

1    **A.      Correct.**

2    Q.      And now as of when are you back at training?

3    **A.      June of 2015 I am the OIC of the gymnasium unit.**

4    Q.      And what's that mean, the OIC of the gymnasium

5    unit?

6    **A.      So there's a sergeant in charge.  We're one**

7    **branch of the training section.  So you have the gym,**

8    **the range and the academy.**

9    Q.      Okay.

10   **A.      So I oversee the instructors in the gym.**

11   Q.      And what are they teaching?

12   **A.      They teach subject control, physical**

13   **conditioning, handcuffing, ASP baton, taser, pepper**

14   **spray, all your immediate weapons.**

15   Q.      And you taught all of those at some point?

16   **A.      I am certified in some of those, but I haven't**

17   **actually taught them.**

18   Q.      Which ones have you taught?

19   **A.      With the Cleveland Police Academy, I actually**

20   **was only a substitute when I was a patrolman on the**

21   **subject control.  So it was on occasion if an**

22   **instructor wasn't there, like if they were short an**

23   **instructor.  So I never taught it as a full-time**

24   **position.**

25   Q.      Who else have you taught for?

1  **A.     Tri-C, Cuyahoga Community College.**

2  Q.     And what do you teach for them?

3  **A.     Various topics.  Community diversity, crisis**

4  **intervention, subject control, physical conditioning.**

5  **I think there's probably another classroom topic or**

6  **two, I just don't recall.  It's been a few years.**

7  Q.     So you supervised officers who teach all of the

8  subjects you listed under the gym?

9  **A.     Correct.**

10  Q.     So you need to know whether they're doing a good

11  job?

12  **A.     Sure.**

13  Q.     And so you do need to know how to teach those

14  things, right?

15  **A.     Sure.**

16  Q.     Because you evaluate people who teach those

17  things?

18  **A.     M-hm.**

19  Q.     Did you have any personal involvement with the

20  Tanisha Anderson investigation at all?

21  **A.     No.**

22  Q.     Did you have any personal involvement with any

23  review of the conduct of the officers who were engaged

24  with Tanisha Anderson on November 12th, 2014?

25  **A.     No.**

1  Q.    Any personal involvement with any after-action

2  review that may have been done regarding the death of

3  Tanisha Anderson?

4  **A.    No.**

5  Q.    Are you aware of any after-action review that

6  may have been done regarding the death of Tanisha

7  Anderson?

8          MR. BACEVICE:              Objection.

9  **A.    No.**

10          MS. BUNGARD:              Objection.

11  BY MR. GERHARDSTEIN:

12  Q.    As a person involved in training, can you tell

13  me how training topics have been developed over the

14  years, like what do you choose to do in-services on;

15  were you involved in that?

16  **A.    I was years ago.  It's usually a state mandate**

17  **of what topics are to be covered.**

18  Q.    For in-services?

19  **A.    M-hm.**

20  Q.    Was there any discretion within the Cleveland

21  Division of Police to pick topics for in-services, or

22  was it all just whatever the state said?

23  **A.    That wouldn't have been anything -- information**

24  **I would know about.**

25  Q.    Okay.  Did you ever participate in any committee

1  that made decisions about in-service topics?

2  **A.      Not that I recall.**

3  Q.      Did you ever participate in any committee that

4  reviewed policies in light of experiences that officers

5  were having in the field?

6  **A.      Not that I recall.**

7  Q.      Did you ever write any policies?

8  **A.      No.**

9  Q.      Did you ever determine or help determine whether

10  Cleveland policies were actually working?

11  **A.      No.**

12  Q.      Did you ever offer any suggestions for changes

13  or alterations in general orders or training -- well,

14  we'll say general orders first?

15  **A.      Offer any suggestions for changes?**

16  Q.      Yeah.

17  **A.      Not that I recall.**

18  Q.      You have taught subject control and you've

19  supervised people who teach subject control, right?

20  **A.      I've taught subject control very minimally.  I**

21  **was certified and was a fill-in at Cuyahoga Community**

22  **College.**

23  **        At the Cleveland Police Academy in the gym, it**

24  **was a very rare occasion.  Like I said, if they were**

25  **short an officer, an instructor.**

1          **When I got to the academy last year in June they**
2     **were already at the point where the instruction was**
3     **completed, so I've not supervised it.**
4     Q.     But that's part of your job description, right?
5     **A.     Sure.**
6     Q.     So when it comes up you will be supervising it?
7     **A.     Yes.**
8     Q.     And when's the next subject control course?
9     **A.     If we have a police academy, which we may never**
10    **again.  Our current police academy is down at the**
11    **highway patrol, so all their instruction occurred**
12    **there.**
13    Q.     Yeah.  Why is that?
14                MR. BACEVICE:              Objection.
15                MS. BUNGARD:               Objection.
16                THE WITNESS:               Very good?
17    BY MR. GERHARDSTEIN:
18    Q.     You can answer.
19                MS. BUNGARD:               If you
20                know, you can answer.
21    Q.     It isn't that easy.
22    **A.     My understanding is that we are tasked with a**
23    **lot of other training in the RNC; therefore, we really**
24    **wouldn't have the personnel to do both.  It's not**
25    **because we're horrible at what we do.**

Page 11

1    Q.     Would you agree when an officer is trained in

2    handcuffing that the general technique is to cuff the

3    subject behind his or her back?

4    **A.     Yes.**

5    Q.     And in your experience in Cleveland the cuffing

6    is taught where the subject is standing, kneeling and

7    in a prone position, right?

8    **A.     Yes, all three types.**

9    Q.     And an officer, depending on the circumstances,

10   may order a person to a prone position in order to

11   facilitate cuffing, right?

12   **A.     Correct.**

13   Q.     And a person may end up in the prone position as

14   a result of tasing or other intermediate force, right?

15   **A.     Sure.**

16   Q.     Okay.  So it's foreseeable that a Cleveland

17   police officer will be cuffing persons behind their

18   back who are prone on the ground, right?

19   **A.     Has it happened?  Yes, with any police officer.**

20   Q.     And is it likely to happen?

21   **A.     Sure, depending on the situation.**

22   Q.     Right.  And an officer in the field could expect

23   to encounter this opportunity to cuff people who are

24   prone and cuff behind their back, right?

25   **A.     Yes.**

Page 12

1    Q.    So what instructions in your experience have

2    officers been given about how to cuff a subject behind

3    his or her back who's prone when they're being cuffed?

4                    MR. BACEVICE:                    Objection.

5    BY MR. GERHARDSTEIN:

6    Q.    What do you say?

7                    MS. BUNGARD:                    You can

8                    answer.

9    **A.    You're taught like verbiage to use, --**

10   Q.    Okay.

11   **A.    -- to get the person in the prone position,**

12   **which is having the person get on the ground, putting**

13   **their arms out, palms up.  Then you'll tell them to**

14   **interlace their fingers behind their back.  And**

15   **that's -- then you move in and handcuff the individual.**

16   Q.    And where does the officer stand or position him

17   or herself when the subject has placed their hands

18   behind their back and the subject's in the prone

19   position?

20                   MR. BACEVICE:                    Objection.

21   **A.    I mean, I can't say.  It's on the individual**

22   **officer.**

23   Q.    It doesn't matter?

24   **A.    Correct.  I mean, yeah, I really can't say.**

25   Q.    And after the person is cuffed behind his or her

1  back and is still in the prone position, what's the

2  officer supposed to do next?

