# Cleveland Division of Police
## Internal Affairs Unit
### Investigation Tracking Sheet

IAU Case #14-086

Victim/Complainant(s): Tanisha Anderson

Officer(s) Involved: Aldridge#280/Meyers#674

Nature of Allegation: UDFIT 14-18 re: In Custody Death

| | | | | |
|---|---|---|---|---|
| UDFIT: X | FATAL: | NON-FATAL: | NO-INJURY: | SUICIDE: |
| ACCIDENTAL: | IN-CUSTODY: | | | |

**HOMICIDE UNIT #** _____

DATE OVERSIGHT REPORT COMPLETED & DELIVERED TO BSI: _____

DATE REFERRED FOR TACTICAL REVIEW: _____

Location of Incident: 1374 Ansel                                Date: 11/13/14

Assigned Investigator: Sgt Robert Tucker#9063                   Assigned: 11/13/14

Reviewed by OIC: _____                                        Date: _____

Comments/Recommendations:

On Wednesday November 12, 2014, at approximately 2013 hours, the Cleveland Police Communications Center (CCS) received a call from the resident at 1372 Ansel Road. The caller states that that his sister, who has a history of psychiatric problems, is acting belligerent, and he and his family are afraid of her behavior. The CCS call taker creates a code #3 assignment (intermediate dispatch) and forwards it to the dispatch channel (cad#2014-358914).

The dispatcher assigned to the Third District dispatch position, broadcast the assignment to zone car 3A25 [PO's Muniz#440/McGrath#2219] at 2035 hours. They acknowledge the assignment and accept it. At approximately 2041 hours, the residents at 1372 Ansel call back to see if the police were responding. They are told that the police would be out, but could not give a specific time. According to their duty report, 3A25 arrived in the area of 1372 Ansel, at 2043 hours.

Almost simultaneous to their arrival, 3A25 notified the dispatcher that they did not see the female described to them during the broadcast. They asked the dispatcher to call the resident back for additional information. In the interim, a higher priority assignment came into the dispatch center, and 3A25 was told to hold the Ansel assignment in abeyance. After disseminating the higher priority assignment, the dispatch center called the Ansel Road residents informing them of the delay. Despite the delay the dispatch center assured the residents that the police would be responding as soon as possible. 3A25 then responded, as assigned by CCS, to 1364 E. 88th where they received information from an assault victim (cad#8931). Upon completion, 3A25 returned to Ansel Road [2131 hrs.], to address the initial complaint involving a men- ¹ female.

PLAINTIFF'S EXHIBIT 75 9-16-16 CARNES

035225

Attachment A

# Cleveland Division of Police
## Internal Affairs Unit
Investigation Tracking Sheet

IAU Case #14-086

According to internal interviews with Muniz and McGrath, they interviewed several of the Ansel Road family members, while at the same time focusing their attention on the female who was the subject of the complaint. This female, later identified as Tanisha Anderson, was observed to be calm and polite during this response. This contrasted with the family's assertions of erratic behavior by Tanisha. Nevertheless, the officers after interviewing Tanisha felt that there was insufficient support their intervention based on Divisional policy and procedure [GPO 3.2.06].

Internal interviews by Muniz stated Tanisha did not appear to be homicidal or suicidal. Muniz stated they asked Tanisha had she been taking her medication and she answered in the affirmative. Muniz stated that they asked her did she want to go to the hospital and she answered in the negative. Consequently, the officers determined that the proper course of action would be to have the family seek relief through Probate Court. The officer's duty report states they left Ansel at 2159 hours, and disposed the assignment by telling the dispatcher that it was temporarily settled and included the name [Johnson] on their duty as the name of the person the officers talked to.

Meanwhile, at 2246 hours, the residents at 1374 Ansel called the dispatch center again, with a similar complaint. Dispatcher Terese Mallet#21, who has received Division sponsored Crisis Intervention Training [CIT], fielded the call. She spoke with the caller and based on the contents of that conversation, created another code three assignment [cad#2014-359019]. She forwarded the call to the Third District dispatch station and it was broadcasted to zone car 3B35 [PO's Aldridge#280 (FTO-certified) and Meyers#674 (Probationary)] at 2247 hours. It took four minutes for these officers to arrive [2251 hours]. While responding, internal interviews by Aldridge reveal that he received information regarding 3A25's previous response to the same location.