3              MR. BACEVICE:                Objection.

4              MS. BUNGARD:                 Objection.

5  BY MR. GERHARDSTEIN:

6  Q.    You can answer.

7  **A.    There's -- I mean, there's many things.**

8  Q.    Well, --

9  **A.    It depends on the situation.**

10  Q.    Okay.  Let's just assume that the situation is

11  stable.  All right?  You are not dodging bullets or

12  there's other threats around, you know.  They've

13  secured the person.  What's the next thing that's

14  supposed to happen --

15              MR. BACEVICE:                Objection.

16  Q.    -- with respect to the subject?

17  **A.    Once the scene is safe?**

18  Q.    Yeah.

19  **A.    When you're able, you'll get the person up off**

20  **the ground.**

21  Q.    And how is that done?

22  **A.    There's various ways.**

23  Q.    Can you just pull on their arms?

24  **A.    You don't just pull on their arms.  You will**

25  **assist them by their arms to get them up.**

1   Q.     Is there any caution given to officers about any

2   dangers connected with having people cuffed behind

3   their back and prone on the ground?

4                MR. BACEVICE:                Objection.

5   **A.     I'm not sure what you're asking.**

6   Q.     Are there any health hazards to those people?

7                MR. BACEVICE:                Objection.

8   **A.     To the person?**

9   Q.     Yeah.

10  **A.     I mean, sure.  Any individual, once they were**

11  **taken down to the ground, handcuffed, and then you're**

12  **assisting them up, depending on size and things like**

13  **that, sure, there could be harm when a person goes to**

14  **the ground.**

15  Q.     How about while they're on the ground and cuffed

16  behind their back, is there any health hazard from

17  being in that position?

18                MR. BACEVICE:                Objection.

19                MS. BUNGARD:                Objection.

20                     You can answer.

21  **A.     Yeah, there could be a health hazard.**

22  Q.     Tell me about that.

23  **A.     So policemen are taught when able, when the**

24  **scene is safe to -- at a minimum try to roll the person**

25  **on their side.  And then when you're able to, pick them**

1   up, put them in the zone car, the ambulance, wherever

2   they may be going.

3   Q.    So why are they told to roll the person on the

4   side?

5                   MR. BACEVICE:                Objection.

6                   MS. BUNGARD:                 Objection.

7                       Go ahead.

8   A.    When a person is laying on their chest, the

9   chest has a hard time falling and rising, so it can

10  cause a person not to have oxygen or blood pumping.  So

11  that's why after we know that it's safe for the

12  officers, then we will at a minimum roll the person

13  over.

14  Q.    Is there any written material provided to

15  officers that describes this challenge in having your

16  chest rise and fall and the possibility of problems

17  with breathing while you're prone on the ground?

18                  MR. BACEVICE:                Objection.

19                  MS. BUNGARD:                 Objection.

20                      You can answer.

21  A.    Not specifically that.  I know in one of our

22  policies it says no hog-tying.  And then in crisis

23  intervention it talks about excited delirium, which is

24  a multitude of factors and symptoms going on.  So that

25  might just exacerbate.

1    **So when they're being taught about a possible**

2    **excited delirium case, you're taught about the chest**

3    **falling and rising and things like that.  So that's why**

4    **we teach our recruits to at least roll them to their**

5    **side, and then get them up as soon as you're able to.**

6    Q.    From the time you came in in -- what year was

7    it?

8    **A.    To the police academy?**

9    Q.    Yeah.

10   **A.    2009.**

11   Q.    -- 2009 to 2014 was everybody taught about

12   excited delirium?

13   **A.    Who's everybody?**

14   Q.    Everybody that went through in-services and

15   everybody that went through the academy.

16   **A.    I don't know.**

17   Q.    So what about just straight up subject control

18   classes on handcuffing, are those officers who are

19   involved in a handcuffing class taught about the

20   possible breathing problems that come from being prone?

21             MR. BACEVICE:              Objection.

22   **A.    And I've never taught handcuffing in Cleveland,**

23   **so I'm really not sure.**

24   Q.    As you -- do you have the curriculum?

25   **A.    Yes.  The subject control curriculum.  Yes.**

1  Q.    And have you seen the curriculum?

2  **A.    It's been a while, but I have seen it.  Yes.**

3  Q.    Do you know whether the curriculum includes

4  cautions about breathing trouble?

5  **A.    I don't believe so, but I would have to look at**

6  **it to make sure.**

7  Q.    So it would be up to the instructor to explain

8  why they're suggesting that officers roll people over?

9  **A.    Correct.**

10  Q.    Have you ever taken a class where positional

11  asphyxiation is explained?

12  **A.    I just went to a class last -- about a week and**

13  **a half ago.**

14  Q.    Was that the first one you went to where

15  positional --

16  **A.    As I recall, yes.  I believe that's the first**

17  **class I ever went to on that topic.  Excited delirium**

18  **was the topic, but that comes up specifically.**

19  Q.    And where was that class?

20  **A.    That was at Marymount Hospital.**

21  Q.    What network is that part of?

22  **A.    I'm sorry?**

23  Q.    Is that a --

24  **A.    It's Cleveland Clinic now.**

25  Q.    How long was that class?

1  A.      An hour and a half.

2  Q.      And what was included in the materials regarding

3  positional asphyxiation?

4  A.      It was dual-fold.  There was the commander from

5  the police department there and then a professor from

6  Ohio State University.  So he did a small section on

7  the excited delirium.  I can never remember what the

8  topic was.  It was more like for the medical personnel

9  in the room.

10  Q.      Who was the commander?

11  A.      I don't know.  He's commander of Cleveland

12  Clinic Police.

13  Q.      And what did he say about positional

14  asphyxiation?

15  A.      Well, he actually talked about excited delirium,

16  and just explained how it's still kind of a phenomenon

17  where doctors can't just say these five things, that

18  means it's excited delirium.  But within there he

19  talked about adding to the person's heart rate being

20  elevated, their body temperature, possibly under the

21  influence of drugs or alcohol, and then being in a

22  prone position, that that could cause troubles

23  breathing and things like that.

24          So again, he talked about understanding law

25  enforcement safety is utmost, and then when able, being

1  **able to get the person up from that prone position.**

2  Q.     Prior to November 12th, 2014 did you have any

3  other training on positional asphyxiation?

4  **A.     I don't believe so.**

5          MR. BACEVICE:              Objection.

6  **A.     I don't recall.**

7  Q.     Prior to November 12th, 2014 in your experience

8  were recruits told about the physical challenge posed

9  to subjects who are prone on the ground and trying to

10 breathe while they're cuffed behind their back?

11         MR. BACEVICE:              Objection.

12         MS. BUNGARD:               Objection.

13 **A.     I'm not sure.**

14 Q.     Prior to November 12th, 2014 did the City of

15 Cleveland ever provide officers or trainers with any

16 written materials that specifically describe the

17 dangers of positional asphyxiation?

18         MS. BUNGARD:               Objection.

19         MR. BACEVICE:              Objection.

20 **A.     I don't know.**

21 Q.     Prior to November 12th, 2014 did you ever see

22 any specific written materials that describe the

23 dangers of positional asphyxiation?

24         MS. BUNGARD:               Objection.

25         MR. BACEVICE:              Objection.

1   **A.      I honestly don't recall.**

2                **(Thereupon, Plaintiff's Exhibit 41 to**

3           **the deposition of SGT. JENNIFER KEMER was**

4           **marked for identification.)**

5           MR. BACEVICE:                  Is that

6           41?