Upon their arrival on Ansel, officers state they were met by family members who gave them preliminary information about the reason for the call. They state while receiving this information, they noticed Tanisha pacing around, making exaggerated and impulsive gestures, and sweating. All signs of aggression as taught by the Division sponsored CIT training, of which PO Aldridge#280, was a recipient [see certificate July 2011]. Aldridge noticing the behavior began to try to communicate with Tanisha. Aldridge states he asked Tanisha's brother, Joe, to allow him some latitude with her, because Joe, according to other family members, had been agitating Tanisha prior to the police arriving [see Johnson/Green interview's].

Aldridge states Tanisha began to go upstairs and officers and other family members followed. Aldridge states that the family warned them that there was a door, located in an upstairs room that Tanisha might try to use as an exit to get away. They were told this exit was unsafe. Officers state they followed Tanisha from room to room, upstairs to downstairs, all while trying to communicate with her. Aldridge states he wanted to convince Tanisha to accompany them to the hospital for a mental health assessment. Internal interviews reveal that Aldridge, while talking with Tanisha, guided her through some controlled breathing exercises, in an attempt to get her to calm down. These de-escalation techniques paid off when they got Tanisha to voluntarily follow them, un-handcuffed, to the police car located in front of the house. Aldridge stated their intention was to transport Tanisha to the nearest hospital

At some point, Tanisha expressed apprehension about getting into the police car. Internal interviews reveal that Tanisha began to resist getting in the police car [see Aldridge, Meyer's, Jacob Johnson and Mauvion Green interviews]. During the exchange between Tanisha and the officers, they decide to handcuff Tanisha. After successfully handcuffing her, they again try to insert her into the police vehicle. On both occasions, when Tanisha first got to the car and now, Aldridge states he pushed while Meyers pulled from inside the driver's side back seat of the zone car. Both officers and other family members reported hearing Tanisha counting out loud [1, 2, 3, 4, and 5] and saying the Lord's Prayer while they tried to get her into the police car.

035226

# Cleveland Division of Police
## Internal Affairs Unit
Investigation Tracking Sheet

IAU Case #14-086

During his internal interview, Aldridge admits that during this push and pull session, at one point; he brandished his Taser, pointing the red dot toward Tanisha's center body. He admits to threatening to discharge it. He stated he told Tanisha he would use it if she continued to resist their efforts at getting her into the car. [*Taser downloads after the incident reveal that the Taser was not discharged]. Finally, after unsuccessful attempts to get her in the vehicle, officers state they stopped trying and began to reassess their strategy. It was at this point that Aldridge states Tanisha, who was standing facing him, fell rear end first onto the zone car seat, and then onto the ground. Meyers, who was still in the back seat of the police car, states "it looked like she just fell." Neither officer reported seeing her hit her head or any part of her body against the police car when she fell; neither officer report using any type of force to propel her to the ground.

Internal interviews reveal that once on the ground, Tanisha who was on her back, began to kick at officers. Aldridge reports that somehow Tanisha was able to roll onto her stomach and they secured her in an attempt to get her to calm down. When asked to elaborate, Aldridge states he placed one knee onto Tanisha's shoulder area, while Meyers held Tanisha legs; both officers report being in this position for several minutes [both officers demonstrated how the held Tanisha in the video/interview].

Other interviews state that officers got on top of Tanisha [see Jacob Johnson interview], but from his vantage inside the house Johnson state he could not see what part of Tanisha's body was being held down. After several minutes passed, with Tanisha constantly kicking, the officers report that Tanisha appeared to fall asleep abruptly; both officers report inquiring with Tanisha's brother about this new development. Both officers report that the brother, who was outside the whole time, made a statement to the effect that this was not uncommon because of the medication she takes.

Internal interviews reveal that officers perceived her breathing sounds as heavy and labored, like "snoring". Both officers report seeing Tanisha's chest rise with inspirations. Both officers and family member's interviews reveal that Aldridge checked Tanisha pulse several times after the snoring sounds started. It was also at this time that audio tapes reveal that a supervisor was requested [2321 hours]. Aldridge states he called for a supervisor to determine whether they needed to complete a ULLF report because of the pushing and pulling or the restraint that they used to hold Tanisha down while attempting to get to calm down and stop kicking.

Sgt. Bottone#9053, the Sector Supervisor who answered 3B35's call, duty report states she received the call to respond to Ansel at approximately 2320 hours. Upon her arrival, witness's interviews state she checked Tanisha's pulse and recommended that EMS be called. EMS #10 and Fire responded arriving at 2341 hours. Internal run reports reveal that EMS medics determined the patient to be in cardiac arrest and subsequently transported her to Cleveland Clinic while performing chest compressions. Medical personnel at the Cleveland Clinic pronounced Tanisha Anderson expired at 0030 hours.