7                Note an objection to Exhibit 41.

8                And, Al, can I have a standing

9           objection to the questions based off of

10          41?

11          MR. GERHARDSTEIN:              Okay.

12          MR. BACEVICE:                  Thank you.

13          MS. BUNGARD:                   I object,

14          also.

15  BY MR. GERHARDSTEIN:

16  Q.    I'm showing you what has been marked as

17  Exhibit 41.

18  **A.      Okay.**

19  Q.    This is a brochure that was produced in June of

20  1995 about positional asphyxiation and distributed by

21  the Justice Department.  Have you ever seen this

22  before?

23  **A.      I don't believe so.**

24  Q.    How about in TV, movies, news, prior to November

25  12th, 2014 did you ever see positional asphyxiation

Page 21

1   featured in those sources?

2                   MR. BACEVICE:              Objection.

3                   MS. BUNGARD:               Objection.

4   **A.       Possibly in the media.  I honestly don't know.**

5   Q.      So as of November 12th, 2014 what would you

6   expect a Cleveland Police Officer who's been to the

7   training academy and been through the recruit class,

8   what would you expect that officer to know, if

9   anything, about positional asphyxiation?

10                  MR. BACEVICE:              Objection.

11                  MS. BUNGARD:               Objection.

12                  You can answer.

13  **A.       Just that, you know, they're taught the safety**

14  **of the scene, not just themselves or the public, is of**

15  **first concern.  And then once it's safe, if they have**

16  **somebody in any type of position, whether it's**

17  **standing, kneeling or prone handcuffed, that again as**

18  **soon as they're able to at a minimum roll that person**

19  **over, and then obviously when able, pick them up.**

20  Q.      Was that term used?

21  **A.       Not really.  It really isn't.**

22  Q.      So would it be more fair to say that they were

23  told to get the person up, but there wasn't a lot of

24  exploration as to why?

25  **A.       Sure.  I would say yes.**

Page 22

1   Q.    When officers were going through the subject

2   control training, would they be graded?

3   **A.    There's certain things they're graded on.  Yes.**

4   Q.    Is that a pass fail, or graded in another way?

5   **A.    I believe it's all pass fail.**

6   Q.    So if an officer failed to promptly in a

7   scenario get a subject off the ground who was prone and

8   cuffed behind his or her back, would they flunk the

9   subject control?

10              MR. BACEVICE:              Objection.

11  **A.    No.  I don't even think that's -- there's a list**

12  **of what specific techniques they're graded on.  If an**

13  **officer feels that they're deficient in it, they would**

14  **train them until they're able to do it.  They're**

15  **trained in techniques.**

16  Q.    And on that list is there a place to assess how

17  promptly a person who is prone and cuffed behind their

18  back is either rolled over or moved up off the ground?

19              MR. BACEVICE:              Objection.

20              MS. BUNGARD:               Objection.

21  **A.    No.**

22  Q.    What's that list called?

23  **A.    I would have to look at the curriculum.  I don't**

24  **know.**

25  Q.    But if I were to look at a training file on a

1   person who's been through a subject control class,

2   would I find a checklist and then an indication that

3   that person had mastered the techniques and items

4   listed on the checklist?

5   **A.      Yes.  It's like a skills checklist.**

6   Q.      Okay.

7   **A.      I don't know if that's exact verbiage.  And**

8   **that's a form that's from the state.  So I don't know**

9   **that we have it, but it is there.**

10  Q.      So are the training records that you have owned

11  by the Attorney General's office?

12  **A.      I have no clue.**

13  Q.      Do you keep a copy of all the training, related

14  records for each officer, or do they go to the state?

15  **A.      I do not.  I am not in charge of that, so I am**

16  **not sure if it's kept at the training section or at the**

17  **state.**

18  Q.      You mentioned that hog-tying is prohibited.

19  What is that; what is hog-tying?

20  **A.      Hog-tying is essentially putting somebody in the**

21  **prone position, legs up and hands together.  There's**

22  **different terms for it.  There's like a new term out**

23  **they kept using at this training I never heard.**

24  Q.      Legs up and hands together behind their back, or

25  hands connected to the legs?

1   **A.      Hog-tying is considered hands connected to the**

2   **legs.**

3   Q.      What's the problem with it?

4   **A.      Just a person being on their chest and that**

5   **chance of not being able to let the chest fall and**

6   **rise.**

7   Q.      In your training have you ever been told how

8   long a person -- how soon a person could have

9   respiratory distress if they're on their chest and

10  cuffed behind their back?

11              MR. BACEVICE:              Objection.

12              MS. BUNGARD:               Objection.

13  BY MR. GERHARDSTEIN:

14  Q.      Like what's the timing involved in this?

15              MS. BUNGARD:               You can

16              answer.

17  **A.      No.  I mean, I never been told there's an amount**

18  **of time.**

19  Q.      As you sit here today with whatever training you

20  got up through today, do you know whether there's some

21  amount of time when it becomes more dangerous to have a

22  person prone and cuffed behind their back?

23              MR. BACEVICE:              Objection.

24              MS. BUNGARD:               Objection.

25  **A.      No, no.  I don't believe anybody's ever said a**

1  **time frame.**

2  Q.    So what do you consider to be the time frame you

3  should work within in order to comply with the

4  instruction you give subjects about rolling them over

5  or getting them up?

6              MR. BACEVICE:              Objection.

7              MS. BUNGARD:               Objection.

8  **A.    There isn't one.  I don't believe there is one.**

9  Q.    Given your understanding of positional

10 asphyxiation, are obese people more at risk of that

11 problem than people who are not obese?

12             MR. BACEVICE:              Objection.

13             MS. BUNGARD:               Objection.

14 **A.    I don't know.**

15 Q.    Given your understanding of positional

16 asphyxiation, are people who have pressure put on their

17 back when they're prone more at risk of positional

18 asphyxiation than those who simply are positioned prone

19 without pressure on their back?

20             MR. BACEVICE:              Objection.

21             MS. BUNGARD:               Objection.

22 **A.    I really don't know.**

23 Q.    In the subject control classes you've observed

24 and taught and will now supervise are there any

25 cautions given to trainees about obese people being at

Page 26

1  risk for positional asphyxiation when they are prone

2  and cuffed behind their back?

3           MS. BUNGARD:                   Objection.

4           MR. BACEVICE:                  Objection.

5  **A.    I don't know of that being part of the training.**

6  Q.    And again, in these subject control classes that

7  you've taken, have taught and will now supervise are

8  there any cautions given to trainees about placing

9  pressure on the back of the subject who is prone and

10 cuffed behind their back?

11          MR. BACEVICE:                  Objection.

12          MS. BUNGARD:                   Objection.

13               Go ahead.

14 **A.    Just again, they're taught obviously any time**

15 **you would put pressure on somebody, there's obviously a**

16 **chance to cause a problem.  But it's the safety of the**

17 **situation, and then getting the person up when you're**

18 **able.**

19      **But depending what the person is doing, there's**

20 **times you may have to do that in order to affect what**

21 **you're trying to do.**

22 Q.    So you would expect a Cleveland Police Officer

23 to know that there is a risk posed to the breathing of

24 a subject who is prone on the ground and cuffed behind

25 their back when pressure is put on that subject's back,

Page 27

1    and that should be part of the calculus as to what

2    amount of force to use given other considerations at

3    the time; --

4              MR. BACEVICE:              Objection.

5              MS. BUNGARD:               Objection.

6    BY MR. GERHARDSTEIN:

7    Q.    -- is that fair?

8    **A.    I would say you just talked in a circle.**

9    **Honestly I'm not sure what you're asking.**

10   Q.    I'm asking you, every officer has to only use

11   reasonable force, right?