After Tanisha expired, an UDFIT light was initiated, by the Divisional chain of command. Commander Brian Heffernan, of the Integrity Control Unit, was notified and had members of the Integrity Control Unit respond to monitor the Use of Deadly Force Investigation Team [UDFIT] investigation. He provided the location of 1374 Ansel Road and advised me that the assignment was regarding a person who expired while in custody of Cleveland Police.

The UDFIT performed the required on-scene investigation and Sgt. Tucker, from the Internal Affairs Unit, was given primary responsibility for the over-sight and administrative review of the case. While waiting for the UDFIT to conduct the required investigation, on January 8, 2015, the Cuyahoga County Medical Examiner's office, released the report from Tanisha Anderson's post mortem examination. Dr. Keep, Deputy Medical Examiner for Cuyahoga County, reported the official cause of death to be "sudden death associated with physical restraint in a prone position in association with ischemic heart disease and bi-polar disorder with agitation; other condition obesity." The manner of death has officially

# Cleveland Division of Police
## Internal Affairs Unit
Investigation Tracking Sheet

IAU Case #14-086

been ruled homicide [CCME #2014-0919]. As a consequence, the Lt. Timm, OIC of the UDFIT, titled this incident "Homicide/Crisis Intervention/In Custody Death."

Due to the sensitive nature of this incident, the Internal Affairs Unit has been asked to expedite the administrative review associated with this case. That said Sgt. Tucker began the review with as much information as he could gather. The UDFIT provided several videos of member and witness interviews [see Tuckers report]. Sgt. Tucker compared and contrasted those interviews with the Division's policies and procedures governing the Use of Force and Dealing with the Mentally Ill.

He also gathered medical reports gleaned from EMS records and examined Cleveland Police Academy protocols for handcuffing techniques. The Division sponsored Crisis Intervention Training, which is taught to many Cleveland police officers, under the auspices of The Cuyahoga County Alcohol, Drug Addiction, and Mental Health Services Board [ADAMHS], was also reviewed. In addition, Tucker reviewed the CCS audio tapes, and the CCS audit trail. Finally, copies of Aldridge's CIT training and FTO training certificates were examined.

Sgt. Tucker was involved with this case from the beginning. He responded to the Ansel Road address on the morning of November 13, 2014, as part of the UDFIT, and performed oversight while investigators gathered evidence. He monitored the progress of the investigation, while it meandered through its normal investigatory process. Consequently, on January 26, 2015, as recommended by the chain of command, Sgt. Tucker submitted an expedited administrative review of the incident.

He concluded that based on all the information available to him at the time, the facts of the investigation indicate that officer Aldridge#280 failed to notify EMS in a timely fashion, when it became apparent that Tanisha Anderson needed medical treatment. He also made it a point to identify Aldridge, as being the senior officer in this incident. Aldridge was assigned as Meyer's Field Training Officer [Meyer's was still on probation at this time]. This was the first time either officer worked together. Tucker recommended administrative discipline for violation(s) of the following Divisional policies and procedures.

GPO 2.1.01 [V, A] Use of Force: which states that members shall obtain medical assistance for people appearing injured or complaining of injury.

Manual of Rules 2.03, 2.04, 4.14: Tucker also recommended discipline for rule violations associated with rule compliance and assisting injured or sick people.

I concur with Tucker's recommendations with one caveat. During the internal interviews, Aldridge states he made several inquiries about Tanisha Anderson's physical state while she lay on the ground. Aldridge says and witness reports confirm that he checked Tanisha's pulse on several different occasions. Aldridge states he monitored Tanisha's respirations, tactilely and visually while she lay on the ground. Both Aldridge and Meyer's state they were told by Anderson's brother that it was not uncommon for Tanisha to "crash" abruptly, due to the effects of her medication.

So while, Aldridge and Meyer's may have misjudged the critical nature of notifying EMS sooner, it is clear that they took some action. Additionally, Tucker did not include PO Meyer's in his recommendation for discipline. Each officers actions should be judged based on objective reasonableness, therefore Meyer's, as inexperienced as he is, cannot be left out of this examination. Consequently, his exposure, albeit limited, must be part of this review. Nevertheless, based on all the information available to me at the time of this review, I recommend the case be submitted to the chain for ascending re-

# Cleveland Division of Police
## Internal Affairs Unit
### Investigation Tracking Sheet

IAU Case #14-086

view. If it is determined that Tucker's recommendations are sustained, I recommend Officer's Aldridge and Meyer's be disciplined for, but not limited to, the recommendations outlined in Tuckers review.