12   **A.    Every officer is expected to use objectively**

13   **reasonable force, correct.**

14   Q.    Right.  And the calculation for that includes

15   the risk of harm to the subject is one thing, right?

16   **A.    I don't know that it's calculation.  It's not a**

17   **formula.  It's based on the situation at hand.**

18   Q.    Right.  And it's not mathematical, but you have

19   to look at certain factors.

20   **A.    Sure.**

21   Q.    Seriousness of the crime, right?

22   **A.    Yes.**

23   Q.    And whether there's a threat posed to the

24   officer or member of the public, right?

25   **A.    Correct.**

Page 28

1  Q.     And whether the person is fleeing?

2  **A.     Right.  That's the objective.**

3  Q.     And you would also in a situation where you're

4  on a mental health run want to keep in mind whether

5  there's any crime at all, right?

6  **A.     Yes.**

7              MR. BACEVICE:                Objection.

8  BY MR. GERHARDSTEIN:

9  Q.     Because people who you're helping go to the

10  hospital are not even under your control due to a

11  public safety problem in many instances, right?

12             MR. BACEVICE:                Objection.

13             MS. BUNGARD:                 Objection.

14  **A.     Again, I'm not sure what you're asking.**

15  Q.     Well, I'm trying to get an agreement on what are

16  the factors that you want to look at when you're

17  evaluating the force an officer uses.  Okay?

18         So if you've got a person cuffed on the ground

19  and prone, you'd want to know what that person did,

20  right, the seriousness of whatever the conduct was that

21  led that person to be cuffed by you, right?

22             MR. BACEVICE:                Objection.

23             MS. BUNGARD:                 Objection.

24             THE WITNESS:                 Can I

25             answer?

```
 1              MS. BUNGARD:                    Yeah.
 2   A.      Not necessarily.  It's still what are the
 3   actions of that individual, whether they committed a
 4   crime or not.
 5   Q.      Right.
 6   A.      If they're still --
 7   Q.      Okay.
 8   A.      -- of a safety factor to everybody involved.
 9   Q.      So you want to know that, whether they committed
10   a crime or not, right, is one of the things you just
11   said?
12   A.      Well, yes.
13   Q.      Okay.  And you'd also want to know whether or
14   not they are posing a threat?
15   A.      Correct.
16   Q.      And you'd also want to know whether the force
17   you're going to use is likely to injure them, and
18   balance that against these other factors, right?
19              MR. BACEVICE:                   Objection.
20              MS. BUNGARD:                    Objection.
21   BY MR. GERHARDSTEIN:
22   Q.      Is part of your objective reasonableness?
23   A.      I take -- an officer, yes, is supposed to use
24   that standard objectively reasonable when they're going
25   to use force, correct, and they take factors into
```

1    **consideration.**

2         **Every situation is different, so I can't say --**

3    **just in a scenario every situation is different.  But**

4    **yes, you are obligated to use an objective reasonable**

5    **standard when you determine force.**

6    Q.    Have you ever been asked to review the

7    reasonableness of force by persons who -- by officers

8    who were cuffing people in the field?

9    **A.    I don't believe so.**

10    Q.    So you've been a supervisor in the field, right?

11    **A.    Yes.**

12    Q.    And on all the tours of duty that you've had

13    have any of the officers under your command used force?

14    **A.    Yes.**

15    Q.    And have you had to make a determination at an

16    initial level whether those officers used reasonable

17    force?

18                   MS. BUNGARD:              Yeah, you

19                   can answer.

20    **A.    I think I had two use of force investigations as**

21    **a supervisor on the street.**

22    Q.    And while you were in training were you ever

23    instructed to retrain people by supervisors who said

24    this person ought to be retrained on this or that

25    technique because of concerns about their proficiency?

Page 31

1  A.      I was not, no.

2  Q.      Have you ever been involved in any sort of

3  review of use of force by another officer other than

4  those two instances that you just described?

5              THE WITNESS:              Am I good?

6              MS. BUNGARD:              Yeah.

7  A.      I think, again, since I went down to the gym,

8  there were maybe two cases where my guys delivered

9  reinstruction for a -- for an officer, but I was not

10  personally involved in that.

11  Q.      But you supervised your instructors doing

12  reinstruction to those officers?

13  A.      Yes.

14  Q.      And tell me about those cases.

15  A.      One was I believe a -- it started as a report

16  writing incident.  So I think it came down to the gym

17  and ended up going back to the academy.

18          And the other one was -- I'd have to look at the

19  report.  It was two officers involved in a burglary

20  incident and a foot pursuit ensued, and then

21  reinstruction was on some type of subject control,

22  taking control of the individual.

23          Like I said, I wasn't involved in the

24  instruction, so I can't tell you exactly what the

25  incident was.

1  Q.     How did the report writing incident relate to

2  subject control?

3  **A.     It wasn't subject control.  That's why they**

4  **thought maybe it was gym issue, and then they realized**

5  **it was more of an academy issue.**

6         **I think that was the only two cases that I can**

7  **recall that came across my desk, per se.**

8  Q.     And then you had a couple of instances out in

9  the field.  Tell me about those, where you were

10 assessing the reasonable of force that people use.

11 **A.     I had a set of officers who tased an individual,**

12 **and it was my job to do the investigation afterwards.**

13 Q.     And in that instance did you determine that the

14 tasing was appropriate?

15 **A.     I did.**

16 Q.     And any other instances?

17 **A.     I had two officers that pepper sprayed an**

18 **individual.**

19 Q.     And what happened there in terms of your

20 investigation?

21 **A.     They were 100 percent justified in what they**

22 **did.**

23 Q.     And then when you have taught or supervised

24 those who taught during the scenario-based training

25 you're constantly making judgments about whether the

Page 33

1  conduct of the officers is consistent with the training

2  that has been provided to them, right?

3  **A.      That they're doing it right?**

4  Q.      Yeah.

5  **A.      Yes.  The instructors are, as they're teaching**

6  **and showing, they're making sure they're doing it**

7  **right.  if they're not, they're going to show them the**

8  **right way.**

9  Q.      Do you know Officer Antonio Muniz?

10 **A.      Just by name.**

11 Q.      Now, he was hired on May 4th of 2009.  And when

12 he was deposed in this case not too long ago, I think

13 it was in February, he said that he had not received

14 any instruction with respect to the dangers posed or

15 possibly experienced by obese people when you restrain

16 them when they're face down on the ground and you're

17 cuffing them behind their back.  Does that surprise you

18 as a person who's been involved in training, or not

19 surprise you?

20             MR. BACEVICE:                Objection.

21             MS. BUNGARD:                 Objection.

22 **A.      I really don't know.**

23 Q.      Well, it's consistent with what you said in that

24 you didn't give any instruction or aren't aware of any

25 instruction of any particular dangers posed by obese

1    people on the ground prone when they're cuffed behind

2    their back, right?