- Note: the review for criminality remains in the hands of the Cuyahoga County Prosecutor's Office and no ruling has been made as of this time.
- Additionally, because of the expedited nature of this review, ULLF reports associated with this incident are unavailable to be reviewed at this time.

Consulted:

GPO 3.2.06: Handling the Mentally Ill
Cleveland Accu-Weather Service for November 12/13, 2014
Ohio Revised Code 5122.01
CIT Certified CCS personnel
OPOTC Basic Training for Crisis Intervention [Academy]
ADAMHS Crisis Intervention Training Manual [pages 1-19; Thursday/section The Cop and the Therapist]

Respectfully,

Monroe Goins, Lt #8498

IAU OIC's Signature: _____

Reviewed by Commander of BIC: Brian Heffernan # 6118

Comments/Recommendations: This administrative review was completed without the benefit of the entire Homicide file. Because of this fact; the report summarizing the interview with JOELL ANDERSON, the ULLF report (and investigation), and the official DDA sheet faxed to radio are not available. The interview of ANDERSON may be important. By several accounts Mr. Anderson was present for most if not all of the incident.

The interviews of the two juveniles conducted by Homicide are noteworthy as their version of the incident is consistent with what was reported by the Officers in their Garrity statements.

Based on my review I find the following deficiencies in the initial and follow up investigation as forwarded:

# Cleveland Division of Police
## Internal Affairs Unit
### Investigation Tracking Sheet

IAU Case #14-086

For whatever reason, PO Aldridge #280 is not listed on the record provided by the police academy of CIT certified Officers. It has been verified that Officer Myers #280 is certified. Sgt Bottone the on scene supervisor is also certified. This needs to be addressed by the Training Section.

I did not see an interview or reference of Sgt Bottone being interviewed by Homicide. This interview if not yet completed is necessary, particularly due to the fact that Sgt Bottone initiates the call for EMS to respond among other reasons.

Officer Muniz was assigned as PO McGrath's FTO despite not being certified as an FTO. This also may be against policy.

PO Aldridge # 280 is guided through the interview with the advantage of leading questions by UDFIT.

I recommend these areas are considered once the entire UDFIT file is received. Additional recommendations for corrective action and / or discipline can be addressed by Sgt Tucker at that time.

For now, I agree with discipline as recommended for PO Aldridge #280 for failure to notify EMS in a timely manner.

BIC Commander's Signature: _RCWL Cmdr_ 1/31/15

Date Sent to Chief for Review: 2/2/15    Delivered By: 1118

Received by Signature: _JD DC_

Chief's Executive Assistant's Comments/Recommendations: Retraining on subject control w/ positional asphyxiation. GPO 2.1.06 "abnormal breathing can be an indication of positional asphyxia the officer shall immediately reposition the person to avoid asphyxia. GCO DC

# Cleveland Division of Police
## Internal Affairs Unit
Investigation Tracking Sheet

IAU Case #14-086

Chief's Orders:    File - No Further Action: _____    Referred to Prosecutor: _____

Directed to Grand Jury: _____    Administrative Charges Only: **X**

Chief's Directions: SGT. CARNEY, PREPARE CHARGES FOR BOTH OFFICERS

Chief's Signature: _[signed]_ , CHIEF    Date: 2-2-15

→ BASED ON THIS INVEST. & FORWARD TO SAFETY DIRECTOR FOR A HEARING & DISPOSITION UP TO AND INCLUDING TERMINATION. RETURN AFTERWARDS FOR REVIEW OF INVESTIGATIVE LAPSES BY UDFIT.

Received at the Prosecutor's Office: _____    Date: _____

Delivered to Prosecutor's Office By: _____    Date: _____

Prosecutor's Ruling: _____

Prosecutor's Signature: _____    Date: _____

Date Sent To Grand Jury: _____    Date Presented: _____

Date of True Bill: _____    Date of No Bill: _____

Log of Hearings/Court Appearances – Date – Location – Disposition – Name of IAU Member Attending:

035231

# Cleveland Division of Police
## Internal Affairs Unit
Investigation Tracking Sheet

IAU Case #14-086

Final Disposition: _____ Date: _____

OIC's Signature: _____ Badge # _____ Date: _____