3                    MR. BACEVICE:                 Objection.

4                    MS. BUNGARD:                  Objection.

5    **A.      Me personally, no, I don't recall giving any**

6    **instruction on that.**

7    Q.     And what about David Borden, do you know him,

8    Detective?

9    **A.      Again, just by name.**

10   Q.     He said he was hired in August of '96.  And he

11   said that he never received any training from Cleveland

12   Division of Police on positional asphyxia.  That's

13   consistent with your experience, right?

14                   MR. BACEVICE:                 Objection.

15                   MS. BUNGARD:                  Objection.

16                       You can answer.

17   **A.      Yeah.  I don't recall.**

18   Q.     You don't recall what?

19   **A.      Instruction on positional asphyxiation.**

20   Q.     Right.  What about Detective Rhonda Gray, do you

21   know her?

22   **A.      Again, just by name.**

23   Q.     She was hired in '98.  Also said she wasn't

24   trained in positional asphyxiation.  And she

25   volunteered at page 70 of her deposition that she

Page 35

1  thinks officers in Cleveland are not adequately trained

2  regarding the dangers of positional asphyxiation.  Do

3  you agree with that?

4            MR. BACEVICE:         Objection.

5            MS. BUNGARD:         Objection.

6  **A.    I don't have an opinion.  I haven't sat down and**

7  **thought about it in that sense.**

8  Q.    Well, as we sit here today and we're thinking

9  about it, what is your opinion as to whether officers

10  have been adequately trained on positional asphyxiation

11  in Cleveland?

12            MR. BACEVICE:         Objection.

13            MS. BUNGARD:         Objection.

14  **A.    I mean, I'd rather not sit here and form an**

15  **opinion.**

16  Q.    Are you familiar with the death of Eric Garner

17  in New York?

18            MR. BACEVICE:         Objection.

19            MS. BUNGARD:         Objection.

20  **A.    I've heard of it.  I mean very minimally I've**

21  **heard of it.**

22  Q.    You followed that on the news?

23  **A.    I can't say I followed it.  I've heard of the**

24  **case.**

25  Q.    And are you aware that on August 1, 2014 the New

Page 36

```
 1   York City Medical Examiner determined that the cause of
 2   death for Eric Garner was a homicide due to neck
 3   compression and the compression of Garner's chest in
 4   prone positioning during physical restraint by police.
 5   Did you know that?
 6                 MR. BACEVICE:              Objection.
 7                 MS. BUNGARD:               Objection.
 8   A.    No.
 9   Q.    And Eric Garner was the person who said I can't
10   breathe while he was being restrained.  You remember
11   that, right?
12                 MS. BUNGARD:               Objection.
13                 MR. BACEVICE:              Objection.
14   A.    Just, like I said, I'm familiar with the case
15   from the TV.
16   Q.    And you saw LeBron James wear an I can't breathe
17   t-shirt when he was working out shortly after the
18   medical examiner ruled that way, right?
19                 MR. BACEVICE:              Objection.
20                 MS. BUNGARD:               Objection.
21   A.    I did.
22   Q.    And you saw Kyrie Irving's that said the same
23   thing, I can't breathe?
24                 MR. BACEVICE:              Objection.
25                 MS. BUNGARD:               Objection.
```

1    **A.      I honestly don't remember him wearing it.**

2    Q.      Okay.  Well, he did.  And even President Obama

3    applauded them for noting this tragic death in such a

4    public way and the fact that he said I can't breathe,

5    right?

6                    MR. BACEVICE:                    Objection.

7                    MS. BUNGARD:                     Objection.

8    **A.      I don't know.**

9    Q.      So after this big basketball star in Cleveland

10   wears I can't breathe on his shirt and there's such

11   public notice of the dangers of prone positioning

12   during physical restraint by police, did the Cleveland

13   Police take a look in any way that you're aware of at

14   their policies and training regarding positional

15   asphyxiation?

16                   MR. BACEVICE:                    Objection.

17                   MS. BUNGARD:                     Objection.

18   **A.      I don't know.**

19   Q.      Did you ever become aware of any review of the

20   policies and training regarding positional asphyxia

21   between the death of Eric Garner in July of 2014 and

22   the death of Tanisha Anderson on November 12th, 2014?

23                   MS. BUNGARD:                     Objection.

24                   MR. BACEVICE:                    Objection.

25   **A.      I don't know.**

Page 38

1   Q.      Now, there was a divisional notice.  I'm going

2   to ask you to take a look at Exhibit 40.

3                   MR. BACEVICE:              I know I

4                   did this the last depo, but re-note an

5                   objection to Exhibit 40 and objection to

6                   the questions based on Exhibit 40.

7                   MR. GERHARDSTEIN:          Okay.

8                   MR. BACEVICE:              Okay.

9   BY MR. GERHARDSTEIN:

10  Q.      Do you have it?

11  **A.      I do.**

12  Q.      Do you see the divisional notice that's marked

13  Exhibit 40?

14  **A.      I do.**

15  Q.      And it's dated November 24th, 2014.

16  **A.      M-hm.**

17  Q.      Did you assist in any way with the development

18  of this divisional notice?

19  **A.      No.**

20  Q.      Do you know who wrote it?

21  **A.      I do not.  But the chief of police signs off**

22  **on it.**

23  Q.      Right.  But he doesn't write all these, does he?

24  **A.      No.  We have a unit for that.**

25  Q.      I see in the lower left-hand corner we have some

Page 39

1   initials, and it says policy and procedures unit.  Does

2   that help at all?

3   **A.      No.  I believe that's the chief there.**

4   Q.      You're right.

5   **A.      And probably a secretary, or who's in charge of**

6   **policy and procedures.**

7   Q.      Is policy and procedures part of the training

8   unit?

9   **A.      No.**

10  Q.      Okay.  Did you get a copy of this divisional

11  notice?

12  **A.      I'm sorry?**

13  Q.      Did you get a copy of the divisional notice?

14  **A.      I don't recall.  I more than likely did.**

15  Q.      When you received it, did you connect the

16  divisional notice back to the death of Tanisha

17  Anderson?

18              MS. BUNGARD:                Objection.

19                  You can answer.

20  **A.      No.**

21  Q.      But you knew that she was encountering police

22  because there was a crisis intervention run, right?

23              MS. BUNGARD:                Objection.

24  **A.      I mean, I know from hearing that it was a crisis**

25  **intervention run and there were officers involved.**

Page 40

1    Q.    Right.

2    **A.    I don't know much otherwise.**

3    Q.    And you knew that back in November 2014, right?

4              MS. BUNGARD:              Objection.

5    **A.    I heard about it, I mean.**

6    Q.    So this coming out 10 days after or 12 days

7    after she died, did that trigger in your mind that

8    there was a need being addressed by the chief to remind

9    people of issues that come up during crisis

10   intervention?

11             MS. BUNGARD:              Objection.

12   **A.    I don't recall ever having a thought like that.**

13   Q.    You taught crisis intervention, right?

14   **A.    I did.**

15   Q.    And the fifth bullet point down says that the

16   officers should contact a supervisor if the person is

17   uncooperative but not an immediate threat to themselves

18   or others.  Is that a change in how crisis intervention

19   had been pursued prior to this time?

20             MS. BUNGARD:              Objection.

21   **A.    I would have to look at the prior policy to see**

22   **if that's a change or not.  I'm really not sure.**

23   Q.    This particular divisional notice doesn't bring

24   up the subject of positional asphyxia, does it?

25   **A.    No.  I've scanned it.  I didn't read every word,**

1   but I don't believe it brings it up.

2   Q.      And there is no general order that addresses

3   positional asphyxia, right?

4   A.      I don't believe so.

5   Q.      You also taught first aid, right?

6   A.      Years ago.

7   Q.      And you taught in the academy?

8   A.      Yes.

9   Q.      Has that changed over the years, what's taught

10  with respect to first aid?

11  A.      I'm not sure.  It's been a few years and I know

12  that it's always -- American Heart re-evaluates I think

13  every year or six months.

14  Q.      When you first taught first aid was there any

15  equipment in the cruisers to assist officers who were

16  administering first aid?

17  A.      I don't believe so.

18  Q.      And has there ever been any equipment in the

19  cruisers that assist officers who are administering

20  first aid?

21  A.      That I know of, no.  But I -- I haven't been

22  here since the department started, so --

23  Q.      What's your expectation as to what an officer

24  ought to be able to do in terms of first aid in terms

25  of assessing the need for medical intervention or any

Page 42

1    other measures; what's the expectation of an officer?

2                MR. BACEVICE:                 Objection.

3                MS. BUNGARD:                  Objection.

4    A.     To do what they were taught in the first aid

5    class.

6    Q.     And what is that?  Just a general --

7    A.     I'd have to go through the curriculum.  It's

8    been so long.  Really, I would have to go through the

9    curriculum.

10   Q.     Any idea at all what you taught in the first aid

11   class?

12   A.     I mean, you teach, you know, if somebody's

13   bleeding, pressure, things like that.  Splinting an

14   arm, a bee sting, heat.  There's a lot of topics.  It's

15   a curriculum, there's a book and that's what's taught

16   to them.

17   Q.     Is there any particular instruction regarding

18   when to call EMS?

19               MR. BACEVICE:                 Objection.

20               MS. BUNGARD:                  Objection.

21   A.     I'm really not sure.

22   Q.     Is it your expectation as a supervisor that

23   officers should know when to call EMS?

24               MR. BACEVICE:                 Objection.

25               MS. BUNGARD:                  Objection.

Page 43

1    **A.      I really can't answer for every situation, an**

2    **officer that's out there.  If an officer doesn't know**

3    **somebody's in distress --**

4    Q.    Is it your expectation that an officer would

5    call EMS if force has been used?

6                    MR. BACEVICE:                Objection.

7                    MS. BUNGARD:                Objection.

8    **A.      It would be what's in policy and what policy**

9    **states to do.**

10   Q.    Is that what's in policy?

11   **A.      I'd have to look at it.**

12   Q.    So as you sit here today you just don't remember

13   whether --

14   **A.      I don't believe policy -- there's no time frame**

15   **to -- that says you call them, if that's what you're**

16   **asking.**

17   Q.    No.  I'm just trying to figure out what are the

18   triggers for calling EMS.  If you use force, are you

19   supposed to call EMS?

20   **A.      I'd have to look at the policy and see.**

21   Q.    And is it your testimony that whenever you are

22   instructed to call EMS, there's no time frame for how

23   soon you have to call them; is that what you were

24   volunteering?

25   **A.      Right.  Like I said, I would have to look at the**

**policy to see what the exact verbiage was when calling for medical help.**

Q. If a person places pressure on the back of a subject that is prone on the ground and cuffed behind her back, is that the type of action that would trigger a duty to call EMS?

MR. BACEVICE: Objection.

MS. BUNGARD: Objection.

**A. I don't believe so.**

Q. If a person places pressure on the back of a subject who's prone on the ground and cuffed behind her back, and then after three or four minutes of administering pressure the person becomes unresponsive, is that a reason -- does that trigger a duty to call EMS?

MR. BACEVICE: Objection.

MS. BUNGARD: Objection.

THE WITNESS: Can I go ahead?

MS. BUNGARD: Yeah.

**A. If a person is unresponsive, they need medical attention and you would call for EMS.**

Q. What if they are -- what if the officer thinks they're breathing but they are unresponsive; they have gone from kicking and talking to not responding but

Page 45

1   possibly breathing, --

2               MR. BACEVICE:               Objection.

3               MS. BUNGARD:                Objection.

4   BY MR. GERHARDSTEIN:

5   Q.      -- is that a reason to call EMS?

6   A.      I mean, I can't say.  I'm not that officer.

7   Q.      All right.  So you would as a supervisor give an

8   officer discretion not to call EMS if the subject had

9   gone from talking and kicking to not moving and

10  otherwise unresponsive but maybe breathing; --

11              MR. BACEVICE:               Objection.

12              MS. BUNGARD:                Objection.

13  Q.      -- that's enough in your view as a supervisor

14  that the officer could choose not to call EMS?

15              MR. BACEVICE:               Objection.

16              MS. BUNGARD:                Objection.

17  A.      I can't give an opinion.  That's an opinion.  I

18  can't form an opinion.

19  Q.      All right.  So you don't think that that's clear

20  enough as a supervisor that in that situation the

21  officer would have a duty to call EMS?

22              MR. BACEVICE:               Objection.

23              MS. BUNGARD:                Objection.

24  A.      Again, I can't form an opinion on that.

25  Q.      When an officer does call EMS, is an officer

Page 46

1    supposed to also call for a supervisor?

2    **A.      Again, I'd have to look at the policy, but I**

3    **believe you don't have to call a supervisor if you're**

4    **calling for EMS for an individual.**

5    Q.      And is an officer authorized to call EMS, or

6    does the officer have to wait for a supervisor to come

7    to the scene before calling EMS?

8    **A.      No.  They're allowed to call EMS.  They don't**

9    **have to have a supervisor's permission.**

10   Q.      Would you agree that it's foreseeable for

11   Cleveland Police Officers that they will encounter

12   consumers that are having a mental health crisis --

13                  MR. BACEVICE:               Objection.

14                  MS. BUNGARD:                Objection.

15   BY MR. GERHARDSTEIN:

16   Q.      -- through the course of their work?

17   **A.      Sure.  Policemen can encounter someone having a**

18   **mental health issue.**

19   Q.      And how common is that; do you think?

20                  MR. BACEVICE:               Objection.

21   **A.      I don't know.  I mean, you could get statistics**

22   **from radio dispatch.  I don't know the numbers on that.**

23   Q.      In your experience what's the division of labor

24   between police and EMS when the call requests

25   assistance getting a person having a mental health

Page 47

1   crisis to the hospital or for medical care?

2                   MS. BUNGARD:              Objection.

3                   MR. BACEVICE:             Objection.

4   BY MR. GERHARDSTEIN:

5   Q.     No crime.  Just need some help getting this sick

6   person to the hospital.

7   **A.     What do you mean division of labor?  I'm not**

8   **sure what you're asking.**

9   Q.     Like who handles that kind of call; is it EMS,

10  or police?

11                  MS. BUNGARD:              Objection.

12  **A.     I don't know.  Every situation is different.**

13  Q.     Tell me about that.

14  **A.     EMS could receive it.**

15  Q.     What are the situations in which --

16  **A.     Because EMS might receive a call that we never**

17  **received.  And we might receive a call that we don't**

18  **call EMS.  So it's situational again.**

19  Q.     Have you ever had instances where EMS --

20         Have you ever had instances where you were

21  responding to a crisis intervention call and you

22  thought it would be more helpful to have EMS there

23  rather than a uniformed police presence?

24                  MS. BUNGARD:              Objection.

25  **A.     Myself?**

Page 48

```
 1   Q.      Yeah.
 2   A.      As a supervisor or as a patrolman?
 3   Q.      Either way.
 4   A.      Sure, I've been at crisis intervention
 5   situations where we've called EMS.
 6   Q.      And has there been any problem --
 7           Has there been any problem with EMS responding
 8   in a situation where you have sought their assistance?
 9                   MS. BUNGARD:                 Objection.
10                   MR. BACEVICE:                Objection.
11   A.      Not that I recall.
12   Q.      Have you ever been aware of any contention by
13   EMS personnel that mental health emergencies
14   unaccompanied by a physical medical emergency are not
15   on their turf?
16                   MR. BACEVICE:                Objection.
17                   MS. BUNGARD:                 Objection.
18   A.      I don't know.
19   Q.      You haven't seen that?
20   A.      Not that I know of.
21   Q.      In a crisis intervention encounter if an officer
22   has secured the agreement of the subject to let the
23   officer accompany the subject to the hospital, and then
24   the subject changes her mind and doesn't want to go, is
25   it appropriate for the officer to use force to take the
```

Page 49

1    subject to the hospital?

2              MR. BACEVICE:              Objection.

3              MS. BUNGARD:               Objection.

4    **A.    Again, it's situational.  I mean, I can't**

5    **explain --**

6    Q.    Tell me the type of situation where force would

7    be used and the type of situation where you'd advise

8    the officer to just back off.

9              MR. BACEVICE:              Objection.

10             MS. BUNGARD:               Objection.

11   **A.    I can't answer.  That's a judgment call at that**

12   **scene.**

13   Q.    So describe the types of scenes.  What are the

14   factors you'd want the officer to consider before using

15   force on a non-criminal, unarmed person who you are

16   encountering only because the family would like help

17   getting the person to the hospital?

18             MR. BACEVICE:              Objection.

19             MS. BUNGARD:               Objection.

20   **A.    Again, I can't form an opinion.  I feel like**

21   **you're asking for an opinion that I can't give.**

22   Q.    No.  I'm asking you to --

23   **A.    If I was at a call, I would -- if I was there I**

24   **would make a determination.  So I can't explain why**

25   **somebody else would do what they may have done in a**

1   **situation.**

2   Q.      So you've been on calls like that, right?

3   **A.      Like what?**

4   Q.      Helping people go to the hospital.

5   **A.      Yes.  I've been at calls where somebody had to**

6   **go to the hospital.**

7   Q.      And in those situations have you transported the

8   person in the zone car?

9   **A.      I have.**

10  Q.      And when you've done that, have you ever

11  encountered a situation where the subject started to

12  get in the zone car and then changed his or her mind?

13  **A.      I can't recall a specific incident.  I mean, I**

14  **know I never had every time somebody 100 percent**

15  **wanting to go, but I don't recall an incident**

16  **specifically, if that's what you're asking.**

17  Q.      If those were the only facts you had, that an

18  otherwise compliance subject sat down in the zone car

19  and then changed her mind and got up and said, I don't

20  want to go, is that reason enough to use force on that

21  subject?

22              MR. BACEVICE:                Objection.

23              MS. BUNGARD:                 Objection.

24  **A.      In a specific situation, possibly.  I don't**

25  **know.  I'd have to be in that situation to tell you**

1    **that are there times, sure, if the person has a probate**

2    **warrant to go, then that's an automatic in custody.  So**

3    **again, I can't think of a specific situation that I**

4    **found myself in.**

5    Q.    Yeah.  Well, listen to the question.  The

6    question was if that's all you know, there's no probate

7    warrant, and I'm not going to make up other facts.

8    Okay?

9          All you know is that a person who is otherwise

10   compliant sat down in the zone car, and then changed

11   her mind and said, no, I don't want to go, is that

12   reason enough to use force on that person to require

13   her to go with the officer to the hospital?

14                  MR. BACEVICE:              Objection.

15                  MS. BUNGARD:               Objection.

16                      You can answer.

17   **A.    In my opinion if I've determined as the officer**

18   **that she needs to go to the hospital and she does**

19   **become uncooperative, yes, you could end up having to**

20   **go hands on with somebody.**

21   Q.    And is that what you taught officers when you're

22   teaching crisis intervention?

23                  MR. BACEVICE:              Objection.

24                  MS. BUNGARD:               Objection.

25   **A.    I don't recall talking about a specific incident**

1   **and if you, you know, encountered a resistant person.**

2   **But I mean, I know it comes up in crisis intervention**

3   **training.  We're allowed to determine that that**

4   **person's going to the hospital, and then we use**

5   **whatever tactics are necessary in order to take them**

6   **into our custody.**

7   Q.    If a person sits in the zone car, and then

8   changes her mind and decides that she doesn't want to

9   go with the officer to the hospital, is it appropriate

10  to attempt verbal persuasion of that person, or is it

11  -- does the officer have discretion to use force

12  immediately?

13                  MR. BACEVICE:              Objection.

14                  MS. BUNGARD:               Objection.

15  **A.    Again, that's a situation you find yourself in.**

16  **So I can't form an opinion on the officer as you're**

17  **speaking of.**

18  Q.    Well, did it --

19  **A.    We are allowed to go hands on with individuals**

20  **when there's no criminal activity but we're still**

21  **taking the person in our custody.  Yes, we're allowed**

22  **to go hands on with them.**

23  Q.    And is the decision to go hands on, can

24  expediency be a reason --

25                  MR. BACEVICE:              Objection.

Page 53

1        MS. BUNGARD:                    Objection.

2   BY MR. GERHARDSTEIN:

3   Q.     -- to go hands on?

4   **A.     Possibly if there's a threat there.**

5   Q.     What's the --

6   **A.     There's so many factors --**

7   Q.     Yeah.

8   **A.     -- in a situation.  Every situation is**

9   **different.**

10  Q.     I'm not adding threats to it.  The only thing

11  I'm trying to talk about is a person who says they

12  don't want to go to the hospital.  There's no threat.

13  There's no weapon.  There's no crime.  The only thing

14  is they don't want to go to the hospital.

15                  MR. BACEVICE:                    Objection.

16  **A.     There could be a threat at any time.  So that's**

17  **-- I don't know what you're asking me.**

18  Q.     So if the officer thinks there could be a threat

19  developing or if the officer is afraid there might

20  become a threat, he can use force?

21                  MR. BACEVICE:                    Objection.

22                  MS. BUNGARD:                    Objection.

23  Q.     He doesn't really have to have a threat?

24  **A.     No.  There could or couldn't be.  It's a**

25  **determination while you're there in that incident.**

1  **Every situation is different, so I don't know.**

2  Q.    So after Tanisha Anderson was taken to the

3  hospital, the officers involved in the encounter did a

4  walk-through and explained what happened to officers

5  who were investigating the use of force, I assume in a

6  manner similar to the officers you investigated that

7  used the taser or did the pepper spray.  Okay.

8  **A.    I wouldn't know if they did or didn't.**

9  Q.    Okay.  So the one detective who attended the

10  walk-through was Detective Borden, and I want to tell

11  you what he said happened.

12        So he's doing a walk-through with the officer

13  who was engaged with Tanisha Anderson.  And this is how

14  he reported it.  She had sat in the car.  She wouldn't

15  put her legs in the car.  She tried to convince -- they

16  tried to convince her to get all the way in the car.

17  At one point she got back up out of the car, and then

18  she started to resist their efforts to take her to the

19  hospital.  They get into a wrestling match I guess

20  would be the best way to put it.  And they wound up on

21  the ground.  And then she wound up on her face, and

22  they wound up handcuffing her because she was kicking

23  and swinging at the officers and they were afraid that

24  she was going to hit them or hurt herself.

25        So what do you mean by wrestling match?  They

1   were trying to gain control of her and she didn't want

2   to comply with what they wanted her to do.  She was

3   fighting them, pulling her arms away, swinging at them,

4   kicking at them.  All right.  So that's what one

5   detective heard in this walk-through.

6         And then another one who was at the walk-through

7   summarized what happened, which is at Exhibit 17, the

8   victim still would not comply and enter the police

9   vehicle.  She then collapsed to the ground, laid on her

10  back and began kicking at the officers.  She then

11  rolled onto her stomach.  PO Aldridge states he placed

12  his right knee onto the victim's right shoulder blade

13  to control her and keep her down.  He described

14  displacing his weight by keeping his left leg to the

15  side and off the victim.

16        PO Myers described controlling the victim by

17  holding the victim's left arm down and grabbing the

18  victim's left leg and holding it up to prevent the

19  victim from back-kicking them.  After three to four

20  minutes the victim ceased her actions and appeared to

21  fall asleep.

22        So just given what I've relayed to you from

23  these officers and these detectives, what they heard

24  during the walk-through as described by these officers,

25  was the application of force to the back of the cuffed

1    and prone Tanisha Anderson for three to four minutes

2    consistent with the training?

3                    MR. BACEVICE:                Objection.

4                    MS. BUNGARD:                 Objection.

5    **A.      There isn't a time frame.  We don't ever put a**

6    **time frame on anything, so I can't say three or four**

7    **minutes was consistent or not.  You're not given a**

8    **certain amount of time that things occur in.**

9    Q.     Okay.  So your answer is it is consistent?

10   **A.      What is consistent?**

11                   MS. BUNGARD:                 Objection.

12   BY MR. GERHARDSTEIN

13   Q.     So is the force that was applied, as you heard

14   it described in what I read to you, consistent with how

15   you trained officers when you supervised trainers of

16   officers who are engaged with people on mental health

17   crisis runs?

18                   MR. BACEVICE:                Objection.

19                   MS. BUNGARD:                 Objection

20                   THE WITNESS:                 Can I

21                   answer?

22                   MR. BACEVICE:                Sure.

23   **A.      If officers have a person that's kicking,**

24   **flailing, afraid they're going to get hit, yes, they**

25   **are allowed to take the person to the ground in the**

Page 57

1    prone position, handcuff them, restrain them, whatever

2    the case may be, because there is a threat there at

3    that point.

4         So from what you described did officers do

5    things they were allowed to do?  Yes.  Time frame, I

6    can't comment on because nothing's -- we don't put

7    things in time.

8    Q.    Right.  Well, if I understand this, and correct

9    me if I'm wrong, it sounds like what you're saying is

10   they aren't taught that any particular time frame must

11   be honored; so therefore, you can't say that putting

12   the pressure on for three to four minutes is a

13   violation of something they were taught; is that fair?

14              MR. BACEVICE:              Objection.

15              MS. BUNGARD:               Objection.

16   A.    It's fair to say there's nothing in writing that

17   I know of that says there's a time frame, which means

18   there wouldn't be anything to violate.

19   Q.    Okay.  Now, another thing that happened and that

20   was learned about was the fact that the victim -- when

21   I ended the narrative I said she appeared to fall

22   asleep.  And by looking at both what was said at the

23   walk-through and by reviewing the radio records, the

24   summary that went into this report says a review of the

25   CCS CAD notes revealed a supervisor was requested at

Page 58

1   23:20 hours and EMS was requested at 23:34 hours,

2   indicating the victim was in a prone position for a

3   minimum of 14 minutes.

4        And they also said that both officers report the

5   victim was on her stomach, handcuffed behind her back

6   until the sergeant arrived on scene.  Upon her arrival,

7   she moved the victim onto her back and requested EMS.

8        So it looks like from their research on this

9   that officers let Tanisha Anderson lay on her stomach,

10  cuffed behind her back, unresponsive or they said

11  appeared to be sleeping for 14 minutes.  And then

12  during that time they called a supervisor.  The

13  supervisor then rolled her over and called EMS.

14       Is that consistent, that type of conduct

15  consistent with the training that officers have

16  received about subject control and first aid?

17                  MR. BACEVICE:              Objection.

18                  MS. BUNGARD:               Objection.

19  **A.    I don't know.  I mean, you're talking a timing**

20  **thing again.**

21  Q.    Okay.  Can you help me understand a situation

22  where leaving somebody who is unresponsive for 14

23  minutes on their stomach with their hands cuffed behind

24  their back would be reasonable?

25                  MR. BACEVICE:              Objection.

1              MS. BUNGARD:                    Objection.

2    **A.     I wasn't there; I can't comment on that**

3    **situation.**

4    Q.     So as you hear it you also can't say that it

5    violates training?

6    **A.     I can't say it violates training, no.**

7              MR. BACEVICE:                   Objection.

8              MS. BUNGARD:                    Can we

9              take a few minutes?

10             MR. GERHARDSTEIN:               Sure.

11                (Thereupon, there was a recess.)

12             MR. GERHARDSTEIN:               All right.

13             So I have no more questions.

14             MS. BUNGARD:                    You have

15             the right to read the transcript before we

16             can, to check for any typographical

17             errors.  She does a very good job, so

18             there probably won't be any.  But you

19             absolutely have that right.

20                They will send me a letter telling me

21             that you would be notified to go to her

22             office to read it.  You have 30 days from

23             the date the letter is received, or you

24             can waive that right.  You will get to see

25             the transcript anyways if you choose to.

1          THE WITNESS:              You don't

2     have any concern?

3          MS. BUNGARD:              No.  I

4     don't have any concerns.  So you need to

5     let her --

6          THE WITNESS:              Then I'm

7     okay with that.

8          MS. BUNGARD:              So you say

9     I waive.

10          THE WITNESS:              I waive.

11                    - - -

12          (DEPOSITION CONCLUDED.)

13            (SIGNATURE WAIVED.)

14                    - - -

15

16

17

18

19

20

21

22

23

24

25

1                      CERTIFICATE

2    State of Ohio,      ) SS:

3    County of Cuyahoga.  )

4        I, Kristine M. Esber, a Notary Public within and
     for the State of Ohio, duly commissioned and qualified,
5    do hereby certify that the within-named witness, SGT.
     JENNIFER KEMER, was by me first duly sworn to tell the
6    truth, the whole truth and nothing but the truth in the
     cause aforesaid; that the testimony then given by her
7    was reduced to stenotypy, and afterwards transcribed by
     me through the process of computer-aided transcription,
8    and that the foregoing is a true and correct transcript
     of the testimony so given by her as aforesaid.

9

10       I do further certify that this deposition was
     taken at the time and place in the foregoing caption
11   specified.

12       I am not, nor is the court reporting firm with
     which I am affiliated, under a contract as defined in
13   Civil Rule 28(D).

14       I do further certify that I am not a relative,
     employee or attorney of either party, or otherwise
15   interested in the event of this action.

16

17       IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Cleveland, Ohio, on
18   this 11th day of May 2016.

19

20

21       _____
         Kristine M. Esber, Notary Public
22       in and for the State of Ohio.
         My Commission expires November 29, 2020.

23

24

25